UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:15-cv-01743-MMD-NJK |
| Plaintiff, | ORDER |
| v. | |
| 400 ACRES OF LAND, more or less, situate in Lincoln County, State of Nevada; and JESSIE J. COX, *et al.*, | |
| Defendants. | |

I.    **INTRODUCTION**

In this eminent domain action, the Court has found that the United States' taking of property ("the Property") for the purpose of operating the Nevada Test and Training Range ("NTTR"), a military test and training facility at Nellis Air Force Base, is for a congressionally authorized public use. (ECF No. 111 at 1.) Accordingly, the only issue that remains is just compensation.

Before the Court are 18 motions involving evidentiary issues mainly relating to the parties' experts' opinions. (ECF Nos. 385, 386, 390, 391, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 406, 407, 408, 409.)

The Court grants the following motions: the government's combined motion for a property viewing and to appoint a land commission (ECF No. 401); the government's motion to exclude the expert opinion and testimony of Danny and Joe Sheahan (ECF No. 402); the government's motion to exclude the expert opinion and testimony of George Harris (ECF No. 404); the government's motion to exclude evidence of sales to the government (ECF No. 406); the government's partial motion to reconsider excluding all evidence regarding online surveys (ECF No. 407); and the government's motion to exclude use of the income capitalization approach to valuation (ECF No. 408).

The Court denies the following motions: Landowners' motion regarding the standard of admissibility that applies in this case (ECF No. 385); Landowners' motion to

exclude the expert opinion and testimony of Warren Neville (ECF No. 390); Landowners' motion to exclude all evidence of environmental contamination (ECF No. 395); Landowners' motion to confirm uses of unpatented land (ECF No. 396); Landowners' motion to establish condition of the Property related to water rights (ECF No. 397); Landowners' motion to exclude the expert opinion and testimony of Nathan Moeder (ECF No. 398); Landowners' motion to exclude the expert opinion and testimony of Marc Springer (ECF No. 399); and the government's motion to exclude valuation evidence premised on tourism use (ECF No. 409).

The Court grants in part and denies in part Landowners' motion to exclude the expert opinion and testimony of Dr. Donald Singer (ECF No. 400).

The Court denies as moot the following motions: Landowners' motion for summary judgment on the range of values for just compensation that can be presented to the factfinder (ECF No. 391); Landowners' motion regarding access to and view from the Property (ECF No. 386); and the government's motion to exclude evidence and argument related to active mining as the highest and best use of the Property (ECF No. 403).

## II.    RELEVANT BACKGROUND

The United States filed a Complaint and Declaration of Taking on September 10, 2015, to acquire 400 acres of property located within the NTTR consisting of a group of patented and unpatented mining claims known as the Groom Mine. (ECF No. 1 (Complaint); ECF No. 1-4 (Legal Description); ECF No. 2 (Declaration of Taking).) The Property is in the Groom Lake Valley about 7 miles from the area popularly known as Area 51. (ECF No. 132 at 5.) The Property is the only privately owned property that has an unobstructed view of Area 51. (*Id.* at 16.) Landowners' family has owned the Property since about 1885, long before the United States began to use the nearby property. (*Id.* at 4-5.)

On September 16, 2015, the Court granted the United States immediate possession of the Property. (ECF No. 14 at 1.) Landowners filed their Answer on November 6, 2015. (ECF No. 53.) The United States deposited the estimated

compensation to the Court in the amount of $1,200,000 (ECF No. 10 at 1), and the funds were released to Landowners on March 9, 2016 (ECF No. 85 at 1-2). On October 5, 2016, the Court determined that the "taking is for a congressionally authorized public use identified in the United States' Complaint [ECF No. 1-3], and is legally valid." (ECF No. 111 at 1.)

The amount of just compensation based on the Property's highest and best use is the sole remaining issue in this case. Landowners have valued the Property based on two highest and best uses: mining and as a commercial tourism site for viewing Area 51. The government has valued the Property based on its existing use.

The Court begins by rejecting Landowners' request for a relaxed standard of admissibility in this case, then denies the government's motion to exclude all valuation evidence premised on a commercial tourism use. The Court then grants the government's combined motion for a property viewing and to appoint a land commission and grants the government's motion to exclude testimony based on the income capitalization approach to valuation. The Court then denies Landowners' motions to establish certain facts about the Property before considering the parties' motions to exclude certain expert witness testimony. The Court denies the Landowners' motions and grants the government's motions, with the exception of Landowners' motion to exclude the opinion of Dr. Donald Singer, which the Court grants in part and denies in part. Finally, the Court grants the government's two motions for reconsideration of earlier orders and denies the parties' remaining motions as moot.

## III.  LANDOWNERS' MOTION REGARDING THE STANDARD OF ADMISSIBILITY THAT APPLIES IN THIS CASE (ECF NO. 385)[1]

The Court will deny Landowners' motion regarding the standard of admissibility that applies in this case for the following reasons.

///

---

[1]The Court has reviewed the response (ECF No. 426) and reply (ECF No. 469) related to this motion. The Court also heard oral argument on this motion on July 1, 2019. (ECF No. 493.)

Landowners argue that the Court should apply a "widened special purpose standard of admissibility" to every pretrial motion and evidentiary ruling in this case because the Property is so unique. (ECF No. 385 at 23.) Landowners do not expressly define this standard in their motion, though it seems they are asking the Court to admit all relevant evidence of value, regardless of methodology or reliability. Landowners contend that the Court need not "agree with the expert's data and the method for applying that data before expert testimony is admissible." (*Id.* at 4.) Landowners also assert that "[a]ll facts which would influence a person of ordinary prudence, desiring to purchase the property, are admissible." (*Id.* (alteration in original) (quoting *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1400 (9th Cir. 1986).)

The Court agrees with the government that Landowners' requested relief would require the Court to abandon its gatekeeping function. (*See* ECF No. 426 at 3.) The Court also observes that Landowners' request is similar to a request the Court considered and rejected in an earlier order. (*See* ECF No. 241 at 3-5.) As the Court previously decided, Landowners' requested relief is overbroad and does not reflect the role of the Court in serving its gatekeeping functions.

Accordingly, Landowners' motion regarding the standard of admissibility that applies in this case is denied.

## IV. GOVERNMENT'S MOTION TO EXCLUDE VALUATION EVIDENCE PREMISED ON TOURISM USE (ECF NO. 409)[2]

The Court denies the government's motion to exclude valuation evidence premised on tourism use for the following reasons.

### A. LEGAL FRAMEWORK

Just compensation "includes all elements of value that inhere in the property" but cannot exceed fairly determined market value. *Olson v. United States*, 292 U.S. 246, 255

///

---

[2]The Court has reviewed the response (ECF No. 447) and reply (ECF No. 486) related to this motion. The Court also heard oral argument on this motion on July 1, 2019. (ECF No. 493.)

(1934). The factfinder may consider both actual and potential uses of the property. *See id.* at 255-56. A potential future use may be considered if it is the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the near future. *See id. Olson* thus "requires a showing of reasonable probability that the land is both physically adaptable for such use and that there is a need or demand for such use in the reasonably near future." *United States v. 341.45 Acres of Land*, 633 F.2d 108, 111 (8th Cir. 1980). The factfinder should consider how the potential future use affects market demand for the property, but the potential future use does not necessarily constitute the measure of value. *See Olson*, 292 U.S. at 255.

The factfinder should not consider any elements of value that "depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable." *Id.* at 257. Consideration of those elements would "allow mere speculation and conjecture to become a guide for the ascertainment of value." *Id.*; *see also Wash. Water Power Co. v. United States*, 135 F.2d 541, 543 (9th Cir. 1943) (citing exclusionary rule from *Olson*).

Importantly, if determining reasonable probability of a potential future use requires weighing evidence and evaluating credibility, the evidence should be submitted to the jury. *See United States v. 100 Acres of Land*, 468 F.2d 1261, 1267-68 (9th Cir. 1972).

## B.    DISCUSSION

The Court will deny the government's motion because Landowners have shown an evidentiary basis from which a rational factfinder could infer that the use of the Property as an Area 51 tourist destination is reasonably probable. The Uniform Appraisal Standards for Federal Land Acquisitions ("UAS" or "Yellow Book") require that a highest and best use is physically possible, legally permissible, financially feasible, and results in the highest value. *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1181 (9th Cir. 2000). The government has not disputed that Landowners' proposed highest and best use satisfies the first two elements of physically possible and legally permissible. (*See* ECF No. 447 at 6-7.) And Landowners have introduced evidence that the use is financially

5

1  feasible—they have identified comparable tours, nearby alien/Area 51-themed hotels and

2  businesses, opinions of nearby business owners and brokers, consumer surveys, and

3  expert opinions. (*See id.* at 8-11.) Landowners also have introduced evidence that the use

4  is the most profitable use—appraisals by expert witnesses Richard Roddewig and Tio

5  DiFederico. (*See id.* at 11-12.)

6      The government presents a strong case for doubting that commercial tourist use is

7  reasonably probable. For example, neither the former owners nor anyone else ever tried

8  to convert the Property to tourist use; Landowners have not identified a tour operator;

9  Landowners' experts assumed away problems related to environmental contamination

10  and permitting; and the remote, isolated location makes large-scale commercial traffic to

11  the Property difficult. (ECF No. 409 at 9-21.) But the Court would be required to weigh

12  evidence and evaluate credibility to determine whether Landowners' proposed use is

13  reasonably probable. The Court cannot. *See 100 Acres of Land*, 468 F.2d at 1267-68.

14      Accordingly, the Court denies the government's motion to exclude valuation

15  evidence premised on tourism use.

16  **V.   GOVERNMENT'S COMBINED MOTION FOR A PROPERTY VIEWING AND TO
       APPOINT A LAND COMMISSION (ECF NO. 401)[3]**

17

18      The Court grants the government's combined motion for a property viewing and to

19  appoint a land commission for the following reasons.

20      **A.   PROPERTY VIEW**

21      The government first argues that a property view is necessary to address the

22  parties' disparate positions regarding highest and best use. (ECF No. 401 at 17.) The

23  government believes that the highest and best use of the Property is its existing use,

24  whereas Landowners believe the highest and best use of the Property is for development

25  into a lucrative, large-scale commercial tourist operation centered on seeing Area 51. (*Id.*)

26  ///

27  [3]The Court has reviewed the response (ECF No. 430) and reply (ECF No. 484)
    related to this motion. The Court also heard oral argument on this motion on July 1, 2019.

28  (ECF No. 493.)

The government contends that the factfinder will need to assess the view of Area 51 from the Property as well as the Property's physical characteristics (e.g., remoteness, topography, shape) in order to evaluate these differing opinions. (*Id.* at 18.) The government also argues that a property view will help to ensure a fair and transparent trial by enhancing the factfinder's ability to assess whether the proposed highest and best use of the Property as an Area 51 attraction is credible. (*Id.* at 20.)

Landowners "do not oppose a site visit under fair and accurate conditions." (ECF No. 430 at 1 (emphasis omitted).) Nevertheless, Landowners express concern that the government may attempt *ex parte* communications with the factfinder and assert that the factfinder could evaluate the view of Area 51 "through a few photographs." (*Id.* at 2-4.) Landowners also suggest that an instruction to the factfinder that the Property has a clear and unobstructed view of Area 51 would suffice. (*Id.* at 3.)

The Court agrees with the government that a property view would be helpful to the factfinder in this case. Given that Landowners' proposed highest and best use truly hinges on "the view," the Court agrees that it is essential for the factfinder to personally evaluate that view. And while the Court is sensitive to concerns about any party engaging in *ex parte* communication with the factfinder,[4] the Court need not address such concerns until they are substantiated. There is no suggestion in the record that the government's counsel would engage in such conduct.

Accordingly, the Court grants the government's request for a property view.

## B.     LAND COMMISSION

Federal Rule of Civil Procedure 71.1(h)(2)(A) provides that where a party has demanded a jury to determine compensation, "the court may instead appoint a three-person commission to determine compensation because of the character, location, or quantity of the property to be condemned or for other just reasons." The Ninth Circuit has

///

---

[4]Landowners raise numerous logistical considerations (*see, e.g.*, ECF No. 430 at 19) that the parties likely will be able to resolve through the meet and confer process, though the Court will help to resolve any persistent concerns.

not required a showing of "extraordinary or unusual" circumstances to justify the appointment of a land commission. *See United States v. Hall*, 274 F.2d 856, 859 (9th Cir. 1960).

The government argues that a land commission is necessary in this case due to the Property's location, character, and the necessity of a property view. (ECF No. 401 at 20.) Regarding location, the government points out that the nearest federal courthouse is 150 miles away, the nearest town is more than 30 miles away, and the nearest hospital is about an hour away. (*Id.* at 21.) Regarding character, the government notes that the Property is not served by potable water or electricity and that portions of the Property have rocky, uneven terrain with poor accessibility. (*Id.*) The government also notes that there are open mine shafts, tunnels, pits, mill tailings, waste dumps, and sweating dynamite on the Property. (*Id.*) Regarding the property view, the government asserts that it will be easier to coordinate the visit with a land commission than a lay jury. (*Id.*) In particular, the commission could view the Property outside of peak hours (perhaps on weekends) and might be more amenable than a lay jury to the background check necessary to visit the NTTR. (*Id.*)

At the hearing, Landowners primarily objected to the appointment of a land commission based on their concern about delay. (ECF No. 496 at 50.) However, the government "shares the landowners' desire for a just and speedy determination of just compensation." (ECF No. 484 at 13.) The government also explained at the hearing that the process could take several months, rather than decades as Landowners' counsel feared. (ECF No. 496 at 56-57.)

Given that a site visit is crucial in this case due in particular to the parties' disparate positions on highest and best use, and in light of the remote location and backcountry character of the Property, the Court agrees with the government that it is appropriate to appoint a land commission.

Accordingly, the Court grants the government's combined motion for a property viewing and to appoint a land commission.

## VI. GOVERNMENT'S MOTION TO EXCLUDE USE OF THE INCOME CAPITALIZATION APPROACH (ECF NO. 408)[5]

The Court grants the government's motion to exclude use of the income capitalization approach for the following reasons.

### A.    BACKGROUND

The government seeks to exclude testimony of Landowners' experts based on the "income capitalization approach" to valuation. (ECF No. 408 at 3.) Capitalization in this context refers to the conversion of future income to present value. "[T]he income approach can indicate what a buyer would pay at the present time for the anticipated future benefits, discounted for risk and other variables, of owning a property." (ECF No. 410-2 at 8 (Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions ("Yellow Book") 136 (6th ed. 2016)).) "The income capitalization approach may refer to either direct capitalization or yield capitalization techniques." (*Id.* at 10 (Yellow Book at 138).) "Direct capitalization techniques are used to derive an indication of the market value of a stabilized income-producing property by applying an overall capitalization rate to a property's single-year net income." (*Id.*) "Yield capitalization techniques are used to derive an indication of the market value of an income-producing property with varying forecasted income or expenses, typically using discounted cash-flow (DCF) analysis" (*Id.*) "Forecasts of net income, expenses, cash flow and other factors over a holding or projection period are required." (*Id.*)

Landowners' experts DiFederico and Clauretie both used the direct capitalization technique to estimate the present value of a single annual income stream. (ECF No. 408 at 6.) Roddewig used a variation of the technique to estimate the present value of multiple annual income streams. (*Id.*) DiFederico also used yield capitalization techniques, specifically a discounted cash-flow analysis and a subdivision development method, which

///

///

_____

[5]The Court has reviewed the response (ECF No. 443) and reply (ECF No. 481) related to the motion.

converted multiple years' projected income streams and expenses into a present value. (*Id.*)

**B.    DISCUSSION**

The Ninth Circuit "generally recognizes three appraisal methodologies in ascertaining fair market value: '(1) Comparable sales; (2) the income or capitalization of income; and (3) the reproduction cost at the time of taking, less depreciation.'" *United States v. 99.66 Acres of Land*, 970 F.2d 651, 655 (9th Cir. 1992) (quoting *100 Acres of Land*, 468 F.2d at 1265). "Ordinarily, if there are sales of comparable property at or near the time the condemned property is taken, evidence in regard to such sales would be more appropriate than any other method in determining the market value of the property taken." *100 Acres of Land*, 468 F.2d at 1265. "However, if there are no comparable sales, then other methods must be resorted to in order to ascertain market value." *Id.* The court is "not restricted to a particular method in arriving at the fair market value for the condemned material." *United States v. 22.80 Acres of Land*, 839 F.2d 1362, 1365 (9th Cir. 1988). The court's goal "is to assure that the landowners are restored to the pecuniary position they would have occupied had the property not been taken." *Id.* (citing *100 Acres of Land*, 468 F.2d at 1265).

The government argues that the income capitalization approach is inappropriate in this case because the Property was not generating any income on the date of taking and had not generated any income for 60 years. (*See* ECF No. 408 at 14-17.) The Court agrees. The Yellow Book—which Landowners' expert referred to as the appraiser's "Bible" (ECF No. 410-5 at 5)—expressly states that "[d]irect capitalization techniques cannot be used to value property that is not generating income as of the date of value." (ECF No. 410-2 at 11 (Yellow Book at 139).) The Yellow Book explains:

> [D]irect capitalization of net income is an appropriate method of valuation only when the landowner can establish actual income, application of the capitalization approach is thus necessarily limited to those situations where eminent domain proceedings impinge an established, on-going business' opportunity for *continued* as opposed to *prospective* profit. There can be no capitalization of income unless the fact of income is itself first established.

10

Any other rule would permit a valuation, speculative *ab initio*, to be seriously compounded.

(*Id.* (first quoting *United States v. 15.00 Acres of Land in Miss. Cty.*, 468 F. Supp. 310, 315 (D. Ark. 1979); then citing *United States v. 25.202 Acres*, 860 F. Supp. 2d 165, 175-81 & n.20 (N.D.N.Y. 2010); then citing *Foster v. United States*, 2 Cl. Ct. 426, 448 (1983), *aff'd*, 746 F.2d 1491 (Fed. Cir. 1984).) Landowners do not expressly address this argument.

The Court also finds persuasive the reasoning of *25.202 Acres*. There, the landowner's appraiser valued the property based on its hypothetical use as a site for a duty-free store and other uses. 860 F. Supp. 2d at 175. Using an income capitalization approach, the appraiser found that the income would consist of rents paid by an entity operating a duty-free store on the site. *Id.* The court rejected this approach:

> The highest and best use of a property may increase the value of vacant land because a buyer may pay more for property that is capable of being developed into a profitable operation. However, if there is no currently operating business, it would be "improper to value the property as if it were ***actually being used*** for the more valuable purpose." *United States v. Meadow Brook Club*, 259 F.2d at 45 (quoting *Olson*, 292 U.S. at 255, 54 S.Ct. 704) (emphasis added). Thus, even though the highest and best use may include a duty-free store, if there is no currently operating store on the property, an income approach should not be used, and is not a reliable method of appraising the land.

860 F. Supp. 2d at 177. Similarly here, while Landowners may advance that the highest and best use of the Property is commercial tourism, the income capitalization approach is not a reliable appraisal methodology when the Property has not generated income.

The government has identified additional persuasive authority for rejecting the income capitalization approach here. *See* 4 Nichols on Eminent Domain Ch. 12B.08[3] ("Valuation based on an estimate of the potential income which might be realized from utilization by the property owner in a manner of which it is capable (but of which the owner has not as yet availed himself or herself) has been rejected on the ground that this income is too uncertain and conjectural to be acceptable."); *id.* at Ch. 12B.09[3] ("The capitalization of hypothetical income method of valuation has generally been rejected by the courts."); *see also Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 100 (6th Cir. 1939)

("Anticipated profits from any business, especially farming, are too uncertain and speculative in character to be of much weight in determining farm values. Their realization depends more upon general business conditions, trading, skill and business acumen of the proprietors and weather changes than upon location.").

Landowners rely on *California v. Kinder Morgan Energy Partners LP*, 613 F. App'x 561, 564-65 (9th Cir. 2015). (ECF No. 443 at 5.) There, the court held that damages for trespass/nuisance actions under California Civil Code § 3334 "can be proved through estimates of a property's rental value based on hypothetical assumptions rather than its actual use." *California*, 613 F. App'x at 564. The case is inapplicable because it concerns damages for tort actions under state tort law—not eminent domain. And the government notes that California does not extend this tort-damages rule to eminent domain proceedings. (ECF No. 481 at 8 (citing several cases).)

Landowners also rely on *U.S. v. Waterhouse*, 132 F.2d 699 (9th Cir. 1943). (ECF No. 443 at 5.) The land at issue in *Waterhouse* consisted of several lots that were leased for growing sugar cane and that belonged to an entity known as the Damon Estate. *Waterhouse*, 132 F.2d at 700. The Damon Estate encompassed additional land that had been subdivided and leased. *Id.* The government's witnesses testified that the highest and best use to which most of the land at issue was adapted was for growing sugar cane. *Id.* at 701. These witnesses testified that the remainder of the land was more valuable because of its potential uses, with one witness testifying that those potential uses included house and farm lots. *Id.* The landowners' witnesses testified that the land had outgrown its use as cane lands, and that its highest and best use was for residences, business, and truck gardening. *Id.* The landowners' witnesses valued the land based on that use by capitalizing hypothetical rents that could be obtained by subdividing the property and leasing the resultant lots. *See id.* The government argued that the capitalization evidence was inadmissible because it was based on some future value of the property rather than the value of the property at the time of taking. *Id.* at 702. The court rejected the argument, reasoning that the landowners' witnesses had properly estimated the present value of the

land based on what a willing buyer would pay in light of the land's potential future use. *Id.* The court then considered whether the landowners' capitalization evidence was admissible. *Id.* The court synthesized from *Olson*, 292 U.S. 246, the following rule: "if there is substantial evidence to show that the adaptability of the lands in question for the uses testified to was reasonably probable, then the evidence was admissible, and it was for the jury to say whether such adaptability affected the market value of the lands." *Id.* (internal quotation marks omitted). Based on this rule, the court found the landowners' capitalization evidence admissible. *Id.*

At first blush, it may seem as though *Waterhouse* requires the admission of all valuation evidence related to a prospective use once the proponent has adduced substantial evidence to show that prospective use is reasonably probable. But such a reading of *Waterhouse* is implausibly broad, particularly when the Federal Rules of Evidence impose a gatekeeping role on the court. Moreover, admitting all expert valuation evidence regardless of methodology or reliability would "allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth." *Olson*, 292 U.S. at 257.

The Court also rejects a broad reading of *Waterhouse* because the question of whether evidence of a prospective use is admissible to establish the property's highest and best use is analytically distinct from the question of whether expert valuation evidence based on that prospective use is admissible. Regarding the first question, evidence of a prospective use is admissible if that use is "fairly shown to be reasonably probable." *Id.* But expert valuation evidence, by contrast, is only admissible if it complies with Federal Rule of Evidence 702 and *Daubert*.

Finally, *Waterhouse* does not speak to situations in which the property at issue is not producing any income. The land in *Waterhouse* had produced rental income for many years. Some of the land was leased for growing sugar cane, while other land in the Damon

///

///

13

1   Estate was subdivided and leased. 132 F.2d at 700. Thus, *Waterhouse* has no bearing on

2   this case, in which the Property has not produced any rental income for the past 60 years.[6]

3        Accordingly, the Court grants the government's motion to exclude use of the income

4   capitalization approach.

5   **VII.  LANDOWNERS'  MOTION  TO  EXCLUDE  ALL  EVIDENCE  OF
        ENVIRONMENTAL CONTAMINATION (ECF NO. 395)[7]**

6

7        The Court denies Landowners' motion to exclude all evidence of environmental

8   contamination for the following reasons.

9        **A.    BACKGROUND**

10       The Property intermittently operated as a lead mine from the late 1800s through

11  the mid-1950s. (ECF No. 437 at 8.) Unremediated waste rock dumps and tailings piles as

12  well as "appreciable quantities" of lead and arsenic remain at the Property. (*Id.* (quoting

13  ECF No. 130-1 at 18).)

14       Landowners hired experts—among them, Richard Roddewig and Tio DiFederico—

15  to appraise the Property based on its highest and best use. (*See id.*) One of the

16  government's  expert  witnesses—Dr.  Graham  Davis—reviewed  Roddewig  and

17  DiFederico's reports. (*Id.*) Both Roddewig and DiFederico made "extraordinary

18  assumptions" that any environmental conditions on the Property did not affect its value.

19  (*Id.* at 8-9.) An extraordinary assumption is a term of art in the appraisal context meaning

20  "an assumption, directly related to a specific assignment, as of the effective date of the

21  assignment results, which, if found to be false, could alter the appraiser's opinions or

22  ///

23  _____

24       [6]Additional facts distinguish *Waterhouse* from this case: the parties here are sharply
    divided on the issue of whether the Property is adaptable for any purpose other than its
    current use and there is no evidence that Landowners historically have held a plan for
25  tourist commercial development. *See Waterhouse*, 132 F.2d at 702 ("[A]ll valuation
    witnesses . . . agreed that the frontages were adaptable for purposes other than cane-
26  land"), 700 ("There was also evidence that the Damon Estate had had a plan of subdivision
    for some time.").

27
         [7]The Court has reviewed the response (ECF No. 437) and reply (ECF No. 474)
28  related to this motion.

                                        14

conclusions." (ECF No. 395-9 at 4.) Under the Uniform Standards of Professional Appraisal Practice ("USPAP"), an appraiser may only use an extraordinary assumption if the following conditions are satisfied: (1) the extraordinary assumption is required to properly develop credible opinions and conclusions; (2) the appraiser has a reasonable basis for the extraordinary assumption; (3) use of the extraordinary assumption results in a credible analysis; and (4) the appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions. (ECF No. 437 at 9 (citing ECF No. 437-3 at 5).)

Dr. Davis opined that the extraordinary assumptions made by Roddewig and DiFederico were unreasonable. (*See* ECF No. 395-1 at 4.[8]) Additional experts retained by the government—Beverly Weissenborn, Maurice Robinson, Stephen Roach, and Nathan Moeder—offered similar criticism from various perspectives on the Landowners' use of an extraordinary assumption that the Property is not environmentally contaminated. (*Id.* at 12.)

## B.    DISCUSSION

Landowners first argue that evidence of contamination is only admissible if both the fact of contamination as well as remediation costs are known. (ECF No. 395 at 8-13.) The government counters that Landowners rely solely on state law and that federal law supports the admissibility of contamination evidence. (ECF No. 437 at 12-15.)

The Court agrees with the government. Federal law requires this Court to consider "all the facts and circumstances that would reasonably go into the making of a bargain of purchase and sale." *United States v. 429.59 Acres (Imperial Beach)*, 612 F.2d 459, 462 (9th Cir. 1980). It is reasonable to assume that the presence of "appreciable quantities" of lead and arsenic on a property would affect that property's sale—particularly if the buyer planned to invite the general public to the property as part of a commercial tourist use—

///

---

[8]While the portion of Dr. Davis's report that the government cites does not expressly discuss DiFederico's opinion, it is obvious that the portion applicable to Roddewig's report (referred to as the "Clarion Report") would also apply to DiFederico. (*See* ECF No. 395-1 at 4.)

because lead and arsenic are commonly known to be harmful to human health. The cases Landowners cite from the New Jersey Supreme Court, the Florida Supreme Court, and a Tennessee mid-level appellate court are not binding on this Court. (*See* ECF No. 395 at 8-10.) Nor do they persuade the Court to exclude contamination evidence here. In *Housing Authority of City of New Brunswick v. Suydam Investors, LLC*, the New Jersey Supreme Court expressed concern about potential double liability for the existence of contamination: "once as a reduction in calculating fair market value and again in a subsequent action for recovery of remediation costs." 826 A.2d 673, 680 (N.J. 2003). But Landowners have identified no legal theory under which they could be held liable to the government for the costs of remediation, or how the potential for double liability applies here.

Next, Landowners assert that the government's rebuttal expert reports are improper because they are actually initial expert opinions disguised as rebuttal opinions. (*See* ECF No. 395 at 13-14.) The government persuasively explains that its experts' opinions constitute proper rebuttal because they point out omissions in Landowners' experts' reports and directly contradict and rebut Landowners' experts' opinions. (ECF No. 437 at 15.) The Court agrees with the government and rejects Landowners' argument.

Landowners further argue that the rebuttal reports are not reliable because Dr. Davis's conclusions constitute "mere surmise." (ECF No. 395 at 16-17.) The Court disagrees. Upon reviewing the excerpts of Dr. Davis's expert report and deposition testimony, the Court agrees with the government that Dr. Davis based this opinion on his education, experience, sampling results showing "appreciable quantities" of lead and arsenic, and the EPA ranking of lead and arsenic as the number 1 and 2 (out of 275) "contaminants of concern," among other things. (*See, e.g.*, ECF No. 395-1 at 4 ("A 1986 survey by Quade and Tingley found high concentrations of lead and mercury in stream sediments south of the Groom Mine workings.") (footnotes omitted); *id.* (noting that samples used by Nexus Geos ("NGL")—one of Landowners' experts—"contained 'appreciable quantities' of lead, silver, zinc, copper, and arsenic); ECF No. 395-13 at 11

("I also suspect, given the historic mining and the uncontained nature of the tailings pile and the high grades of ore, in particular lead that were extracted in the '40s and '50s, that there is higher-than-normal concentrations of lead in and around the property.").)

Landowners further argue that the government should not be permitted to discuss environmental contamination when no case-in-chief expert in this case—including the government's—adjusted their appraisals for environmental contamination. (ECF No. 474 at 8-9.) Landowners' argument is non sequitur. Environmental contamination is relevant in considering whether the highest and best use of the Property is commercial tourism as explained *supra*. Accordingly, the Court rejects Landowners' argument.

Landowners further argue that the Ninth Circuit requires the exclusion of evidence not tied to market value. (ECF No. 474 at 7 (first citing *United States v. 760.807 Acres*, 731 F.2d 1443 (9th Cir. 1984); then citing *United States v. 87.98 Acres*, 530 F.3d 899 (9th Cir. 2008).) The Court finds this argument irrelevant. Dr. Davis's opinion properly rebuts Landowners' experts' opinions by pointing out that their extraordinary assumption is allegedly unwarranted and incorrect. Consequently, it is relevant and admissible.

Accordingly, the Court denies Landowners' motion to exclude all evidence of environmental contamination.

## VIII. LANDOWNERS' MOTION TO ESTABLISH CONDITION OF THE PROPERTY AS TO WATER RIGHTS (ECF NO. 397)[9]

The Court denies Landowners' motion to establish the condition of the Property as to water rights for the following reasons.

### A. BACKGROUND

The Property is located in the Groom Lake Basin. (ECF No. 397 at 2.) Landowners contend that they possessed vested surface water and groundwater rights and that they possessed the right to appropriate even more water from the Groom Lake Basin. (*Id.* at 3.)

///

---

[9]The Court has reviewed the response (ECF No. 446) and reply (ECF No. 477) related to this motion.

Landowners retained an expert—Thomas Driggs—for the following purposes related to water rights. (*Id.*) First, Driggs was to identify the vested water right claims that the Property owners possessed as a result of the early stakeholder's water use in connection with their historical mining activities. (*Id.*) Second, Driggs was to identify the water rights available for appropriation in the Groom Lake prior to the date of taking. (*Id.*)

In his report, Driggs discusses Nevada water law and concludes that Landowners possessed 362 acre feet annually (a.f.a.) of vested surface water rights and 868 a.f.a. of vested groundwater rights on the date of taking. (*Id.* at 6.) Driggs also concluded that a tourist operation would require 40 to 120 a.f.a. (ECF No. 397-1 at 13.)

## B. DISCUSSION

Landowners seek a ruling that the Property included the water rights necessary to operate a commercial tourist site on the Property. (ECF No. 397 at 13.) In essence, Landowners ask the Court to declare a particular fact as incontrovertible. But as the government points out (*see, e.g.*, ECF No. 446 at 6-10), Landowners have not adduced evidence to support such drastic relief. They have not shown clear chain of title, the amount of prior beneficial use, and various other proof necessary for the Court to make such a determination. For example, Driggs stated "[a] complete and clear chain of title is necessary to confirm that no interest in any appurtenant water rights was ever reserved by a grantor in the conveyancing deed." (ECF No. 397-1 at 4.) However, Driggs simply assumes that this is the case without explanation. (*See id.* ("This Report assumes that there is a clear chain of title for Groom Mine, and there are no reservations in any of the deeds in the chain of title.").) In the absence of these important factual predicates, the Court cannot conclude that the Property categorically included the water rights necessary to operate a tourist commercial use on the Property. Nevertheless, Landowners may still present evidence of the reasonable probability of sufficient water to the factfinder.

Accordingly, the Court denies Landowners' motion to establish the condition of the Property as to water rights.

///

18

## IX. LANDOWNERS' MOTION TO CONFIRM USES OF UNPATENTED LAND (ECF NO. 396)[10]

The Court denies Landowners' motion to confirm uses of unpatented land for the following reasons.

### A. BACKGROUND

The Property consists of patented and unpatented mining claims. (ECF No. 438 at 4.) Patented mining claims are usually equivalent to full fee title ownership. *See United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1281 (9th Cir. 1980). Unpatented mining claims, however, are a "unique form of property" to which the government retains certain rights: "Although owners of unpatented mining claims hold fully recognized possessory interests in their claims . . . [t]he United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired." *United States v. Locke*, 471 U.S. 84, 104 (1985). The parties seem to agree that the holder of an unpatented mining claim has exclusive rights to mine and conduct mining-related activities. (*See* ECF No. 438 at 5.)

Landowners primarily seek a ruling that the public, once invited to the Property, could use the unpatented land for recreation, such as hiking, camping, rock collecting, and sightseeing. (ECF No. 396 at 15.) Landowners seek to exclude contrary testimony on this point by government experts Neville, Weissenborn, Roach, and Dr. Davis. (*Id.*)

### B. DISCUSSION

Landowners have not demonstrated that they are entitled to the relief they seek. They rely primarily on *Curtis-Nevada Mines*, 611 F.2d 1277. (ECF No. 396 at 11.) There, the court considered the meaning of "other surface resources" in 30 U.S.C. § 612(b), a statute that allows the United States to manage vegetative and "other surface resources" on unpatented mining claims. *Curtis-Nevada Mines*, 611 F.2d at 1280; *see* 30 U.S.C. §

///

---

[10]The Court has reviewed the response (ECF No. 438) and reply (ECF No. 476) related to this motion.

612(b) ("Rights under any mining claim hereafter located under the mining laws of the United States shall be subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the vegetative surface resources thereof and to manage other surface resources thereof (except mineral deposits subject to location under the mining laws of the United States).") The court found that "the phrase 'other surface resources' was clearly intended to include recreational uses." *Id.* at 1283. The practical consequence of this holding was that the owners of the unpatented mining claims at issue in the case could no longer bar the general public from using the land for recreation and entrance to adjacent National Forest lands. *See id.* at 1286.

*Curtis-Nevada Mines* is not relevant here, or if it is, it supports the government's position. The government contends that the land underlying the unpatented claims was withdrawn from public use in 1984. (ECF No. 438 at 3.) The land in *Curtis-Nevada Mines* had not been withdrawn from public use. Plus, the holding of *Curtis-Nevada Mines* is that the United States has statutory authority to manage "other surface resources" in connection with an unpatented claim that includes recreational uses. Thus, it seems that *Curtis-Nevada Mines* supports the government's contention that it can restrict recreational use of unpatented land. (*See* ECF No. 438 at 12.) Accordingly, the Court rejects Landowners' argument based on *Curtis-Nevada Mines*.

Landowners also rely on 43 C.F.R. § 3715.0-1(c), which provides that "[t]his subpart does not impair the right of any person to engage in recreational activities or any other authorized activity on public lands BLM administers." (ECF No. 396 at 3.) The government argues that this regulation probably does not apply to the Property because the Property is not part of the "public lands BLM administers." (ECF No. 438 at 13 (quoting 43 C.F.R. § 3715.0-1(c)).) The government also argues that any recreational activities must be authorized and notes that recreational activities have not been authorized on any federal land within the NTTR, including the Property's unpatented land, since the land was withdrawn in 1984. (*Id.*) In response, Landowners press an argument that the land ///

underlying the unpatented claims was not subject to the 1984 withdrawal. (*See* ECF No. 476 at 7-8.) The Court addresses that argument next.

Landowners argue that the land underlying the unpatented mining claims was not subject to the 1984 withdrawal. (*See* ECF No. 476 at 3-5.) The government concedes that the Air Force guaranteed Landowners conditional access to the Property following the 1984 withdrawal but notes that the Air Force did not change the permissible use of the unpatented land from mining purposes to non-mining purposes. (ECF No. 438 at 11.) The Court finds the government's position more persuasive. Landowners rely on various assurances from the Air Force during the 1984 withdrawal that Landowners would retain their access and property rights, but none of those assurances show that Landowners ever possessed a right to use the unpatented land for recreation. (*See* ECF No. 470 at 8-10; *see also* ECF No. 476 at 4 (incorporating ECF No. 470 by reference).) Rather, the assurances Landowners cite confirm the government's position that the Air Force simply guaranteed Landowners conditional access to the Property. (*See, e.g.*, ECF No. 388-4 at 68 ("And in Mr. Sheahan's case . . . they have had access; there has been no change to that.").)

Landowners also argue that the government conceded the unpatented land was not subject to the 1984 withdrawal in their legal instructions to their expert witnesses. (ECF No. 396 at 9.) The relevant portion of the legal instruction provides that "the Groom Mine property was not within the scope of the 1984 withdrawal" and that "the Groom Mine property was surrounded by the withdrawn area, but the owners retained access to the Groom Mine property for personal and business purposes." (ECF No. 396-11 at 2.) The government argues that the legal instruction is irrelevant. (ECF No. 438 at 9-10.) The government contends that the instruction "does not say whether the unpatented claims could or could not be used for non-mining purposes" and that it merely instructed the government's appraiser to "assume for valuation purposes that a hypothetical buyer of the Groom Mine could have conditional access to the property *from* the surrounding federal land" despite the 1984 withdrawal. (*Id.*) The Court agrees with the government. The legal

1  instruction does not amount to a concession that Landowners could use the unpatented

2  land for recreational purposes.

3      Landowners have not demonstrated that they are entitled to the relief they seek.

4  Accordingly, the Court denies Landowners' motion to confirm uses of unpatented land.

5  **X.    MOTIONS RELATED TO EXPERT WITNESSES**

6      **A.    LEGAL FRAMEWORK**

7      "A witness who is qualified as an expert by knowledge, skill, experience, training,

8  or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific,

9  technical, or other specialized knowledge will help the trier of fact to understand the

10  evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or

11  data; (c) the testimony is the product of reliable principles and methods; and (d) the expert

12  has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

13      The Supreme Court provided additional guidance on Rule 702 and its application

14  in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire*

15  *Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). In *Daubert*, the Court held that scientific

16  testimony must be reliable and relevant to be admissible. *Daubert*, 509 U.S. at 589. *Kumho*

17  *Tire* clarified that *Daubert's* principles also apply to technical and specialized knowledge.

18  *See Kumho*, 526 U.S. at 141. The trial court has "considerable leeway" in deciding how to

19  determine the reliability of an expert's testimony and whether the testimony is in fact

20  reliable. *Id.* at 152. The "test of reliability is 'flexible,' and *Daubert's* list of specific factors

21  neither necessarily nor exclusively applies to all experts or in every case." *Id.* at 141.

22      The Ninth Circuit has emphasized that "Rule 702 is applied consistent with the

23  liberal thrust of the Federal Rules and their general approach of relaxing the traditional

24  barriers to opinion testimony." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th

25  Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) (citations and

26  internal quotation marks omitted). "An expert witness—unlike other witnesses—is

27  permitted wide latitude to offer opinions, including those that are not based on firsthand

28  knowledge or observation, so long as the expert's opinion has a reliable basis in the

1  knowledge and experience of his discipline." *Id.* (citations and internal quotation marks

2  omitted). Shaky but admissible evidence should not be excluded but instead attacked by

3  cross-examination, contrary evidence, and attention to the burden of proof. *Primiano v.*

4  *Cook*, 598 F.3d 558, 564 (9th Cir.), *as amended* (Apr. 27, 2010).

5  **B.  LANDOWNERS' MOTION TO EXCLUDE OPINION AND TESTIMONY OF GOVERNMENT EXPERT WARREN NEVILLE (ECF NO. 390)[11]**

6

7  The Court denies Landowners' motion to exclude the opinion and testimony of

8  Warren Neville—an expert hired by the government to appraise the Property—for the

9  following reasons.

10  **1.  Background**

11  Neville valued the Property at $333,300. (ECF No. 390-2 at 4.) Landowners argue

12  that Neville's opinion and testimony should be excluded because he does not possess the

13  relevant expertise to appraise the Property and because his methodology is unreliable.

14  (*See* ECF No. 390 at 14-24.) The Court disagrees.

15  **2.  Qualifications**

16  Landowners argue that Neville lacks the relevant expertise to appraise the

17  Property, but the Court finds that Neville is qualified to testify as an expert appraiser

18  because he possesses relevant professional qualifications; has appraised land similar to

19  the Property for many years; and has associated with a local appraiser. Regarding

20  qualifications, Neville holds a professional appraiser designation known as an MAI

21  designation that requires, among other things, a bachelor's degree, good moral character,

22  status as a Certified General Real Property Appraiser, and rigorous education

23  requirements. (ECF No. 445-1 at 2; ECF No. 445-5 at 2.) Neville holds a Bachelor of

24  Science from the University of California, Riverside as well as a real estate license he

25  obtained in the late 1970s and a broker's license he obtained in the 1980s. (ECF No. 390-

26  1 at 8.) Neville's appraisal practice—which spans more than two decades—has centered

27  ///

28  [11]The Court has reviewed the response (ECF No. 445) and reply (ECF No. 471) related to this motion.

on the valuation of vacant land, including land in Nevada. (ECF No. 390-2 at 10; ECF No. 390-1 at 10.) For example, Neville appraised a property known as the Fuch Nuclear Mine that—like this Property—was used for mining and located within the NTTR. (ECF No. 390-1 at 10.) Neville also has appraised mineral properties in Clark County and the Lake Mead recreation area. (*Id.*) Neville's curriculum vitae lists his experience appraising desert land, special purpose facilities, commercial and industrial land, and partial takings for condemnation. (ECF No. 445-1 at 2.) In addition, Neville consulted with Chris Mathews, MAI, who grew up in Lincoln County, Nevada and whose appraisal practice encompasses the valuation of property in rural Nevada including Lincoln, Nye, White Pine, and Esmerelda Counties (the Property is located within Lincoln County). (ECF No. 390-2 at 10.) Mathews "provided valuable insight into . . . the local real estate market." (*Id.*)

Landowners make several unpersuasive arguments that are based on Neville's alleged lack of relevant experience. First, Landowners argue that Neville has "zero experience appraising tourist commercial properties," (ECF No. 390 at 8), but that contradicts Neville's deposition testimony. Neville testified that he has "appraised a lot of commercial property that could be developed with tourist related uses." (ECF No. 390-1 at 34.) Landowners further argue that Neville has never actually concluded that the highest and best use for a property is commercial tourism (*id.*), but this is a potential basis for cross-examination, not exclusion. Neville has the experience of considering whether a property is suited for commercial tourism, regardless of whether he ultimately has found that use to be the highest and best use.

Similarly, Landowners argue that Neville has not appraised "special purpose facilities" because Neville has never concluded that a property was a special purpose facility. (*See* ECF No. 471 at 3.) However, Neville identified and produced an appraisal report in which the opposing appraiser asserted that a property was a special purpose property, while Neville concluded it was not. (ECF No. 390-1 at 77-78.) He has experience considering whether a property was a special purpose facility, regardless of his ultimate conclusion.

Next, Landowners argue that Neville has never appraised "former mining properties at tourist attractions in remote, undeveloped areas of southern Nevada" (ECF No. 471 at 2 (quoting ECF No. 445 at 3, 8)), but Neville is not required to have experience appraising land identical to the Property. Rather, he should have experience appraising similar kinds of property that renders his testimony relevant and reliable. This he has. (*See, e.g.*, ECF No. 390-1 at 10 (discussing appraisal of the Fuch Nuclear Mine and other Nevada properties).) That he lacks experience appraising properties identical to the Property may be fertile grounds for cross-examination, not exclusion.

Landowners further argue that Neville's experience appraising residential land that may someday be used for a general commercial use does not qualify Neville to provide an opinion in this case. (ECF No. 471 at 3.) But Neville's experience is more relevant than that—he has appraised commercial property that could be developed for tourism. (ECF No. 390-1 at 34 ("I've appraised a lot of commercial property that could be developed with tourist related uses.").) Accordingly, the Court rejects this argument.

Finally, Landowners argue that the MAI designation does not reflect that Neville has expertise to appraise "the most difficult unique special purpose properties," such as "the Statue of Liberty." (ECF No. 471 at 2-3.) The Court rejects this argument because Neville has experience that is more relevant than appraising the Statue of Liberty—he has actually appraised land within the NTTR. (*See* ECF No. 390-1 at 10.)

The Court thus finds that Neville is qualified to provide his expert opinion in this case and rejects Landowners' arguments to the contrary.

### 3.    Methodology

Landowners' next arguments relate to Neville's methodology. Landowners first argue that Neville's report and testimony should be excluded because he failed to conduct extensive marketability or feasibility studies and failed to obtain specialized consultant

///

///

///

25

assistance. (ECF No. 390 at 15-16.) Landowners rely on the Yellow Book,[12] which prohibits appraisers from adopting "unauthorized, unreasonable, or unsupported assumptions in making an appraisal in lieu of obtaining specialized consultant assistance." (*Id.* at 15 (quoting ECF No. 390-18 at 113).) Landowners also base their argument on their assertion that Neville has no experience appraising special purpose and commercial tourism properties. (*See id.*) The Court rejects Landowners' argument because Neville has relevant experience and because Landowners have not produced evidence to show that extensive studies or specialized consultant assistance are necessary in this case. The Yellow Book only requires consultants when necessary. (*See* ECF No. 390-18 at 113 ("If the appraiser finds that an appraisal cannot be completed with a consultant's assistance, the appraiser should notify the agency involved immediately. The appraiser may not adopt unauthorized, unreasonable, or unsupported assumptions in making an appraisal in lieu of obtaining specialized consultant assistance.").) While Landowners presumably believe that the Property is so unique as to require extensive studies and specialized expertise, reasonable minds could differ. Plus, Neville has specialized expertise given that he has appraised property within the NTTR. Again, Landowners have identified a basis for cross-examination, not a basis for exclusion.

Defendants further argue that Neville's report and testimony should be excluded because Neville failed to connect his conclusion that a commercial tourism use was not financially feasible to any supporting data. (ECF No. 390 at 17.) The Court rejects this argument. Landowners do not identify a "massive analytical gap" (*id.* at 18) so much as a subjective opinion that Neville had an insufficient basis for concluding that a commercial tourism use was not financially feasible. (*See id.* at 17-18.) Landowners express incredulity that Neville could conclude—based on one visit to the Property and conversations with four locals who did not think a campground use was suitable—that the Property was not

///

---

[12]The Court notes that Landowners cited the 2000 edition of the Yellow Book. It is not clear whether the instructions Landowners cite exist in the 2016 edition of the Yellow Book cited elsewhere in this order.

suited for a commercial tourism use. (*See id.*) But Neville relied on more than that. In his report, he discussed physical constraints that would negatively impact development costs as well as the challenge of finding employees to operate similar tourist-oriented businesses such as the Little A'Le'Inn. (ECF No. 390-2 at 40.) Landowners are free to argue that Neville's opinion is based on insufficient data, but they have not demonstrated an analytical gap requiring exclusion of the opinion altogether.

Landowners further argue that Neville's report and testimony should be excluded because his financial feasibility conclusion does not require any specialized insight. (ECF No. 390 at 18.) Again, Landowners essentially argue that the Neville based his conclusions on insufficient evidence. (*See id.* ("Neville wants to testify that a tourist commercial use is not financially feasible on the Landowners' Property because: 1) he visited the property once and saw that there could be development constraints; and, 2) four people told him they did not think a tourist use would succeed on the Landowners' Property (which turned out to be inaccurate).").) They may attack the credibility of his report, but they have not demonstrated a basis for excluding the report or testimony.

Landowners also argue that Neville's report and testimony should be excluded because the financial feasibility element of Neville's highest and best use analysis does not meet the standard set forth in *Desert Citizens*, 231 F.3d 1172. (ECF No. 390 at 16-17.) Landowners' argument is conclusory, however. Landowners simply state that the "financial feasibility element of [Neville's] highest and most profitable use analysis does not even come close to meeting this Ninth Circuit standard" and that Neville "clearly has not provided the 'level of detail' necessary to support his financial feasibility finding." (*Id.* at 17.) The Court rejects Landowners' argument as conclusory but nevertheless considers the applicability of *Desert Citizens.*

In *Desert Citizens*, three environmental organizations (collectively, "Desert Citizens") challenged a decision by the BLM to enter into a land exchange with certain corporations. 231 F.3d at 1174. Desert Citizens alleged that BLM violated certain provisions of federal law by relying on an outdated appraisal that undervalued the federal

lands involved in the exchange. *See id.* The district court found that BLM's reliance on the allegedly outdated appraisal ("1994 Appraisal") was proper. *Id.* at 1180. The Ninth Circuit found that the district court clearly erred because the 1994 Appraisal did not consider a potential future use of the land for landfill purposes. *See id.* at 1181 & n.10.

Neville did not fail to consider the potential future use of the Property for commercial tourism—he considered and rejected the idea. (*See* ECF No. 390-2 at 37-43.) Neville found that a commercial tourist use was legally permissible and physically possible but not financially feasible. (*See id.* at 37-40.) Neville opined that "given the physical and locational constraints of the subject, it is unlikely that a potential buyer . . . would consider developing the property as a commercial resort or recreational vehicle park." (*Id.* at 40.) While Landowners may test the rigor of Neville's consideration of commercial tourist use on cross-examination, they have not adduced a basis for excluding Neville's testimony altogether.

Landowners further argue that Neville's report and testimony should be excluded because the report constitutes a summation appraisal in violation of the unit rule, also known as the undivided fee rule. (ECF No. 390 at 22; *see also United States v. 6.45 Acres of Land*, 409 F.3d 139, 146 (3d Cir. 2005) (using "unit rule" and "undivided feel rule" interchangeably).) "The 'undivided fee rule' essentially operates by permitting the governmental authority to condemn property by providing just compensation, then allowing the respective interest holders to apportion the award among themselves, either by contract or judicial intervention." *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1269 (9th Cir. 2003). The gist of the rule is that courts or contracts—not the condemnor— should determine how compensation is allocated. *See id.*

The undivided fee rule has no applicability here. Neville has not sought to opine about how compensation should be apportioned among holders of various legal interests in the Property. Rather, Neville found that the unpatented mining claims had one highest and best use while the patented mining claims had another. This is reasonable given that
///

1  the legally permissible uses of the claims vary depending on whether they are patented or

2  unpatented. *See supra* Section IX.

3      Accordingly, the Court denies Landowners' motion to exclude the opinion and

4  testimony of Warren Neville.

5  **C.    LANDOWNERS' MOTION TO EXCLUDE OPINION AND TESTIMONY OF GOVERNMENT EXPERT NATHAN MOEDER (ECF NO. 398)[13]**

6

7      The Court denies Landowners' motion to exclude the opinion and testimony of

8  Nathan Moeder—one of the government's rebuttal experts—for the following reasons.

9          **1.    Background**

10     The government hired Moeder as an expert in real estate development, investment,

11  and economics to review and analyze some of Landowners' experts' reports. (ECF No.

12  427 at 3; *see also* ECF No. 398-2 at 3.) Moeder concluded that use of the Property for

13  commercial tourism was "at the highest end of the risk spectrum for real estate

14  investments." (ECF No. 398-2 at 4.) Landowners do not dispute Moeder's qualifications

15  but argue that Moeder's opinion should be excluded because it is unreliable. (*See* ECF

16  No. 398 at 5 ("Moeder's theories [related to "highest and best use" and "fair market value"]

17  are incorrect, improper, [and] unreliable . . . .").) Landowners also argue that Moeder's

18  opinion is not adequately supported. (*See id.* at 8 ("Moeder has not done the necessary

19  work to make the criticisms contained in his report.").)

20          **2.    Discussion**

21     Landowners first argue that Moeder's opinion should be excluded because he

22  believes the highest and best use of a property depends on the identity of that property's

23  owner, contrary to appraisal standards. (*See* ECF No. 398 at 5-7.) The Court rejects this

24  argument because it rests on mischaracterization of Moeder's deposition testimony.

25  Moeder understands that an appraiser—which he is not—determines "highest and best

26  use" based on "criteria of legally permissible, physically possible, and financially feasible."

27  ///

28      [13]The Court has reviewed the response (ECF No. 427) and reply (ECF No. 478) related to this motion.

(ECF No. 398-1 at 9; *see also id.* at 10 ("I'm not an appraiser, so I don't know exactly all the things they consider.").) Moeder explained that his perspective as an expert in real estate development is different. (*Id.* at 9.) He conceives of "highest and best use" as the answer to the following question: "What should we put on that property that is supported by the market." (*Id.*) And when advising developers about their real estate investments, he considers their areas of expertise. For example, he might recommend that use of a property for business offices is not the highest and best of that property for a developer who lacks experience in office property. (*Id.* at 10.) While Moeder's testimony would not be reliable if it were intended to show how an appraiser determines highest and best use, Moeder intends to show something else—that a real estate developer would not consider the tourist commercial use of the Property to be the use most supported by the market. This testimony is relevant because Landowners have proposed that the highest and best use of the Property is for a commercial tourism use and that someone—"likely . . . a regional or even international investor" (ECF No. 427-1 at 6)—would theoretically buy it for that purpose.

Landowners next argue that Moeder's opinion is unreliable because he misunderstands the concept of "fair market value." (ECF No. 398 at 7-8.) Landowners again mischaracterize Moeder's testimony. Moeder understands that appraisers define "fair market value" as "what a willing buyer would be willing to pay a willing seller at an arm's length transaction as an all cash transaction." (ECF No. 398-1 at 49.) Moeder is testifying about something different—how developers, investors, and lenders use rates of return and development costs to evaluate prospective developments on vacant land. (ECF No. 427 at 16.) Moeder conducts investment analysis—considering for example rates of return, cost of financing, and development costs—when advising clients. (*See* ECF No. 398-1 at 24.) Moeder's opinion is relevant because DiFederico predicated his analysis at least in part on the possibility of a regional or international investor purchasing the Property. (ECF No. 427-1 at 6 ("[T]he likely buyer of this property is a regional or even international investor that would have purchased the property to operate or lease the

30

property to an operator of a tourist commercial development. . . ."). And while DiFederico testified that an owner-operator could purchase the Property, he also testified that the "most probable buyer" would be "[a]n investor that would look to lease it to a[n] operator." (ECF No. 478-1 at 4.)

Landowners further argue that Moeder's opinion is unreliable because he criticized Landowners' experts for failing to calculate demand, pricing, and financial feasibility of the tourist commercial use without making these calculations himself. (*See* ECF No. 398 at 8-9.) The government argues that Moeder's opinions are proper rebuttal and that Landowners are shifting their burden of proof to Moeder. (ECF No. 427 at 12-15.)

The Court agrees with the government. Moeder's opinions constitute proper rebuttal because he questioned the methodologies, assumptions, and data used by Landowners' experts, and he investigated, analyzed, and opined on methods and facts they did not consider. For example, Moeder found that Landowners' experts failed to account for various types of risk that real estate investors consider when advising clients. (*See, e.g.*, ECF No. 398-2 at 4 (discussing business risk, financial risk, liquidity risk, inflation risk, management risk, interest rate risk, legislative risk, and environmental risk); ECF No. 398-3 at 9 (noting that Clauretie failed "to acknowledge and analyze the significant risks that are associated with any real estate project"); *id.* at 19 (noting that DiFederico failed "to acknowledge and analyze the significant risks that are associated with any real estate project").) Moeder also opined that Clauretie failed to conduct an adequate feasibility analysis. (ECF No. 398-3 at 6-7.) And Moeder need not calculate demand, pricing, and financial feasibility himself in order to criticize others' work. It is Landowners who bear the burden of proof in supporting their position on highest and best use. *United States v. 4.0 Acres of Land*, 175 F.3d 1133, 1140 (9th Cir. 1999) (citing *US ex rel. TVA v. Powelson*, 319 U.S. 266, 273 (1943)). Landowners contend that Moeder lacks the foundational knowledge to make these determinations and calculations himself (*see* ECF No. 478 at 6-7), but Moeder's testimony does not support such an extreme conclusion. While Moeder testified that he did not calculate demand, pricing, and financial

feasibility, he had a reasonable explanation—no one asked him. (*See* ECF No. 398-1 at 11.) Accordingly, the Court rejects this argument.

The government has suggested that Moeder's testimony is related to investment value rather than market value. (*See* ECF No. 427 at 16.) Landowners argue that Moeder should not be permitted to testify about investment value when the relevant legal consideration is market value. (ECF No. 478 at 6.) The Court rejects this argument because Landowners' proposed market value depends on investment. (ECF No. 427-1 at 6 ("[T]he likely buyer of this property is a regional or even international investor that would have purchased the property to operate or lease the property to an operator of a tourist commercial development. . . .").) Investment value is therefore relevant to the factfinder.

Landowners also argue that Moeder should be excluded based on *Prall v. Ford Motor Co.*, No. 2:14-cv-01313-MMD-GWF, 2017 WL 361545 (D. Nev. Jan. 24, 2017). The plaintiff in that case sued Ford Motor Company in connection with a car accident that she alleged was caused by a mechanical failure in the vehicle. *Id.* at *1. The plaintiff designated an expert witness who was a seasoned auto-body repairman with decades of experience conducting and inspecting collision repairs. *Id.* at *2. The expert concluded that the plaintiff's accident was caused by a defective speed control cable based on the following circumstantial evidence: a conversation with the plaintiff and her son, the existence of a parts replacement program, and similar complaints from other Ford vehicle owners that the expert read online. *Id.* The Court found that the expert's testimony was inadmissible because it was based on circumstantial evidence that a lay person could understand rather than the knowledge and experience of his discipline. *Id.* at *3.

Moeder does not seek to testify about circumstantial evidence a lay person could understand. Rather, Moeder plans to testify about how sophisticated investors and developers make informed business decisions. Moeder also will testify that Landowners' experts failed to consider factors that investors and developers would consider. This testimony is relevant and based on Moeder's specialized knowledge.

///

1    Accordingly, the Court denies Landowners' motion to exclude the opinion and

2    testimony of Nathan Moeder.

3    **D.    LANDOWNERS' MOTION TO EXCLUDE OPINION AND TESTIMONY OF GOVERNMENT EXPERT MARC SPRINGER (ECF NO. 399)[14]**

4

5    The Court denies Landowners' motion to exclude the opinion and testimony of Marc

6    Springer—an expert the government retained to estimate and appraise the mineral

7    resources at the Property—for the following reasons.

8    **1.    Background**

9    Landowners and the government hired experts to determine whether mineralization

10   on the Property improves its value. (ECF No. 428 at 5-6.) The experts first estimated the

11   amount and quality of mineral resources on the Property and then appraised their value.

12   (*Id.*) Landowners hired one expert for each purpose (with NGL providing the estimate and

13   Mineral Valuation Specialists ("MVS") providing the appraisal), while the government hired

14   Springer for both. (*Id.*)

15   Springer is a geologist with more than 40 years of experience. (ECF No. 428 at 6;

16   ECF No. 428-1 at 8.) He is a registered professional geologist, a certified general real

17   estate appraiser, a certified mineral appraiser, and a BLM-certified mineral examiner.

18   (ECF No. 428-1 at 8.) Landowners do not seem to dispute his qualifications.

19   For his mineral resource estimate, Springer found that there were 352,400 tons of

20   indicated resources and 647,600 tons of inferred resources.[15] (ECF No. 399-1 at 45.)

21   Springer determined that the highest and best use for the Property's mineral interest is to

22   hold it for future mineral resources exploration. (*Id.* at 48.)

23   ///

24   ///

25   ────────────────

26   [14]The Court has reviewed the response (ECF No. 428) and reply (ECF No. 479) related to this motion.

27   [15]Mineral resources are divided into inferred, indicated, and measured categories. (ECF No. 246 at 25.) Indicated mineral resources have a confidence level somewhere in

28   between inferred (lowest level of confidence) and measured (highest level of confidence) mineral resources. (*Id.*)

To arrive at a mineral resource estimate, Springer "analyzed two mineral reserve/resource estimates from 1986 appraisals." (*Id.* at 42.) The Court will refer to these as the Hulse Estimate and the McClung Estimate. Springer also analyzed and accepted a review of the appraisals, which he found reasonable and which the Court will refer to as the Godbe Review. (*Id.*) The Hulse Estimate assumed that 34,000 tons of ore remained on the Property—Springer rejected this assumption based on "the geology; mineralization control characteristics; and the exploration, development, and production history." (*Id.* at 43.) Springer accepted the McClung Estimate that 1,000,000 tons of ore remain on the Property. (*See id.*) Springer then used drill hole data, maps, cross-sections, and other information to estimate the relative amounts of indicated and inferred resources, concluding that 352,400 tons were indicated and 647,600 tons were inferred. (*Id.* at 44-45.) Springer noted that the maps and cross-sections available to him were missing some information because they had been improperly reduced from 11"x17" originals. (*Id.* at 44.) Springer also noted that "data are incomplete for some of the drill holes, and some drill holes appear to be missing." (*Id.*) Nevertheless, Springer proceeded, noting that "enough information is provided for me to estimate indicated and inferred resources." (*Id.*)

Springer later supplemented his report after receiving missing information related to the drill holes, maps, and cross-sections. Springer clarified that the additional information did not cause him to change his opinions and in fact provided added support for his opinions. (ECF No. 428-1 at 3.) Springer also stated that the missing data from the cross-sections and plan views would have caused him to reduce his estimate of the amount of mineral resources remaining on the Property. (*Id.* at 5.)

NGL—Landowners' expert—estimated 1 million tons of indicated resources and 9 million tons of inferred resources. (ECF No. 428 at 9.)

## 2. Discussion

Landowners make several arguments that Springer's mineral resource estimate is unreliable because it is based on incomplete facts and data. (ECF No. 399 at 13-17.) The government responds that Springer considered exploratory drill hole information that was

34

missing initially and explained that information in the missing maps would have caused him to reduce his mineral resource estimate, not increase it. (ECF No. 428 at 3.) The Court finds that Springer's supplement and affidavit resolve any concerns about missing data. In addition, while Landowners argue that Springer's "sole basis for his mineral resource conclusion was [the McClung Estimate]," Springer relied on more than that. He considered the Hulse Estimate as well as the Godbe Review. Accordingly, the Court rejects Landowners' first argument for excluding Springer's report.

Landowners next argue that Springer failed to reliably classify the mineralization into inferred and indicated categories because he did not rely on geological sampling. (*See* ECF No. 479 at 6.) This does not seem to be correct. (*See* ECF No. 399-1 at 44 (estimating indicated and inferred resources based on drill hole data).) Accordingly, the Court rejects this argument.

Landowners further argue that Springer's mineral resource estimate should be excluded under Federal Rule of Evidence 403 or the doctrine of judicial estoppel because the government's experts have taken inconsistent positions about the existence of a mineral resource on the property. (ECF No. 399 at 18.) According to Landowners, Springer found that a mineral resource existed on the Property while Dr. Graham Davis, another of the government's experts, did not. (*Id.* at 18-20.) The government essentially argues that Landowners have oversimplified Dr. Davis's testimony to create the appearance of a contradiction that does not in fact exist. (ECF No. 428 at 16-17.) Whatever contradiction exists between the governments' experts goes to the weight of their testimony rather than admissibility. Dr. Davis found that mineralization at the Property did not constitute a "resource" under industry criteria because the mineralization "was not currently or eventually economically profitable to extract as of the [date of taking]." (ECF No. 399-12 at 26-27.) While Springer concluded that mineral resources existed at the Property, it does not seem that he expressly considered whether the mineralization was economically profitable to extract. (*See generally* ECF No. 399-1.) While there may be some disagreement between Springer and Dr. Davis as to the prospects for economic extraction

35

of the mineralization at the Property, they both seem to agree that mineralization exists. Any differences between their opinions are subjects for cross-examination rather than grounds for exclusion.

Landowners' next argument relates to another purported inconsistency between Springer's testimony and Dr. Davis's testimony. (*See* ECF No. 399 at 20-21.) Dr. Davis criticized NGL for failing to prepare a block model or evaluate prospects for eventual economic extraction. (ECF No. 428 at 18.) Landowners argue that Springer also failed to do these things. (ECF No. 399 at 20-21.) The government counters that Dr. Davis did not state that block models were required in every instance and that Springer's failure to evaluate prospects for eventual economic extraction goes to weight rather than admissibility. (ECF No. 428 at 18-19.) The Court agrees with the government. Dr. Davis only testified that block models were "normally" used, and omissions in Springer's testimony bear on its weight. Moreover, Springer seems to have at least implicitly considered prospects for eventual economic extraction. In his deposition, Springer affirmed that he was "basically saying that there's some reasonable prospect of eventual minimal extraction sometime in the future." (ECF No. 399-2 at 63.)

Landowners argue that Springer's failure to specifically analyze the factors of highest and best use renders his opinion unreliable. (ECF No. 399 at 21.) The government responds that Springer implicitly considered these factors. (ECF No. 428 at 4.) The Court agrees with the government that Springer adequately considered the four factors of highest and best use in his opinion. (*See* ECF No. 174 at 11-13 (explaining how Springer considered the factors of highest and best use); *see also* ECF No. 399-2 at 63 (Springer's deposition testimony that he considered the factors).)

Landowners argue that Springer's highest and best use conclusion (holding for future mineral resource exploration) is invalid because Dr. Davis opined that mineralization at the Property was not currently or eventually economically profitable to extract as of the date of taking. (ECF No. 399 at 23-24.) The government argues that Dr. Davis's opinion is "just a commentary . . . on [NGL's] failure to consider the prospects for eventual

36

1   economic extraction of the mineralization at the Groom Mine." (ECF No. 428 at 22.) The

2   government also argues that holding the Property for future mineral resource exploration

3   is obviously financially feasible because that is how the Property was used for about 60

4   years. (*Id.*) Again, disagreement among the government's experts affects the weight of

5   their testimony, not the admissibility of their testimony.

6        Accordingly, the Court denies Landowners' motion to exclude the opinion and

7   testimony of Marc Springer.

### E.   LANDOWNERS' MOTION TO EXCLUDE OPINION AND TESTIMONY OF GOVERNMENT EXPERT DR. DONALD SINGER (ECF NO. 400)[16]

10       The Court grants in part and denies in part Landowners' motion to exclude the

11  expert opinion and testimony of Dr. Singer—one of the government's rebuttal experts—as

12  explained herein.

### 1.   Background

14       NGL prepared an expert report for Landowners concluding that there are 1 million

15  tons of indicated resources and 9 million tons of inferred resources remaining on the

16  Property. (ECF No. 246 at 23.) NGL used a computer program called EMINERS to develop

17  its estimate. (*See id.* at 29-31.) The EMINERS program was developed by the U.S.

18  Geological Survey ("USGS") "to allow geologists to 'estimate the number of undiscovered

19  deposits at different levels of probability.'" (*Id.*; *see also* ECF No. 432 at 2.)

20       The government hired Dr. Donald Singer as a rebuttal expert to, among other

21  things, review NGL's use of the EMINERS program. (ECF No. 432 at 2.) Dr. Singer worked

22  for USGS from 1973 to 2009 and played a large role in the development of EMINERS.

23  (*Id.*) Dr. Singer has opined that NGL made several mistakes in using EMINERS, including:

24  (1) misrepresenting what EMINERS does and how it works; (2) misidentifying the type of

25  mineral deposit at the Property; (3) using the wrong USGS grade and tonnage model; and

26  ///

27  ///

---

[16]The Court has reviewed the response (ECF No. 432) and reply (ECF No. 480) related to this motion.

(4) failing to follow EMINERS' two-kilometer spatial rule. (*Id.* (citing ECF No. 400-1 (Dr. Singer's expert report)).)

### 2. Discussion

Landowners argue that Dr. Singer's expert report should be excluded in its entirety and, alternatively, that particular statements should be excluded. The Court rejects Landowners' arguments for excluding Dr. Singer's report in its entirety before addressing the admissibility of individual statements in the report.

Landowners first argue that Dr. Singer's entire opinion should be excluded because it requires application of the 2014 SME/CIM Standards.[17] (ECF No. 480 at 2.) The government acknowledges that application of the 2014 SME/CIM Standards lies outside the scope of expertise Dr. Singer will provide in this particular case. (ECF No. 432 at 9.) Given that some of the statements Landowners challenge do not require application of the 2014 SME/CIM Standards as discussed herein, the Court rejects Landowners' first argument.

Landowners also argue that Dr. Singer's entire opinion should be excluded because Dr. Singer—who did not conduct an economic analysis of the Property—cannot opine as to whether mineralization was economic to mine. (ECF No. 480 at 2.) The government concedes the point but argues that the statements challenged on these grounds are not affirmative statements that the mineralization was uneconomic—they are observations either that a previous appraiser found in 1986 that the mineralization was uneconomic or that NGL failed to demonstrate that the mineralization would have been economic to extract on the date of value. (ECF No. 432 at 3.) The Court rejects Landowners' request to exclude Dr. Singer's entire opinion in favor of atomistic consideration of particular challenged statements below.

///

///

---

[17]The parties use the term "2014 SME/CIM Standards" to refer to the nearly identical resource reporting standards established by the Canadian Institute of Mining, Metallurgy and Petroleum ("CIM") and the Society for Mining, Metallurgy & Exploration ("SME"). (ECF No. 400 at 2 n.1.)

#### a. Statement No. 1

Statement No. 1 provides: "As demonstrated below, the Nexus Geos estimates of indicated and inferred resources remaining at the Groom Mine property are not supported by relevant and reliable information and must be rejected." (ECF No. 432-1 at 2.) The government does not object to the exclusion of this sentence. (ECF No. 432 at 10.) Accordingly, the Court will grant Landowners' motion as to Statement No. 1.

#### b. Statement No. 2

Landowners withdrew their request to exclude Statement No. 2. (ECF No. 480 at 7.) Accordingly, the Court takes no action with respect to Statement No. 2.

#### c. Statement Nos. 3 & 4

Statement No. 3 provides: "The Pioche deposit is also a polymetallic replacement-type deposit, but that does not support an estimate of 9,000,000 tons of inferred resources at depth at the Groom Mine." (ECF No. 432-1 at 21.)

Statement No. 4 provides: "Thus, the assertion by Nexus Geos that the similarity of the Groom Mine property to the Pioche Deposit justifies an estimate of 9 million tons of inferred resources at depth is wrong." (*Id.*)

Landowners argue that both statements must be excluded because they require application of the 2014 SME/CIM Standards. (ECF No. 480 at 7-8.) The government disputes this characterization, insisting that Dr. Singer has simply stated that knowing the tonnage of one deposit is insufficient to estimate the tonnage of another deposit. (*See* ECF No. 432 at 11-13.)

The Court agrees with the government. Dr. Singer opined that tonnages among deposits of the same type "often vary by factors of 4 to 25, or more." (ECF No. 432-1 at 20.) He is qualified to express this opinion because he is a geologist with expertise on the geology of Nevada, the mineral deposits found there, and the use of EMINERS. (ECF No. 432 at 12-13.) And this opinion is a sufficient basis for concluding that the similarity of the deposit types at Pioche and the Property does not necessarily imply similarity of tonnage. ///

39

No step of this analysis requires application of the 2014 SME/CIM Standards. Accordingly, the Court will deny Landowners' motion as to Statements No. 3 and 4.

### d.    Statement No. 5

Statement No. 5 provides: "This is not the kind of mistake that should be made by experts in modern methods of ore reserve estimation." (ECF No. 432-1 at 23.) The mistake Dr. Singer identifies is NGL's failure to account for densities, spatial distributions, and volumes when extrapolating ore tonnage from samples. (*See id.* at 22-23.)

Landowners argue that Dr. Singer cannot opine as to what is involved in "modern methods of ore reserve estimation" because he lacks expertise in applying the 2014 SME/CIM Standards. (ECF No. 480 at 8.) The government argues that Dr. Singer is qualified to interpret a cumulative frequency plot and offer his explanation of the mistake that NGL made. (ECF No. 432 at 14.) The Court agrees with the government. Dr. Singer's explanation does not incorporate the application of the 2014 SME/CIM Standards and is admissible. (*See id.*) Accordingly, the Court denies Landowners' motion as to Statement No. 5.

### e.    Statement No. 6

Statement No. 6 contains five sentences, two of which the government concedes should be excluded. (ECF No. 432 at 14.) Those two sentence are struck from the statement reproduced below:

> Critique: [1] The 1 million tons in the indicated category (not consistent with the modern classification of resources) is based on 13 drill holes that go to a depth of up to 210 feet. [2] The Godbe report (1988) points out that in addition to needing more drilling to confirm these numbers, the 1 million tons would be uneconomic at 1986 prices and costs. [3] ~~The 13 drill holes would be considered insufficient to establish the degree of geological and grade continuity appropriate for a modern inferred classification of resources in my view.~~ [4] Nothing presented in the Nexus Geos report shows that 1 million tons would be economic to mine at 2015 prices and costs. [5] ~~Nexus Geos's report does not present adequate support to determine that there are 1 million tons of indicated resources, under modern classification standards.~~

(ECF No. 432-1 at 25.)

Landowners argue that the first sentence should be excluded because it requires application of the 2014 SME/CIM Standards. (ECF No. 480 at 9.) In particular, Landowners

seem to take issue with the parenthetical statement "not consistent with the modern classification of resources." The government argues that the parenthetical statement does not require application of the 2014 SME/CIM Standards because it simply references a fact—the 1 million tons of mineralization identified in the McClung Estimate are not consistent with modern classification standards. (ECF No. 432 at 15.) The government argues that the remainder of the sentence is similarly factual. (*Id.*) Landowners counter that the parenthetical only could apply to NGL's estimate of 1 million tons of indicated resources because the preceding statement references NGL's report, not the McClung Estimate. (ECF No. 480 at 9.) While the reference in Dr. Singer's report to "[t]he 1 million tons in the indicated category" is somewhat ambiguous, the parenthetical suggests that Dr. Singer intended to refer to the McClung Estimate, which the Court already understands as inconsistent with the modern classification system. (*See* ECF No. 246 at 24.) Accordingly, the statement is factual and admissible.

The government argues that the second sentence is simply a statement of fact. (ECF No. 432 at 15.) The Court agrees. While Landowners may dislike the inferences that can be drawn from the statement (*see* ECF No. 480 at 9), they are free to argue against those inferences at trial. Accordingly, the second sentence is admissible.

Landowners make several arguments that the fourth sentence is inadmissible, but the Court agrees with the government that the statement amounts to an observation that NGL has not shown that any of the mineralization would be economic to extract as of the date of taking. (*See* ECF No. 480 at 10-11; ECF No. 432 at 15.) Accordingly, the fourth sentence of the statement is admissible.

In summary, the Court grants Landowners' motion as to the third and fifth sentences and denies Landowners' motion as to the first, second, and fourth sentences.

### f.      Statement No. 7

Statement No. 7, with the challenged portion underlined, provides: "Because the mined material at the Groom Mine was within 210 feet of the surface, the projected additional 700,000 tons would occur within 210 feet of the surface also. It would be at the

shallow depth <u>and total less than the estimated 1 million tons of 'indicated resources'</u> <u>mentioned as uneconomic</u>." (ECF No. 432-1 at 25.)

Landowners argue that the underlined portion of Statement No. 7 is inadmissible because Dr. Singer does not know what is required to define mineralization as an indicated resource and did not conduct analysis to conclude whether the mineralization was uneconomic as of the date of taking. (ECF No. 480 at 11.) The government argues that the disputed portion is admissible because Dr. Singer is simply noting that (1) 700,000 is less than McClung's 1 million tons of estimated "ore reserve" (an outdated classification system) and (2) this 1 million tons, as noted by McClung, was not economic to extract in 1986 when the estimate was prepared. (ECF No. 432 at 16.) The Court agrees with the government that the statement is admissible. Accordingly, the Court denies Landowners' motion as to Statement No. 7.

### g.    Statement No. 8

The portion of Statement No. 8 that remains in dispute provides: "In addition, the Nexus Geos opinion that there are 2 to 3 undiscovered deposits at depth containing 9 million tons of inferred mineralization is unsupported by any information that is unbiased." (ECF No. 432-1 at 25.)

Landowners argue that this portion of Statement No. 8 should be excluded because it refers to the information used to quantify inferred mineralization. (ECF No. 480 at 11.) The government argues that the disputed portion of the statement lies within Dr. Singer's expertise because—given the size of the Property claims—there can only be one deposit at the Property, and it has already been discovered. (ECF No. 432 at 17.) The government also argues that Dr. Singer is qualified to opine that the existence of mineralization in other Nevada locations (the Black Metal mine and Pioche mining district) is not sufficient to support a specific estimate of 9 million tons. (*Id.*) The Court agrees with the government that these opinions lie within his proffered area of expertise as an expert on the geology of Nevada and the types of mineral deposits found there. Accordingly, the Court denies Landowners' motion as to the disputed portion of Statement No. 8.

42

In summary, the Court grants Landowners' motion as to Statement No. 1. The Court denies Landowners' motion as to Statements Nos. 3, 4, 5, and 7 as well as the disputed portion of Statement No. 8. As to Statement No. 6, the Court grants Landowners' motion as to the third and fifth sentences and denies Landowners' motion as to the first, second, and fourth sentences.

### F.   GOVERNMENT'S MOTION TO EXCLUDE THE EXPERT OPINION AND TESTIMONY OF GEORGE HARRIS (ECF NO. 404)[18]

The Court will grant the government's motion to exclude the expert opinion and testimony of George Harris—hired by Landowners as an expert rebuttal witness—for the following reasons.

Harris provided a one-page expert report that is reproduced in its entirety below:

Rebuttal of Warren Neville Financial Feasibility Determination

I have been asked to address the highest and best use conclusion by Warren Neville, an appraiser retained by the United States Government to appraise the Groom Mine 400 acre property. It is my understanding that Mr. Neville concludes that "given the physical constraints of the subject, it is unlikely that a potential buyer of the 6 patented claims would consider developing the property as a commercial resort or recreational vehicle park. This is due to the uncertain financial feasibility of this type of use." It is also my understanding that Mr. Neville concludes "[h]ence, the highest and best use of the patented claims is rural recreational use."

I strongly disagree with Mr. Neville's highest and best use conclusion for the following reasons:

- I have visited the Landowners' Property and know that it is located in Lincoln County and has a clear and unobstructed view of Area 51.

- I am aware that there is significant interest in seeing Area 51 as I am the owner of the Alien Research Center in Hiko, Nevada and the Alien Tequila Spirits;

- It is my opinion that persons would pay to enter onto the Landowners' Property to see Area 51; and

- That a tourist commercial use on the Landowners' Property would succeed.

[Signature block]

---

[18]The Court has reviewed the response (ECF No. 434) and reply (ECF No. 482) related to this motion.

My Curriculum Vitae is attached hereto;

Testimony and deposition history in the past 4 years (N/A);

Publications within the past 10 years - I have published articles within the magazine Liberty Watch on a variety of subjects within the past 10 years.

Payment: $250 per hour[.]

(ECF No. 404-1.) Although the report indicates that Harris's curriculum vitae was attached, it was not attached because Harris does not have a current resume or curriculum vitae. (ECF No. 404 at 2-3.)

Landowners argue that Harris is qualified to provide expert rebuttal to Neville's testimony regarding financial feasibility because he has actual and specific business experience in the exact market sector (alien and Area 51 related tourism) at direct issue in this case. (ECF No. 434 at 13.) However, Landowners have not shown that Harris is qualified to provide expert testimony on financial feasibility and the determination of a property's highest and best use. Rather, Landowners have shown that Harris may be able to provide lay witness testimony.

Accordingly, the Court grants the government's motion to exclude the expert opinion and testimony of George Harris.

### G. GOVERNMENT'S MOTION TO EXCLUDE LANDOWNERS DANNY AND JOE SHEAHAN'S OPINIONS OF VALUE (ECF NO. 402)[19]

The Court grants the government's motion to exclude Landowners Danny and Joe Sheahan's opinions of value for the following reasons.

#### 1. Background

Two Landowners—Danny and Joe Sheahan—have expressed opinions concerning the value of the Property. Danny is about 62 years old and has worked at the Groom Mine for most of his life. (ECF No. 431 at 17.) Joe is about 57 years old and has spent most of his life in southern Nevada. (*Id.* at 12.) He worked at McCarran International

///

---

[19]The Court has reviewed the response (ECF No. 431) and reply (ECF No. 473) related to this motion.

Airport for 20 years and for America West and Frontier Airlines for 13 years. (*Id.*) He has spent a great deal of time at the Property over the course of his life. (*Id.*)

Danny values the Property at $79,488,000 based on use of the Property for active mining. (*See* ECF No. 402-2 at 12; ECF No. 402 at 5.) Danny arrived at this figure by multiplying the following factors: grade of remaining mineralization (8 ounces of silver per ton), quantity of remaining mineralization (15 million tons), price of silver ($14.72 per ounce), and royalty rate (4.5%). (*Id.*)

Joe values the Property at $74,250,000 based on use of the Property as an Area 51-themed tourist attraction. (ECF No. 402-1 at 16-17.) Joe arrived at this figure using the direct capitalization method. Under this method, a property's value is determined by multiplying the annual income generated by the Property by a fixed factor or "multiplier." (ECF No. 402 at 6.) Joe assumed that the business would draw 250 people each day to see Area 51, 200 of whom would pay $500 to spend a few hours on the Property and 50 of whom would pay $1000 to spend the night. (*Id.*) Joe assumed the business would operate 330 days a year and generate $49,500,000 in annual gross income. (*Id.*) Joe then assumed that the operator of the business would pay 25% of the assumed gross income to rent the property ($12,375,000). (*Id.*) Joe then chose an income multiplier of 6, resulting in a value of $74,250,000. (*Id.*)

Joe also expressed an alternative opinion of value based on active mining. (*Id.* at 8.) Using the same method as Danny, he values the Property between $46,685,952 and $70,028,928 as an active mine. (*Id.*)

## 2. Discussion

Danny and Joe's opinions are inadmissible because they have not complied with Federal Rule of Evidence 702. While Danny and Joe are offered as lay witnesses, their testimony is based on scientific, technical, and other specialized knowledge under Rule 702 as opposed to their own perceptions under Rule 701. Their testimony is scientific and technical in nature because it relies on computation of various factors that require specialized knowledge. For example, a lay person does not typically know how to calculate

a royalty rate or how to use a direct capitalization method of valuation. While the calculations involve simple multiplication, identifying and computing the factors to be multiplied requires specialized knowledge. Danny and Joe cannot qualify as expert witnesses because Landowners have not offered them as expert witnesses or identified their qualifications to provide expert testimony.

Landowners argue that Danny and Joe may testify about the value of the Property solely because of their ownership. (ECF No. 431 at 6.) The government counters that the right to give an opinion of value is not absolute. (ECF No. 473 at 2.) The Court agrees with the government. None of the cases that Landowners cite expressly exempt landowners from the requirements of Rule 702 when they are offering testimony based on scientific, technical, or other specialized knowledge. Indeed, the Eighth Circuit case that Landowners primarily rely upon, *U.S. v. 3,698.63 Acres*, 416 F.2d 65 (8th Cir. 1969), was decided in 1969, six years before the Federal Rules of Evidence were adopted in 1975. Moreover, the Advisory Committee Notes to the 1972 Proposed Rules affirmatively indicate that landowner opinions of value are subject to Rule 702: "Thus within the scope of the rule [referring to Rule 702] are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." Finally, the government cites several recent cases in which courts have applied Rule 701 or 702 to landowners' opinions of value. *See, e.g.*, *United States v. Easement Over 6.09 Acres*, 140 F. Supp. 3d 1218, 1242 (N.D. Ala. 2015).

Accordingly, the Court grants the government's motion to exclude Landowners Danny and Joe Sheahan's opinions of value.

## XI.  MOTIONS FOR RECONSIDERATION

### A.  LEGAL STANDARD

A motion to reconsider must set forth "some valid reason why the court should reconsider its prior decision" and set "forth facts or law of a strongly convincing nature to persuade the court to reverse its prior decision." *Frasure v. United States*, 256 F. Supp.

2d 1180, 1183 (D. Nev. 2003). Reconsideration is appropriate if this Court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J v. AC&S, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). "A motion for reconsideration is not an avenue to re-litigate the same issues and arguments upon which the court already has ruled." *Brown v. Kinross Gold, U.S.A.*, 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005). Both the government's motions for reconsideration appear to be properly considered on the basis of newly discovered evidence, and Landowners do not dispute this.

### B. GOVERNMENT'S MOTION TO EXCLUDE EVIDENCE OF SALES TO THE GOVERNMENT (ECF NO. 406)[20]

The Court grants the government's motion to exclude evidence of sales to the government for the following reasons.

#### 1. Background

In an earlier motion, the government sought to exclude expert opinions that relate to or consider value to the government in determining just compensation. (ECF No. 241 at 7.) The Court denied relief because it was unclear at the time whether Landowners' experts had improperly considered value to the government. (*See id.* at 10-11.)

The government seeks partial reconsideration of that order, asking the Court to exclude evidence of the prices paid by the government to acquire (1) a former industrial railyard adjacent to Tinker Air Force Base in Oklahoma City (the "Tinker Acquisition") and (2) the Indian Springs Casino, an operating casino/resort, hotel, and restaurant, gas station/convenience store, and RV park adjacent to Creech Air Force Base in Indian Springs, Nevada (the "Creech Acquisition"). (ECF No. 406 at 3.)

Two of Landowners' experts—Richard Roddewig and Tio DiFederico—used data from these sales in their reports.

///

///

---

[20]The Court has reviewed the response (ECF No. 436) and reply (ECF No. 485) related to this motion.

47

Roddewig analyzed the Creech and Tinker Acquisitions and concluded that the Air Force paid a substantial location premium to acquire the adjacent properties. (ECF No. 406-2 at 8 ("Our analysis of both acquisitions indicated the Air Force likely paid a substantial location premium to acquire the adjacent properties.").) To determine this, Roddewig estimated the sales price of the properties that were taken in the Creech Acquisition as if they were purchased by private buyers. (*See id.* at 18-31.) Roddewig totaled that amount, then compared it to the amount that the United States paid. (*Id.* at 30-31.) Roddewig found that that the price paid by the Air Force for the Creech Acquisition was between 26% and 112% higher than the price private buyers would have paid. (*Id.* at 30.) Roddewig performed a similar analysis for the Tinker acquisition and concluded that the premium the government paid for the land ranged from 60% to well over 1,000%. (*Id.* at 34-35.) Based on these sales, Roddewig added a premium of 25% to his appraisal value of the Property. (*Id.* at 35.)

DiFederico relied on the Creech and Tinker Acquisitions as comparable sales, comparing them to the Property to estimate value under the sales comparison approach. (*See* ECF No. 406-1 at 24-25.) DiFederico found that the Property compared favorably to both properties and would command a higher price. (*Id.* at 24-25.)

### 2.    Discussion

"The price paid by a condemnor in settlement of condemnation proceedings or in anticipation of such proceedings is inadmissible to establish value of comparable land as 'such payments are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value.'" *United States v. 10.48 Acres of Land*, 621 F.2d 338, 339 (9th Cir. 1980) (quoting *Slattery Co. v. United States*, 231 F.2d 37, 41 (5th Cir. 1956)). "The only recognized exceptions to this rule are in cases of voluntary sale, or where 'the fact that parties were condemnor and condemnee either was not known or had no influence because the sale was not in connection with, or in anticipation of, condemnation proceedings.'" *Id.* (quoting *Slattery*, 231 F.2d at 41); *see also United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1498 (9th Cir. 1997).

A proponent of evidence within one of these exceptions "must show that the sales were uninfluenced by the buyer's possession of the eminent domain power." *United States v. 2.739 Acres of Land*, No. CV 09-488 TUC AWT, 2013 WL 11311743, at *1 (D. Ariz. Mar. 13, 2013), *aff'd*, 609 F. App'x 436 (9th Cir. 2015) (quoting *Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 19 (5th Cir. 1969)).

In *2.739 Acres*, the court found that two sales to entities with the power of eminent domain were admissible as voluntary sales. The first was a sale of land from the Arizona Department of Transportation ("ADOT") to the United States. *Id.* In connection with that sale, the government's appraiser testified "that he had investigated and confirmed the voluntary nature of the sale as part of his due diligence in preparing his appraisal report." *Id.* The court also considered a letter in which the government purchaser said that the offer amount was based on a recent appraisal. *Id.* at *1-2. "The price offered in this letter was ultimately the price paid, and there was no mention of condemnation proceedings anywhere." *Id.* at *2. The court found it "clear that the sale price did indeed reflect fair market value, rather than a compromise to avoid litigation." *Id.*

The second was a previous sale of land from a private party involved in the litigation with the ADOT. *Id.* The Court noted that the private party's conduct suggested it was "enthusiastic" about the deal and concluded that the private party "took advantage of a welcome opportunity to sell some of its vacant land to ADOT, without any hint of compulsion." *Id.*

The Ninth Circuit expressly affirmed both the trial court's rulings:

> [I]t was not an abuse of discretion to admit the sale to ADOT, because that sale was not used as a comparable and was instead offered to rebut testimony that Holy Cross was reluctant to sell its property. That sale was properly disclosed in a letter by Aries that Holy Cross attached to its motion to exclude Aries' testimony. It was also not an abuse of discretion to admit the sale to GSA, given the government's evidence that the sale had been voluntary.

*United States v. 2.739 Acres of Land*, 609 F. App'x 436, 438 (9th Cir. 2015).

Landowners have not shown that the Creech Acquisition was "uninfluenced by the buyer's possession of the eminent domain power." *2.739 Acres*, 2013 WL 11311743, at

*1. The owners of the Creech property expressly informed the Air Force that they "were not opposed to pursuing litigation to ensure that they are paid the fair value of the property." (ECF No. 436-1 at 3.) In addition, the report states that the owners' attorney reiterated "no less than three times during negotiation talks" that Air Force delays in acquiring the property had diminished its value. (*Id.* at 2-3.) Plus, unlike in *2.739 Acres*, the price offered was not the price paid. The government initially offered $9,940,000 and increased the offer to $9,965,000 the next day due to an increase in the land area determined by a professional survey. (*Id.* at 2.) The owners counteroffered at $12,250,000 in part because "the Air Force's actions in recent years have considerably diminished the value of [the] property." (*Id.*) The "action in recent years" seems to refer to the "Air Force's inaction to acquire the property promptly after the public announcement of their intent to acquire the property." (*See id.*) The government made another offer of $10,200,000. (*Id.*) The owner then made a final offer of $11,450,000, and the government accepted. (*Id.* at 3.) While the negotiator's report states that "[n]egotiations were conducted in a fair and courteous manner and no threats of condemnation were made," the content of the report suggests that the owners resented the Air Force's delay and negotiated under the express possibility of litigation. Accordingly, the Court finds that the Creech Acquisition is not admissible as a reflection of "fair market value, rather than a compromise to avoid litigation." *2.739 Acres*, 2013 WL 11311743, at *1.

Landowners also have not produced sufficient evidence to show that the Tinker Acquisition is admissible. Landowners rely solely on a news article that does not demonstrate either exception to the general rule against admission of government sales applies. (*See* ECF No. 436 at 8-9; *see also* ECF No. 436-7.) The news article details a complex negotiation between the property owner—Burlington Northern Santa Fe Railway ("Railway")—the federal government, the Oklahoma state government, and the Oklahoma City government. (*See generally* ECF No. 436-7.) Nowhere does the article expressly state that the sale was "uninfluenced by the buyer's possession of the eminent domain power," nor does the article imply such a conclusion. When the government approached the

50

Railway, the Railway proposed selling the property for $75 million even though the U.S. Army Corps of Engineers "had appraised the property at about $5 million or $6 million." (ECF No. 436-7 at 6.) Ultimately, the Railway accepted an offer of $44 million. (*Id.* at 7.) The Railway became concerned about liability regarding environmental issues over the course of the sale and then "still hesitated because of other dealings they had in the state." (*Id.* at 11-12.) Nevertheless, the sale proceeded. At best, Landowners have provided insufficient information for the Court to conclude that the Tinker Acquisition was uninfluenced by the government's power of eminent domain. At worst, the article suggests a reluctant sale on the part of the Railway that was perhaps only accomplished through the tacit threat of condemnation.

Accordingly, the Court grants the government's motion to exclude evidence of sales to the government and excludes evidence of the Creech and Tinker Acquisitions.

### C. GOVERNMENT'S PARTIAL MOTION TO RECONSIDER EXCLUDING ALL EVIDENCE REGARDING ONLINE SURVEYS (ECF NO. 407)[21]

The Court grants the government's partial motion to reconsider excluding all evidence regarding online surveys for the following reasons.

#### 1. Background

Several of Landowners' experts relied on survey data to predict how much revenue the Property would generate if it were transformed into a commercial tourist destination. (ECF No. 246 at 3.) The Court has previously referred to two of these surveys as Qualtrics I and Qualtrics II. (*See id.*) The government sought to exclude the results of these surveys as inconsistent with generally accepted principles of survey research in a prior motion. (*See id.* at 8.) The Court denied relief. (*Id.*) The government again seeks to exclude Qualtrics I and II, this time based on Landowners' purported involvement in the drafting of the surveys. (ECF No. 407 at 4.)

///

///

---

[21]The Court has reviewed the response (ECF No. 441) and reply (ECF No. 483) related to this motion.

## 2.    Discussion

Counsel's involvement in designing surveys can render them inadmissible. In *Elliott v. Google, Inc.*, the Ninth Circuit affirmed a district court's exclusion of survey data when those surveys were designed by the proponent's counsel. 860 F.3d 1151, 1160 (9th Cir. 2017). The court noted that counsel was "not qualified to design or interpret surveys" and cited the Federal Judicial Center's Reference Manual on Scientific Evidence, which explains that survey design typically requires graduate training or professional experience in survey research. *Id.* In *Marlo v. United Parcel Service, Inc.*, the Central District of California found that a survey was flawed and inadmissible in part because the plaintiff's counsel "who has not claimed to be an expert on survey methodology appears to have designed the questions." 251 F.R.D. 476, 485 (C.D. Cal. 2008).

Here, the evidence suggests that Landowners' counsel—who do not claim to be experts on survey methodology—designed the questions. Landowners argue that Qualtrics—a company that helped to administer the survey online—helped to design the substantive questions in the surveys (ECF No. 441 at 3-6), but Qualtrics' 30(b)(6) designee testified to the contrary:

> Q. [D]id Qualtrics have responsibility for the survey methodology of Job One?
> A. No.
> Q. And did Qualtrics have responsibility for the survey design of Job One?
> A. No.
>
> ***
>
> Q. [D]id Qualtrics have a responsibility for the survey methodology of Job Two?
> A. No.
> Q. Did Qualtrics have responsibility for survey design of Job Two?
> A. No.
>
> ***
>
> Q. So starting with Job One, was Qualtrics responsible for the content of the survey?
> A. No.
> Q. And for Job Two, was Qualtrics responsible for the content of the survey?
> A. No.

(ECF No. 407-10 at 6-7.) Landowners have not identified any evidence that would refute the designee's testimony, such as emails from Qualtrics containing substantive questions that were obviously drafted by Qualtrics employees.

Landowners further argue that the survey design was a team effort, including Landowners' expert Cameron Steinagel and members of his consulting firm. (ECF No. 441 at 3-6.) But the government correctly notes that Landowners "have not revealed which team members had responsibility for ensuring the surveys' substantive reliability or shown how those team members are qualified to do so." (ECF No. 483 at 10.) Plus, Steinagel expressly disclaimed responsibility for "formulat[ing] questions for the second survey." (ECF No. 441-1 at 43.)

Landowners assert that their counsel "was not the mastermind behind authoring the Qualtrics Surveys" (ECF No. 441 at 2), but it seems evident that Landowners' counsel were substantively involved in drafting the survey questions since Qualtrics was not. Landowners have not argued that their counsel have expertise in survey methodology. And to the extent that the survey questions were the product of a team effort, Landowners have not established which members of the team ensured the reliability of the substantive questions or their qualifications for doing so.

Accordingly, the Court grants the government's partial motion to reconsider excluding all evidence regarding online surveys, and the Court will exclude all evidence of the Qualtrics surveys and portions of Landowners' experts' opinions that rely on those surveys.

///
///
///
///
///
///
///

## XII.    MOTIONS DENIED AS MOOT

### A.    LANDOWNERS' MOTION FOR SUMMARY JUDGMENT ON RANGE OF VALUES FOR JUST COMPENSATION THAT CAN BE PRESENTED TO THE FACTFINDER (ECF NO. 391)[22]

The Court denies Landowners' motion for summary judgment on the range of values for just compensation that can be presented to the factfinder as moot for the following reasons.

Landowners' seek summary judgment "that the range of testimony for this case is between the values testified to by the Landowners and the independent valuation experts they have retained in their case-in-chief." (ECF No. 391 at 2.) Landowners' motion is expressly predicated on the Court having granted their motion to exclude Neville's testimony. (*See id.*) Given that the Court has denied Landowners' motion to exclude Neville's testimony, *see supra* Section X(B), the Court will deny this motion as moot.

Accordingly, the Court denies Landowners' motion for summary judgment on the range of values for just compensation that can be presented to the factfinder as moot.

### B.    LANDOWNERS' MOTION REGARDING ACCESS TO AND VIEW FROM THE PROPERTY (ECF NO. 386)[23]

The Court will deny Landowners' motion regarding access to and view from the Property as moot for the following reasons.

Landowners ask the Court to decree that the following propositions related to the Property are true: (1) Landowners had full and unrestricted access to the Property for themselves and their business invitees; (2) the government had no legal right to constrain, interfere with, restrict, move, or prohibit this access; (3) there is a clear and unobstructed view of the secret military base known as Area 51 from the Property; and (4) the

///

///

---

[22]The Court has reviewed the response (ECF No. 448) and reply (ECF No. 472) related to this motion.

[23]The Court has reviewed the response (ECF No. 440) and reply (ECF No. 470) related to this motion.

1  government is prohibited from denying this view or claiming that it was impeded in any

2  way. (*See* ECF No. 386 at 2.)

3      Landowners' first request is moot. The government "does not dispute that a buyer

4  could be granted permission to the NTTR to access the Groom Mine for themselves, their

5  employees, and business visitors." (ECF No. 440 at 16.)

6      Landowners' second request also is moot. The only dispute between the parties in

7  relation to the second request is whether the Air Force can require visitors by force of law

8  to pass through security checkpoints. (*See* ECF No. 440 at 20; ECF No. 470 at 13.) But

9  Landowners' evidence is designed to show that the security checkpoints—legally

10 enforceable or not—cause the value of the Property to increase. (*See* ECF No. 440 at 22-

11 23; ECF No. 470 at 12-13 (the experts "used these access limitations as an <u>increase</u> to

12 the value of the Property"); ECF No. 440-4 at 12 (one expert's assertion that "the enhanced

13 security and screening requirements – and limitations on visitors – would enhance the

14 visitor experience and make the Groom Mine more desirable as a travel destination since

15 it would ratify the widespread popular culture beliefs and mythology about Area 51 and its

16 purposes").)

17     Landowners express concern that the government will claim it could delay

18 processing individuals through the security checkpoint for up to 20 hours (ECF No. 470 at

19 13), but Landowners exaggerate the government's position. While the government asserts

20 that guards might spend 20 hours per day screening visitors, it is clear that no one

21 individual would regularly wait 20 hours per day for screening. Rather, the government's

22 contention is based on an estimate that guards would spend one to two minutes per visitor

23 screening, for a total screening time of 20 hours per day. (ECF No. 440 at 23.)

24     Defendants' third and fourth requests are overbroad, vague, and ambiguous. As

25 the government points out, "[i]t is illogical to assume the Groom Mine has a clear an[d]

26 unobstructed view of a facility miles away in all weather conditions, at all times, and in all

27 seasons." (ECF No. 440 at 24.)

28 ///

1    Accordingly, Landowners' motion regarding access to and view from the Property

2    is denied as moot.

3    **C.    GOVERNMENT'S MOTION TO EXCLUDE EVIDENCE AND ARGUMENT
            RELATED TO ACTIVE MINING AS THE HIGHEST AND BEST USE OF
4           THE PROPERTY (ECF NO. 403)[24]**

5    The Court denies the government's motion to exclude evidence and argument

6    related to active mining as the highest and best use of the Property as moot for the

7    following reasons.

8    The government moves to exclude all evidence and argument that active mining is

9    the highest and best use of the Property. (ECF No. 403 at 3.) The government's motion is

10   moot because Landowners concede that "no witness in this case believes that 'active

11   mining' is the highest and best use of the Landowners' property or its mineral estate on

12   the date of value."[25] (ECF No. 433 at 2.) The government's motion also is moot because

13   it has already received its requested relief. First, the government seeks to exclude Danny

14   and Joe Sheahan's opinions of value. (ECF No. 403 at 4.) The Court already has excluded

15   Danny and Joe Sheahan's opinions of value because Landowners sought to elicit their

16   testimony in violation of Federal Rule of Evidence 702. *See supra* Section X(G). Second,

17   the government seeks to exclude a small portion of Richard Roddewig's opinion of value

18   based on ongoing mining. (ECF No. 475 at 2.) Roddewig already has prepared a

19   supplemental analysis disregarding any potential income from ongoing limited mining of

20   the Property. (*Id.*) Thus, it does not appear that Landowners seek to offer Roddewig's

21   opinion of value based on ongoing mining.

22   Accordingly, the Court denies the government's motion to exclude evidence and

23   argument related to active mining as the highest and best use of the Property as moot.

24   ///

25   _____

26   [24]The Court has reviewed the response (ECF No. 433) and reply (ECF No. 475)
     related to this motion. The Court also heard oral argument on this motion on July 1, 2019.
     (ECF No. 493.)

27

     [25]To the extent that Landowners Danny and Joe Sheahan's opinions of value are
28   based on use of the Property for active mining, the Court has excluded those opinions.
     *See supra* Section X(G).

## XIII.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions addressed in this Order.

It is therefore ordered that Landowners' motion regarding the standard of admissibility that applies in this case (ECF No. 385) is denied.

It is further ordered that Landowners' motion to exclude the opinion and testimony of Warren Neville (ECF No. 390) is denied.

It is further ordered that Landowners' motion to exclude the opinion and testimony of Nathan Moeder (ECF No. 398) is denied.

It is further ordered that Landowners' motion to exclude the opinion and testimony of Marc Springer (ECF No. 399) is denied.

It is further ordered that Landowners' motion to exclude the opinion and testimony of Dr. Donald Singer (ECF No. 400) is granted in part and denied in part. The Court grants Landowners' motion as to Statement No. 1. The Court denies Landowners' motion as to Statements Nos. 3, 4, 5, and 7 as well as the disputed portion of Statement No. 8. As to Statement No. 6, the Court grants Landowners' motion as to the third and fifth sentences and denies Landowners' motion as to the first, second, and fourth sentences.

It is further ordered that the government's motion to exclude the expert opinion and testimony of George Harris (ECF No. 404) is granted.

It is further ordered that the government's motion to exclude the opinion and testimony of Danny and Joe Sheahan (ECF No. 402) is granted.

It is further ordered that the following motions are denied as moot: Landowners' motion for summary judgment on the range of values for just compensation that can be presented to the factfinder (ECF No. 391); Landowners' motion regarding access to and view from the Property (ECF No. 386); and the government's motion to exclude evidence

///

1 │ and argument related to active mining as highest and best use of the Property (ECF No.
2 │ 403).

3 │    It is further ordered that Landowners' motion to exclude all evidence of
4 │ environmental contamination (ECF No. 395) is denied.

5 │    It is further ordered that Landowners' motion to confirm uses of unpatented land
6 │ (ECF No. 396) is denied.

7 │    It is further ordered that Landowners' motion to establish the condition of the
8 │ Property related to water rights (ECF No. 397) is denied.

9 │    It is further ordered that the government's combined motion for a property viewing
10 │ and to appoint a land commission (ECF No. 401) is granted.

11 │    It is further ordered that the government's motion to exclude evidence of sales to
12 │ the government (ECF No. 406) is granted.

13 │    It is further ordered that the government's partial motion to reconsider excluding all
14 │ evidence regarding online surveys (ECF No. 407) is granted.

15 │    It is further ordered that the government's motion to exclude the income
16 │ capitalization approach (ECF No. 408) is granted.

17 │    It is further ordered that the government's motion to exclude valuation evidence
18 │ premised on tourism use (ECF No. 409) is denied.

19 │    DATED THIS 29th day of August 2019.

20 │

21 │                          _____
22 │               MIRANDA M. DU
              UNITED STATES DISTRICT JUDGE