NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada

TROY K. FLAKE
Deputy Civil Chief
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Telephone: 702-388-6336
Facsimile: 702-388-6787
Email: troy.flake@usdoj.gov

EUGENE N. HANSEN
JOHANNA M. FRANZEN
ANTHONY C. GENTNER
MARK C. ELMER
Trial Attorneys, U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
Telephone: 202-305-0301
Facsimile: 202-514-8865
Email: eugene.hansen@usdoj.gov
        johanna.franzen@usdoj.gov
        anthony.gentner@usdoj.gov
        mark.elmer@usdoj.gov

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:15-cv-01743-MMD-NJK |
| Plaintiff, | **UNITED STATES' MOTION IN LIMINE TO EXCLUDE CERTAIN EVIDENCE FROM TRIAL** |
| v. | |
| 400 ACRES OF LAND, more or less, situate in Lincoln County, State of Nevada; and JESSIE J. COX, et al., | |
| Defendants. | |

The United States respectfully submits the following motion *in limine* to exclude certain evidence at trial pursuant to Fed. R. Evid. 401 and 403, the Court's Scheduling Order providing for an *in limine* motion (ECF 506), and the Court's Civil Standing Order No. 1.

The Parties met and conferred on October 22, 24, and 31, 2019, in an effort to resolve all *in limine* issues.  These conferences resolved most of the issues between the Parties, as set forth in the Stipulation Regarding In Limine Issues (ECF 540).  With respect to points raised by the United States, two issues remain: (1) whether Richard Roddewig should be permitted to testify in light of the Court's exclusion of his income-approach valuation and exclusion of the Qualtrics surveys (upon which Roddewig relies), and (2) whether Dr. Terrence Clauretie should be permitted to testify in light of the Court's exclusion of his "value to the government" and income-approach valuations and exclusion of the Qualtrics surveys (upon which Clauretie relies).

## **BACKGROUND**

This case concerns the just compensation owed for the taking of approximately 400 acres of patented and unpatented mining claims in Lincoln County, Nevada, referred to as the Groom Mine.  In an effort to determine the quantum of just compensation, Defendant Sheahan Landowners (hereafter "Landowners") disclosed three experts who valued the Groom Mine based on a hypothetical use of commercial tourism: Tio DiFederico, Richard Roddewig, and Dr. Terrence Clauretie.[1]  These three experts offered several possible "tourism" valuations ranging from $44 million (Roddewig) to as much as $116 million (Clauretie).

One of these valuation remains:  DiFederico's sales-comparison valuation of $50 million.  The Court excluded all other tourism-based valuations including Roddewig's income-approach valuation of $44 million and Clauretie's income-approach valuation of $116 million.  ECF 497 at 9-14 (Aug. 29, 2019 Order) (excluding use of the income-capitalization approach).  In a prior

---

[1]     Landowners separately retained Mineral Valuation Specialists ("MVS") to appraise the mineral estate.  The United States does not seek through this motion to exclude MVS's valuation of the mineral estate (currently $8.6 million).

order, the Court also excluded Clauretie's $2 billion and $1.2 billion claims for "value to the government." ECF 241 at 7.

Roddewig and Clauretie have offered no other opinions of value. They accordingly will not be able to testify to the value of the Groom Mine.

In the Parties' meet and confer, Landowners nonetheless informed the United States that they intend to call Roddewig and Clauretie to testify that the Groom Mine's highest and best use at the date of value was for commercial tourism. In other words, Landowners intend to have Roddewig and Clauretie testify that a hypothetical tourism operation at the Groom Mine would have been physically possible, legally permissible, financially feasible, and result in the highest value. ECF 497 at 5 (Aug. 29, 2019 Order) (citing *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1181 (9th Cir. 2000).

As set forth below, Roddewig and Clauretie should not be permitted to testify regarding highest and best use. Roddewig and Clauretie both base their highest and best use determination on the excluded Qualtrics surveys. Per this Court's Order, they may not so testify. ECF 497 at 53 (excluding those "portions of Landowners' experts' opinions that rely on [the Qualtrics] surveys"). Second, there is no need for Roddewig's and Clauretie's highest and best use testimony (assuming for the sake of argument that it had some marginal relevance to this case). DiFederico's sales-comparison valuation is the only "tourism" valuation remaining in the case, and DiFederico performed his own independent highest and best use analysis without considering or relying upon either Roddewig or Clauretie. Finally, in all events, the proposed testimony from Roddewig and Clauretie lacks relevance, would confuse the issues, waste time, and be cumulative. Fed. R. Evid. 403.

## I.   <u>IN LIMINE ISSUE #1</u>:  THE COURT SHOULD PRECLUDE RICHARD RODDEWIG FROM TESTIFYING AT TRIAL

### A.   The Court's Ruling Excluding the Qualtrics Surveys Should Preclude Roddewig From Testifying To Highest and Best Use

Roddewig relied upon the Qualtrics surveys to develop his opinion that commercial tourism was the highest and best use of the Groom Mine. Ex. 1 (Roddewig Rep.) at 00038 ("This appraisal report relies … on opinion survey research conducted by Qualtrics related to tourism potential of the Groom Mine property."). In particular, Roddewig relied on the Qualtrics surveys to establish the supposed market demand for an "Area 51" tourism business at Groom Mine, with tourists paying as much as $400/person to visit the property. *Id*. at 00104-108.[2]

In deposition, Roddewig confirmed that he used the Qualtrics surveys specifically for his highest and best use determination. In discussing various factors why his reliance upon Qualtrics supposedly was appropriate, Roddewig testified:

Q.   Number 5, "determine how the appraiser might rely on this information in making decisions and preparing his or her report." Did you do that [in reference to the Qualtrics surveys]?

A.   I did, **and this goes back to my use of the survey responses and our analysis of highest and best use and market value**.

Q.   Okay.  And you already talked about that?

A.   Correct.

Q.   Okay.  And No. 6 "determine the process and procedures used to evaluate the reports prepared by others." Did you do that for the Qualtrics 1 and Qualtrics 2 surveys?

A.   Yes.

Q.   Please explain how.

---

[2]      In determining demand, Roddewig also considered the results of surveys administered at the Alien Research Center ("ARC surveys"). Ex. 1 (Roddewig Rep.) at 00106-107. But that does not save his analysis. The Parties have stipulated that the ARC surveys are subject to exclusion under the law of the case. ECF 540 at ¶ 6 (Stipulation Regarding *In Limine* Issues).

A.     And again, that's summarized in our report, and it explains how we looked at the survey results and we evaluated and used them and then <u>relied on them in our appraisal</u>.

Ex. 2 (Roddewig Dep.) 578:9-579:3 (emphasis added); *id.* at 595:8-9 ("I considered it, but I didn't rely on it in the same way that I relied on the Qualtrics survey."); *id.* at 169:5-15 ("Q. Why did you consider the Alien Research Center surveys but not rely on them?  A.  For reliance on something, there's specific steps that you are required to take under the Uniform Standards of Professional Appraisal Practice…. We took those steps related to the Qualtronics [sic] surveys in order to rely on them….").

The Court should exclude Roddewig's highest and best use testimony.  Roddewig relied on the excluded Qualtrics surveys to determine highest and best use.  Per this Court's August 29, 2019 Order, all opinions relying on the Qualtrics surveys are subject to exclusion, not merely the Qualtrics surveys themselves.  ECF 497 at 53 (excluding those "portions of Landowners' experts' opinions that rely on [the Qualtrics] surveys").

## B.     Roddewig's Proposed Highest And Best Use Analysis Would Waste Time And Be Cumulative

The Court separately should exclude Roddewig's proposed highest and best use analysis because it would waste time and be cumulative (to the extent that his testimony would have relevance).  Fed. R. Evid. 403.  DiFederico will present the only "tourism" valuation at trial, and DiFederico conducted an independent highest and best use analysis.  Ex. 3 (DiFederico Rep.) 00080-83.  DiFederico did not consider or rely upon Roddewig in any respect.  Ex. 4 (DiFederico Dep.) 34:16-17 ("Q. Did you review [Roddewig's] report?  A.  No.").  There accordingly is no need for Roddewig to present a separate "highest and best use" opinion.  His proposed testimony would only waste time and be cumulative of DiFederico (to the extent the testimony would have any relevance).

## C.     Roddewig Should Not Be Allowed To Testify To Any Of The Four "Highest And Best Use" Criteria

Roddewig otherwise should not be allowed to testify to any of the four "highest and best use" criteria.

4

1

2

             1.      Roddewig Should Not Be Permitted To Testify To The Physical
Adaptability Of The Land

3

First, Roddewig should not be permitted to testify that the Groom Mine is physically

4

adaptable to commercial tourism.  Roddewig's analysis of physical possibility amounts to the

5

<u>conclusion</u> that the 400-acre property could host a tourism operation.  The entirety of his analysis

6

is imaged below:

7

**PHYSICALLY POSSIBLE USES**

8

9

10

11

Given the 400-acre size of the Groom Mine property, a large number of uses, including its historic
mining use and recreational tourism commercial use, are physically possible. Water rights and
the availability of well water sufficient to support the legally permissible uses is present at the
subject property according to the *Groom Mine Water Report*. That report also contains the
conclusion that sufficient water availability was present in 2015 to accommodate a low density
recreational tourism facility on the property.

12

13

Ex.1 (Roddewig Rep.) 00088.  This threadbare conclusion and reference to a <u>different</u> report

14

prepared by a <u>different Landowner expert witness</u> (Thomas Driggs) will not help the

15

Commission determine if a tourism operation at the Groom Mine is physically possible.

16

The proposed testimony is cumulative in all events.  At least two other Landowner

17

witnesses, DiFederico and Cameron Steinagel, have opined that a tourism use is physically

18

possible at the Groom Mine.  Ex. 3 (DiFederico Rep.) 00080-81; Ex. 5 (Steinagel Dep.) 548:1-

19

553:17.  There is no need to waste the Commission's time having Roddewig testify to a naked

20

conclusion sponsored by other Landowner witnesses.  Fed. R. Evid. 403.

21

             2.      Roddewig Should Not Be Permitted To Testify To Legal Permissibility

22

Second, Roddewig should not be permitted to testify to the legal permissibility of a

23

commercial tourism use.  Roddewig made clear in deposition that his determination of legal

24

permissibility hinged upon a post-taking, retroactive zone change and special use permit issued

25

by Lincoln County in 2016 (authorizing commercial tourism on the Groom Mine).[3]  Roddewig

26

testified:

27

_____

28

[3]      Landowners pursued this zone change and special use permit for the sole purpose of this
litigation.

Q.     Tell me all of the steps you took to determine that that use [commercial tourism] was legally permissible on the date of value.

A.     It's right there on page 48 [of the Roddewig Report].  They applied for a special use permit and the zoning in May of 2016 – actually, it's on that other page that you gave me.  What page – oh, I marked it – page 52…. And then in that approval there was specific numbers of buildings that were part of the special use permit. And at the bottom of 52, carrying over to 53, is the discussion of those improvements that were part of the special use permit.

Q.     So did you have any other bases besides the October 2016 Lincoln County Commission vote for determining that your concluded highest and best use was legally permissible, or that that – <u>that was it</u>?

A.     <u>Yeah</u>.

                              *     *     *

Q.     No, I'm asking what if anything you did, other than take the board's approval in October 2016 and say, "okay, here's the board's approval; therefore, an approval is – that's sufficient."

A.     Correct.

Q.     <u>That's all you did</u>?

A.     <u>In my professional opinion, it is sufficient</u>.

                              *     *     *

Q.     So because the approval vote in October of 2016, that was all you had to do to determine reasonable probability; had that vote[] approval not occurred, you would have had to take additional steps?

A.     Correct.

Q.     Did you attend the meeting where the vote occurred?

A.     No.

Q.     Did you listen to it?

A.     No.

Ex. 2 (Roddewig Dep.) 327:8-328:10, 331:16-22, 346:2-12.

1
2
3
4

The Commission will not benefit from Roddewig's hearsay testimony about the 2016 zone change and special use permit.  Landowners themselves petitioned for the zone change and permit.  They can provide first-hand testimony at trial, eliminating the need for Roddewig's hearsay.

5
6
7
8
9

Moreover, Roddewig's "legal permissibility" testimony would be cumulative not only of Landowners' testimony but also DiFederico's testimony.  Just like Roddewig, DiFederico relied on the post-taking zoning change and issuance of the special use permit to find that tourism was a legally permissible use at the date of value.  Ex. 3 (DiFederico Rep.) 00080; Ex. 4 (DiFederico Dep.) 137:1-19.  The Court should exclude this cumulative testimony.

10
11
12
13

Finally, Roddewig's testimony would add nothing beyond the applicable zoning code and special use permit.  The documents speak for themselves.  Having Roddewig testify on legal permissibility—particularly where, as here, he has no opinion of value—would only waste time. Fed. R. Evid. 403.

14
15

        3.    <u>Roddewig Should Not Be Permitted To Testify To The Financial Feasibility Of His Hypothetical Tourism Operation</u>

16
17

Roddewig's opinions regarding the supposed financial feasibility of a commercial tourism use should be excluded for any one of several reasons.

18

        a.    <u>*Roddewig Relied On The Excluded Qualtrics Surveys*</u>

19
20
21
22
23
24
25
26

First, as noted above, Roddewig relied on Qualtrics to develop his opinion of the financial feasibility of a tourism use.  Specifically, he used the Qualtrics data to develop an opinion that tens of thousands of visitors annually would pay $200 or $400 per person to view Air Force buildings from a distance of 6-7 miles.  Ex. 1 (Roddewig Rep.) 00104-107.  Based on these hypothetical revenue streams (derived from the Qualtrics surveys), Roddewig concluded that his proposed tourism use was financially feasible.  *Id*. at Clarion Rpt. 00092 (explaining that commercial tourism is financially feasible because estimated capital costs are "significantly less than our estimate of the stabilized annual revenues of $21,750,000").[4]

27
28

---

[4]    As part of his financial feasibility analysis, Roddewig also considered surveys administered at the Alien Research Center ("ARC").  The parties have stipulated that the ARC

For the reasons outlined above, the Court's prior ruling excluding the Qualtrics surveys precludes Roddewig's testimony on the alleged financial feasibility of a commercial tourism use.

        *b.*    <u>*Roddewig Analyzed The Financial Feasibility Of A Tourism Use Different Than That Put Forward By DiFederico*</u>

Roddewig's proposed financial feasibility testimony further should be excluded as irrelevant. As noted above, the only "tourism" value that will be presented at trial is DiFederico's $50 million sales-comparison valuation. The question for the Commission accordingly will be whether <u>DiFederico's proposed tourism use</u> is financially feasible. Roddewig's testimony will not help answer this question for at least two reasons.

First, DiFederico did not consider or rely on Roddewig's financial feasibility analysis (or any other aspect of Roddewig's report). Ex. 4 (DiFederico Dep. 34:16-17) ("Q. Did you review [Roddewig's] report? A. No."). Roddewig's proposed testimony is, therefore, beside the point.

Second, DiFederico and Roddewig analyze two <u>materially different tourism uses</u>. To take one example, DiFederico concludes that the highest and best use of the Groom Mine would <u>not</u> involve any improvements to the property. According to DiFederico, the only development costs would be "putting up some tape so people don't get too close to the structures." *Id*. at 211:1-5; *see also id*. at 212:3-4 ("I'm not building on the property…."). Not even bathrooms would be constructed on the property. *Id*. at 454:21-24 ("Q. So it's assuming that the 250 people a day would be using porta-potties? A. No. It's probably assuming they'll be using the luxury tour buses' bathrooms."). Per DiFederico, the absence of any improvements means that there would be no ramp-up time prior to realizing revenues from the hypothetical tourism operation. *Id*. at 332:13-15) ("I don't think there is any ramp-up time. Like I said, it will take you eight minutes to draw up an ad, and that's about it.").

In contrast, Roddewig concludes that the property would be transformed with improvements such as cabins renting for $750/night, a retail store, and a restaurant. Ex. 1 (Roddewig Rep.) 00119-120.; Ex. 2 (Roddewig Dep.) 231:6-8 ("[T]here would be a deck or a

---

surveys are subject to exclusion under the Court's ruling excluding the Qualtrics surveys. *See* ECF 540 at ¶ 6 (Stipulation).

viewing area and a restaurant and retail store next to it, for them to come to, look out over Area 51."); *id*. at 546:6-13 ("The kind of development that is calculated under our highest and best use would have a much more significant investment of dollars.  It would be interpreted in a way that would be attractive to visitors.  It would have a quality of lodging and restaurant facility that is superior to the Little A'Le'Inn.").  These improvements would cost $5.5 million, and there would be a three-year ramp-up period before lodging revenues could be obtained (although the hypothetical business could obtain revenue from tour bus and day trip visitors).  Ex. 1 (Roddewig Rep.) 00132.

Roddewig and DiFederico also employ (wildly) different assumptions in assessing financial feasibility.  For example, DiFederico contends that nearly twice as many visitors would come to the property annually (91,250 versus 54,537) and that the tour operation would generate almost twice the annual revenue ($41.1 million versus $21.8 million).  This is shown in the table below:

| | DiFederico | Roddewig |
|---|---|---|
| **Days Open Per Year** | **365 days** | **335 days** |
| **Daily Visitors** | **250** | **163** |
| **Annual Visitors** | **91,250** | **54,537** |
| | | |
| **Entrance Price** | **$400** | **$400** (tour bus) <br> **$200** (drive up) |
| **Lodging Price** | n/a | **$750/night** |
| **Gross Revenue** | **$41.1 million** | **$21.8 million** |
| | | |
| **Annual Operating Expenses** | ($13.6 million) | ? |
| **Annual Rent** | ($4.1 million) | ($3.0 million) |
| **Total Annual Expenses** | **($17.7 million)** | ? |

| | | |
|---|---|---|
| **Capital Expenditures** | none | **($5.5 million)** |

*Source: Ex. 3 (DiFederico Rep.) at 00108; Ex. 6 (DiFederico Operating Expense Rep.); Ex. 1 (Roddewig Rep.) at 00133-34.*

These differences are material.  Roddewig and DiFederico quite obviously have put forward two different tourism operations with diverging assumptions.  Roddewig's testimony about his hypothesized tourism business (having a restaurant, retail store, and $750/night cabins) has minimal, if any, relevance to assessing the financial feasibility of DiFederico's bare-bones tourism use (lacking even a porta potty).  Assuming for the sake of argument that Roddewig's proposed testimony had some relevance (and it does not), the confusion of issues and wasting of time would far outweigh any minimal probative value.  Fed. R. Evid. 403.

>   *c.   Roddewig Does Not Address Operating Expenses Rendering His Financial Feasibility Analysis Incomplete And Unhelpful*

Roddewig's financial feasibility analysis also lacks in relevance because Roddewig does not analyze or attempt to quantify the operating expenses of his hypothetical tourism operation.  Roddewig states only that tourism is financially feasible because his gross revenue exceeds the initial capital expenditure needed for a visitor center, restaurant, and 20 cabins.  The entirety of his "expense" analysis is shown below:

> The financial feasibility of future heritage tourism development on the scale we discuss later in this report is confirmed by the report prepared by Neil Opfer related to site improvement costs. He estimated construction costs for two alternative tourism development projects. The second alternative includes a visitor center/restaurant and 20 cabins. Total estimated costs including utilities and overhead and general costs are **$5,544,012** significantly less than our estimate of the stabilized annual revenues of $21,750,000.

Ex. 1 (Roddewig Rep.) at report page 76[5]; *see also* Ex. 2 (Roddewig Dep.) 405:13-21 ("Q. I'm asking, in your entire assignment and in your appraisal, which includes assessment of highest

---

[5]     The Bates is Clarion Rpt. 00394, between pages Clarion Rpt. 00091 and 00093. Roddewig issued a supplement substituting this page, which is why the Bates number Clarion Rpt. 00092 is missing.

1    and best use… at any point did you determine whether the concession or concessions would

2    actually be something profitable for that concessioner?  A. No, because it's not appropriate to do

3    that when you are doing ground rent capitalization."); *id*. at 443:11-13 ("I'm looking at the gross

4    revenues and not at the actual operation and the operating expenses.").

5            Roddewig's conclusion that "financial feasibility … is confirmed" because revenue

6    exceeds the initial capital costs will not help the Commission determine just compensation.  As

7    noted above, DiFederico assumed that there would be <u>no capital improvements</u> to the property

8    (and therefore no capital costs); DiFederico never contemplated a visitor center, restaurant, and

9    20 cabins.  DiFederico's valuation is the only Landowner "tourism" valuation that matters now.

10           In all events, financial feasibility should be determined by comparing the revenue to the

11   <u>operating costs</u> of the hypothetical tourism business. Ex. 7 (Appraisal of Real Estate, 14th ed., at

12   341) ("If the physically possible and legally permissible uses are income-producing, the analysis

13   of financial feasibility will often focus on which potential uses are likely to produce an income

14   (or return) equal to or greater than the amount needed to satisfy <u>operating expenses</u>, financial

15   obligations, and capital amortization of the investment.") (emphasis added).[6]  The hypothetical

16   tourism operation will, among other things, require a work force, tour buses, marketing, taxes,

17   insurance, and rent.  If these operating expenses exceed revenue, then the proposed venture is not

18   financially feasible, calling into question the financial feasibility of the property's rental to a

19   concessionaire for such a hypothetical tourism business.  For this reason, DiFederico issued an

20   entire report on these costs, quantifying them at $17.7 million annually.  Ex. 6 (DiFederico

21   Operating Expense Rep.).

22           Unlike DiFederico, Roddewig studied none of this.  He made no attempt to compare

23   revenue to operating expenses.  His conclusion that a tourism business would generate $21.8

24   million in annual revenue is pointless to determining financial feasibility without any accounting

---

27   [6]      Roddewig and DiFederico both agree that the Appraisal of Real Estate is an authoritative
28   treatise in their profession of appraising real estate. Ex. 2 (Roddewig Dep.) 684:9-685:7
     (Appraisal of Real Estate is "sometimes called the bible of the real estate appraising business");
     Ex. 4 (DiFederico Dep.) 40:7-41:2.

for the likely costs (which could exceed $21.8 million).  His financial feasibility testimony

accordingly lacks relevance and should be excluded pursuant to Fed. R. Evid. 401.

    4.    <u>Roddewig Should Not Be Permitted To Testify That Commercial Tourism Is The Maximally Productive Use Of The Land</u>

       Finally, the Court should preclude Roddewig from testifying that commercial tourism

was the most productive use of the Groom Mine at the date of value.  Without a relevant and

admissible determination of financial feasibility, Roddewig cannot testify that commercial

tourism is the maximally productive use.

       In all events, Roddewig did not undertake any specific analysis.  He did not compare the

financial success of a commercial tourism use to any other possible use, such as a residential use

or mining.  Roddewig testified:

> Q.    Did you consider any uses of the property as a potential highest and best use, other than the use you ultimately concluded was the highest and best use?
>
> A.    Well, that raises an interesting issue about the uniqueness of this property, because this is a one-of-a-kind property, the only privately-owned property with an unobstructed view out over Area 51.
>
>     Based on our analysis of physically possible, legally permissible, and uniqueness of the property, <u>we didn't really have to go and compare with anything else to know what the highest and best use would be</u>.
>
>                *   *   *
>
> Q.    Where in your report are any of these uses considered, rural recreation, mining by itself, residential subdivision, or agricultural/low-level residential?
>
> A.    Well, as I said, given the unique location of this in relationship to Area 51, <u>we didn't do a financial feasibility and present it in the report on those [uses]</u> because, so obviously to us when we ran the numbers, that this one provides a higher value based on its unique character.

Ex. 1 (Roddewig Dep.) 318:15-25 (emphasis added). In short, Roddewig <u>assumed</u> that

commercial tourism was the maximally productive use; he did not analyze this element.

Roddewig's assumption will not help the Commission determine just compensation and should

be excluded.

**II.    IN LIMINE ISSUE #2:  THE COURT SHOULD PRECLUDE DR. TERRENCE CLAURETIE FROM TESTIFYING AT TRIAL**

Clauretie similarly should not be permitted to testify at trial.  The Court has excluded all of Clauretie's opinions of value as well as the foundation for Clauretie's opinion on highest and best use (the Qualtrics surveys).  There is nothing left for him to opine upon.

**A.    The Court's Ruling Excluding the Qualtrics Surveys Should Preclude Clauretie From Testifying To Highest and Best Use**

Just like Roddewig, Clauretie relied upon the Qualtrics surveys to develop his opinion that the highest and best use of the Groom Mine was "recreational tourist use, with the possibility of low intensity mining." Ex. 8 (Clauretie Rep.) 00075.  In particular, Clauretie determined his highest and best use by accepting the "demand" data set forth in the expert report of Cameron Steinagel, a Landowner witness.  Steinagel, in turn, developed the data based on the Qualtrics surveys.  Clauretie testified:

> Q.    Okay. Did – other than Cameron Steinagel, did you use any other sources to come up with these demand numbers?
>
> A.    No, except that he would have viewed the Qualtrics surveys.
>
> Q.    Okay. So we have Steinagel's report and Qualtrics?
>
> A.    That he relied on Qualtrics.

Ex. 9 (Clauretie Dep.) 154:2-9; *id* at 214:9-24 ("Q. What steps did you use in determining highest and best use?  A. Well the steps that I used were very, very easy, and that was the report by Innovation [Steinagel], who did a complete analysis in terms of the demand for that particular project that they determined also would be the highest and best use.").[7]

Clauretie's reliance on the excluded Qualtrics surveys means that his highest and best use opinion should be excluded.  ECF 497 at 53 (excluding those "portions of Landowners' experts' opinions that rely on [the Qualtrics] surveys").

---

[7]    Steinagel confirmed in deposition that he developed his demand numbers based on the Qualtrics surveys. Ex. 5 (Steinagel Dep.) 138:22-139:14.  *See also* Ex. 10 (Steinagel Rep.) at 00042-43 and 53-54.

13

**B.    Clauretie's Proposed Highest And Best Use Analysis Would Waste Time And Be Cumulative**

The Court separately should exclude Clauretie's proposed highest and best use analysis because it would waste time and be cumulative (to the extent that his testimony would have relevance).  Fed. R. Evid. 403.  Again, DiFederico will present the only "tourism" valuation at trial, and DiFederico conducted an independent highest and best use analysis.  Ex. 3 (DiFederico Rep.) 00080-83.  DiFederico did not consider or rely upon Clauretie's opinions.  Ex. 4 (DiFederico Dep.) 479:23-480:12, 571:13-23.  There accordingly is no need for Clauretie to present a separate "highest and best use" opinion.  His proposed testimony would only waste time and be cumulative of DiFederico (to the extent the testimony would have any relevance).

**C.    Clauretie Should Not Be Permitted To Testify To Any Of The Four "Highest And Best Use" Criteria**

Clauretie otherwise should not be permitted to testify to any of the highest and best use criteria.

**1.    Clauretie Should Not Be Permitted To Testify Regarding The Alleged Physical Possibility Of A Tourism Operation**

First, Clauretie should not be allowed to testify that a commercial tourism use was physically possible at the date of value.  The entirety of Clauretie's opinion on this topic reads: "I have determined that this use [recreational tourist use, with the possibility of low intensity mining] is physically possible based upon my personal inspection of the property and my review of the site layout showing potential development on the Sheahan Family property." Ex. 8 (Clauretie Rep.) 00076.  This conclusion will not help the Commission.  In deposition, Clauretie could not recall what that site layout was, what was in it, or who prepared it.  Ex. 9 (Clauretie Dep.) 221:5-17.  He otherwise deferred to another Landowner expert witness, Neil Opfer.  *Id.* at 115:3-8 ("[D]id I consider the topography, and would the topography be a consideration, in terms of the cost of development.  Yes, it would be.  I didn't consider it.  That would have been considered by another expert, Mr. Neil Opfer, and you could ask him those questions – were very pertinent to his report.").

14

Clauretie's proposed testimony is cumulative in all events.  As noted above, at least two other Landowner witnesses, DiFederico and Steinagel, have opined that a tourism use is physically possible.  Ex. 3 (DiFederico Rep.) 00080-81; Ex. 5 (Steinagel Dep.) 548:1-553:17. There is no need to waste the Commission's time having Clauretie testify to a conclusion sponsored by other Landowner witnesses.  Fed. R. Evid. 403.

        2.   <u>Clauretie Should Not Be Permitted to Testify Regarding The Alleged Legal Permissibility Of A Tourism Operation</u>

Clauretie determined that a commercial tourism use was "legally permissible based upon the zone change and special use permit applications, staff recommendation and letter of approval from Lincoln County."  Ex. 8 (Clauretie Rep.) 00075-76.  This bare statement represents the sum total of Clauretie's discussion of legal permissibility.  As Clauretie explained:

> So the only…documents I reviewed is a statement by – I don't know the names, but the authorities that had authority to change the zoning that was – said that they certainly would have changed the zoning as of the date of valuation to allow the use that it was intended, as a recreational property… <u>That's all I can tell you. I can't tell you anything else</u>.

Ex. 9 (Clauretie Dep. Tr. 220:1-10) (emphasis added).

There is no need for Clauretie's hearsay, conclusory testimony.  As noted above, Landowners themselves petitioned for the zoning change and the issuance of the special use permit.  They can provide first-hand testimony at trial.  Moreover, Clauretie's "legal permissibility" testimony would be cumulative not only of Landowners' testimony but also DiFederico's testimony.  DiFederico also relied on the post-taking zoning change and issuance of the special use permit to find that tourism was a legally permissible use at the date of value.  Ex. 3 (DiFederico Rep.) 00080; Ex. 4 (DiFederico Dep.) 137:17-19.  Finally, legal permissibility presents a legal question where Clauretie's testimony would add nothing beyond the applicable zoning code and special use permit.

        3.   <u>Clauretie Should Not Be Permitted To Testify To The Financial Feasibility Of An Alleged Tourism Operation</u>

Clauretie's opinions on the financial feasibility of the hypothetical recreational tourism use should be excluded for any of several reasons.

15

1

a.    *Clauretie Relied On The Excluded Qualtrics Surveys*

2

First, as noted above, Clauretie relied upon the excluded Qualtrics surveys to develop the

3

revenue projections for the hypothetical tourism business (and therefore its financial feasibility).

4

This reliance on the excluded Qualtrics surveys requires exclusion.  ECF 497 at 53.

5

b.    *Clauretie Analyzed The Financial Feasibility of a Vaguely-Defined*

6

*Tourism Use, Different Than The Tourism Use Put Forward By*
*DiFederico*

7

8

Second, as noted above, the sole remaining "tourism" valuation is the sales-comparison

9

valuation of DiFederico.  Clauretie's testimony on financial feasibility will not help the

10

Commission determine the feasibility of DiFederico's proposed tourism use.  DiFederico did not

11

rely on Clauretie's financial feasibility analysis. Ex. 4 (DiFederico Dep.) 479:23-480:12.  And

12

DiFederico could not recall whether he ever saw Clauretie's separate valuation report (including

his highest and best use conclusion and analysis).[8]  *Id.* at 571:13-23.

13

Moreover, Clauretie and DiFederico analyze two different hypothetical tourism uses.

14

Clauretie's assumptions on annual visitation and entrance fees are even higher than DiFederico's

15

(93,130 visitors paying $500 per person versus 91,250 visitors paying $400 per person). Ex. 8

16

(Clauretie Rep.) 00090; Ex. 3 (DiFederico Rep.) 00108.  And Clauretie assumed that the

17

hypothetical concessionaire would pay 20% of its gross income as rent, double the 10% used by

18

DiFederico. Ex. 8 (Clauretie Rep.) 00078; Ex.3 (DiFederico Rep.) 00108.

19

Clauretie's failure to develop his financial feasibility opinion further supports exclusion.

20

For example, Clauretie testified that he had not considered the details of the tour on the property

21

beyond the entrance fee (Ex. 9 (Clauretie Dep.) 138:5-9), did not know the length of time it

22

would take to build out the property, including any overnight facilities (*id.* at 138:10-139:12), or

23

to what extent "low intensity mining" could co-exist with the proposed tourism use (*id.* at

24

25

26

---

27

[8]     DiFederico agreed that a valuation of approximately $100 million (Clauretie's now-
excluded income approach valuation) seemed too high to be reasonable, but noted that he had not
actually looked at that report. *Id.* at 572:24-573:16.

28

1  140:24-141:25).  Clauretie's testimony will result in confusion and waste time.  It should be

2  excluded.  Fed. R. Evid. 403.

3             *c.*     *Clauretie's Financial Feasibility Testimony Otherwise Would*
                     *Confuse The Issues, Unfairly Prejudice The United States, Be*
4                    *Cumulative, And Waste Time*

5             Clauretie's financial feasibility testimony otherwise would confuse the issues, unfairly

6  prejudice the United States, be cumulative, and waste time.  This case now concerns

7  DiFederico's sales-comparison valuation.  There should not be testimony about the supposedly

8  tens of thousands of people who, according to Clauretie, would pay $500 to see the Air Force

9  buildings.  *Supra* at Sec. II(B).

10            Moreover, Clauretie's financial feasibility analysis is nothing more than a restatement of

11  Steinagel's expert report.  Clauretie himself did nothing to determine the revenues of a

12  hypothetical tourism business.  He instead adopted Steinagel wholesale.[9]  Ex. 9 (Clauretie Dep.)

13  77:11-19 ("[I]n…the feasibility analysis, one of the things that one would – would look at is the

14  revenue expected, revenue that could be generated from entrance fees into the property. And

15  those numbers that I used for the – the generation of the entrance fees on an annual basis were

16  taken from the report by Innovation Group [Steinagel], whatever.").  Clauretie did nothing to

17  determine the reliability of Steinagel's work. *Id.* at 177:3-15 ("I accepted this report as being

18  reliable for the purposes of my assignment.").  And Clauretie did nothing to verify Steinagel's

19  conclusions as to the number of annual visitors and the price that they would pay for entry:

20        Q.     What market support do you have for that number [the estimated daily
21               visitors]?

22        A.     You're going to have to ask him [Steinagel]. He's – he did the analysis.

23

24

25  _____

26  [9]        Independent of Steinagel, Clauretie identified possible operating expenses of the
     hypothetical tourism business and quantified these operating expenses at $19.3 million annually.
27  Ex. 8 (Clauretie Rep.) 00116.  But there is no need for this testimony at trial as DiFederico
     issued an entire report quantifying the alleged operating expenses.  Ex. 6 (DiFederico Operating
28  Expenses Rep.).

                                                17

Q.     So you don't independently have any market support; you're relying on Mr. Steinagel, who says, "There is market support for 261 people per day"?

A.     At $500, yes.

*Id.* at 190:7-14.  There is no need for Clauretie to rehash an inadmissible analysis addressed by a different Landowner expert, which Clauretie accepted without question or concern.[10]

Finally, and in all events, Clauretie's testimony would confuse the issues, suggesting that hypothetical income from a hypothetical tourism business has relevance to value (it does not). The testimony also would unfairly prejudice the United States by suggesting that the land "must" be worth millions if it can generate millions in revenue.

          4.     <u>Clauretie Should Not Be Permitted To Testify That Tourism Was The Maximally Productive Use</u>

Finally, the Court should preclude Clauretie from testifying that commercial tourism was the most productive use of the Groom Mine at the date of value.  Clauretie's report states only: "It is also my opinion that this is the use [tourism] that will be maximally productive." Ex. 8 (Clauretie Rep.) 00076.  At deposition, Clauretie made clear that he assumed that commercial tourism was the maximally productive use; he did not analyze this element. Ex. 9 (Clauretie Dep.) 222:12-16 ("I think you're asking me … did I consider any use other than … the tourist – no.").  Clauretie's assumption will not assist the Commission and should be excluded.  In all events, without a relevant and admissible determination of financial feasibility, Clauretie cannot testify that commercial tourism was the maximally productive use.

**III.     THE COURT SHOULD PERMIT THE UNITED STATES TO POINT OUT IN CROSS EXAMINATION THAT RODDEWIG AND CLAURETIE HAD VALUATIONS EXCLUDED BY THE COURT**

For all of the reasons outlined above, Roddewig and Clauretie should not be permitted to testify at trial.  However, in the event that the Court allows some limited testimony on highest

---

[10]     This portion of Steinagel's evidence is not admissible because Steinagel relied on the excluded Qualtrics surveys.

and best use, as requested by Landowners, then the United States respectfully requests that the Court confirm that the United States may cross examine Roddewig and Clauretie on the fact that they had valuations excluded by the Court and that such cross examination will not "open the door" for Roddewig and Clauretie to testify to their excluded valuations on re-direct.  In particular, the United States should be able to: (1) point out that Roddewig and Clauretie put forward income-capitalization opinions of value, (2) these income-capitalization opinions of value hinged on the imagined revenue of a hypothetical tourism business (*i.e.*, the number of hypothetical visitors and the hypothetical entrance price that they would pay), and (3) the Court excluded these opinions as speculative because the property was not generating any income on the date of taking.

Separately, and only to the extent that the Court permits testimony about the financial feasibility of commercial tourism use from Roddewig and Clauretie (which it should not do as outlined above), the United States respectfully requests that the Court confirm that the United States may cross examine Roddewig and Clauretie on the fact that their opinions hinge on evidence excluded by the Court (*i.e.*, the Qualtrics surveys) and that such cross examination will not "open the door" to testimony about the Qualtrics and ARC surveys generally.  In particular, the United States should be able to point out that: (1) Roddewig and Clauretie developed their highest and best use conclusions by relying on surveys performed by Qualtrics, and (2) the Court excluded all evidence relating to the Qualtrics surveys.  The Commission also should be instructed that they may not consider evidence relating to or relying upon the Qualtrics surveys.[11]

This cross-examination will help to provide necessary context for the Commission and also will assist the Commission in assessing the credibility of Roddewig and Clauretie.

---

[11]    To be clear, none of Landowners' witnesses should be permitted to testify regarding the Qualtrics surveys or otherwise testify regarding any opinion that relies upon the Qualtrics surveys.  The United States makes this alternative request solely out of an abundance of caution.  Other Landowner expert witnesses, including DiFederico and Steinagel, also rely upon or consider the Qualtrics surveys.  The United States has not moved *in limine* to exclude these Landowners witnesses from testifying because they have opinions (or portions of opinions) that do not rely upon the Qualtrics surveys and may testify as to those opinions (but not as to their opinions that rely upon the Qualtrics surveys).

**CONCLUSION**

For all of the above reasons, the Court should exclude Roddewig and Clauretie from testifying at trial.

November 1, 2019                                    Respectfully submitted,

                                                   NICHOLAS A. TRUTANICH
                                                   United States Attorney
                                                   District of Nevada

                                                   TROY K. FLAKE
                                                   Deputy Civil Chief
                                                   District of Nevada

                                                   */s/ Eugene N. Hansen*
                                                   */s/ Johanna M. Franzen*
                                                   EUGENE N. HANSEN
                                                   JOHANNA M. FRANZEN
                                                   ANTHONY C. GENTNER
                                                   MARK C. ELMER
                                                   Trial Attorneys
                                                   U.S. Department of Justice

**<u>EXHIBITS</u>**

Exhibit 1 --   Roddewig Report (no addenda)

Exhibit 2 --   Roddewig Deposition Transcript (excerpts)

Exhibit 3 --   DiFederico Report (pg. 00025 redacted)

Exhibit 4 --   DiFederico Deposition Transcript (excerpts)

Exhibit 5 --   Steinagel Deposition Transcript (excerpts)

Exhibit 6 --   DiFederico Operating Expenses Report

Exhibit 7 --   Appraisal of Real Estate (14th edition) (excerpts)

Exhibit 8 --   Clauretie Reports

Exhibit 9 --   Clauretie Deposition Transcript (excerpts)

Exhibit 10 --   Steinagel Report

**<u>CERTIFICATE OF SERVICE</u>**

        I hereby certify that on November 1, 2019, I caused the foregoing United States' Motion in Limine to Exclude Certain Evidence From Trial to be served on all parties who have appeared in this action using the Court's case management/electronic case filing system. I further certify that on November 1, 2019, the United States sent a copy of the foregoing via Federal Express to the following interested parties:

Sandra Sears-Lavallee
1172 Skyline Road
Henderson, NV 89002

Debbie DeVito
c/o Stanley Pedder
3445 Golden Gate Way
Lafayette, CA 94549

John B. Sheahan
address unknown

Melanie Goodpasture
P.O. Box 7044
Cotati, CA 94931

Deborah Lynn Sheahan
4662 Gabriel Drive
Las Vegas, NV 89121

House Rabbit Society
c/o Anne Martin (Registered Agent)
148 Broadway
Richmond, CA 94804

Diane Sibley-Origlia
1615 Via Romero
Alamo, CA 94507

Animal Place
c/o Kim Sturla (Registered Agent)
17314 McCourtney Road
Grass Valley, CA 95949

Katherine Kell
c/o Stanley Pedder
3445 Golden Gate Way
Lafayette, CA 94549

Hui Chu Poole
165 Lakewood Road
Walnut Creek, CA 94598

Amy E. Sears
P.O. Box 71
Pioche, NV 89043

                        /s/ *Johanna M. Franzen*
                        JOHANNA M. FRANZEN