1
2
3          UNITED STATES DISTRICT COURT
4                DISTRICT OF NEVADA
5                      * * *
6    UNITED STATES OF AMERICA,                 Case No. 2:15-cv-01743-MMD-NJK
7                              Plaintiff,                      ORDER
8            v.
9    400 ACRES OF LAND, more or less,
     situated in Lincoln County, State of Nevada;
10   and JESSIE J. COX, et al.,
11                            Defendants.

12   **I.    SUMMARY**

13         In this eminent domain action, the Court has found that the United States' taking of

14   property ("the Property")[1] for the purpose of operating the Nevada Test and Training

15   Range ("NTTR"), a military test and training facility at Nellis Air Force Base, is for a

16   congressionally authorized public use. (ECF No. 111 at 1.) This leaves the amount of just

17   compensation based on the Property's highest and best use as the sole remaining issue.

18   The Court appointed a land commission (the "Commission") (ECF No. 501)[2] under Fed.

19   R. Civ. P. 71.1(h)(2) to determine the amount of just compensation primarily because the

20   Property is unique—at the time of the taking, it was the only piece of private property with

21

22   ─────────────

23         [1]The Property consists of approximately 400 acres of mining claims in Lincoln
     County, Nevada. (ECF No. 656 at 3.) It more specifically consists of "six patented mining
     claims totaling 87.49 acres and 15 unpatented mining claims totaling approximately 309.9
24   gross acres[.]" (Id.) The parties' experts' valuation of the Property was based on the
     acreage of the patented mining claims, as a patented mining claim is equivalent to fee
25   simple ownership. (Id.; see also ECF Nos. 653 at 76, 654 at 89, 659 at 12.)

26         [2]The Commission consisted of a retired Nevada Supreme Court Justice, the
     Honorable Michael L. Douglas, a retired United States District Judge for the District of
27   Nevada, the Honorable Philip M. Pro, and a retired United States Magistrate Judge for the
     District of Nevada, the Honorable Peggy A. Leen. (ECF Nos. 515, 522, 656 at 43.)
28

an unobstructed view of the NTTR, which is known in popular culture as Area 51, and it contains buildings and other indicia of mining activity dating back to the 1850s. After a site visit to the Property,[3] and a bench trial before the Commission, the Commission issued a report concluding that just compensation for the Property is $1.1 million.[4] (ECF No. 556 (the "Report").) Before the Court are objections both parties filed to the Report. (ECF Nos. 659, 660.) Plaintiff the United States urges the Court to largely adopt the Report, but reduce the amount of just compensation. (ECF No. 659.) Defendants, landowners with interests in the Property (the "Landowners"), asserted numerous objections to the Report. (ECF No. 660.) As further explained below, the Court will overrule all objections, and adopt the Commission's Report in full because the Court agrees with the Commission's well-reasoned and well-supported Report.

## II.     BACKGROUND

The Court again incorporates by reference the background facts set forth in one of the Court's prior orders on the parties' motions involving evidentiary issues (ECF No. 497 at 2-3), and the Commission's findings of facts (ECF No. 656 at 9-15). The Court further incorporates by reference the stipulated facts included in the Report to provide further background for this case. (*Id.* at 5-8.)

## III.    DISCUSSION

The Court will first briefly explain why it has decided to adopt the Report, address Plaintiff's objection, and then address Landowners' objections.[5] A copy of the Report is attached to this order as Appendix A.

///

---

[3]The Court also attended the site visit. (ECF No. 605.) The Court gave the Commission instructions at seven sites pursuant to the parties' stipulation. (*Id.*)

[4]Not including mineral rights, which are subject to a separate agreement between the parties. (ECF Nos. 596, 598.)

[5]The Court's review is *de novo. See* Fed. R. Civ. P. 71.1(h)(2)(D); Fed. R. Civ. P. 53(f).

**A. The Report**

At a high level, the valuation question the Commission answered in the Report required the Commission to weigh the credibility of Landowners' primary expert Tio DiFederico against the credibility of Plaintiff's primary expert Warren Neville. As reflected in the Report, the Commission found DiFederico not credible, and Neville credible. The Court agrees with this core finding. As extensively detailed in the Report, DiFederico's opinions and corresponding report were speculative and not grounded in credible evidence. In contrast, Neville's opinions and corresponding report were reasonable and grounded in pertinent data.

After rejecting Landowners' proffered large-scale tourism use based primarily on DiFederico's testimony as speculative (ECF No. 656 at 15-39), the Commission explained that Plaintiff's proffered rural recreational use based primarily on Neville's credible testimony aligned with Landowners' existing use of the Property, complied with applicable professional standards, and was otherwise reasonable (*id.* at 39-41). However, the Commission found Neville insufficiently weighed the uniqueness of the Property in his valuation, and thus valued the Property based on a higher price per acre than Neville did. (*Id.* at 41-43.)

As further explained below while addressing the parties' objections, the Court agrees with the Report, and will adopt it in full. The Report is well-reasoned, clear, and well-supported by citations to the record evidence in this case. DiFederico's outlandish valuation was insufficiently supported by any relevant and credible evidence. In contrast, and like the Commission, the Court finds Neville's approach reasonable and well-supported by relevant evidence. But the Court also agrees with the Commission that Neville somewhat undervalued the Property because he insufficiently accounted for its uniqueness.

///

///

**B. Plaintiff's Objection (ECF No. 659)**

Plaintiff largely urges the Court to adopt the Report in full, with one exception. Plaintiff argues the Commission applied an additional 25% premium per acre above the highest-priced comparable sale used by Plaintiff's expert Neville without any evidentiary basis for doing so. (ECF No. 659 at 8-12.) Plaintiff therefore asks the Court to revise down the Commission's just compensation finding for the Property to $874,900, plus another $104,000 for the mineral estate, for a total of $978,900. (*Id.* at 3 n.4, 12.)

But notably, Plaintiff does not challenge "the Commission's finding that the Groom Mine is unique because it was a former family mining property and because it offers a view" of Area 51. (*Id.* at 10-11.) Plaintiff only objects to how the Commission quantified that uniqueness by applying the 25% premium. (*Id.* at 11.) The Court therefore adopts without objection the Commission's finding that the Property is unique. In addition, however, the Court agrees with the premium the Commission applied to Neville's most expensive comparable property to arrive at its valuation for the Property.

To start, the Commission had ample evidence to find the Property unique, that Neville failed to sufficiently weight the Property's uniqueness, and to then apply a premium to the Property's valuation. (ECF No. 656 at 11-12 (finding the evidence established substantial interest in Area 51, and the Property had an exclusive view of Area 51); *see also id.* at 41 (finding "Neville failed to give sufficient consideration to the unique one-of-a-kind nature of the Groom Mine.").) Further, the site visit convinced the Court of the uniqueness of the Property. (ECF No. 600 ("Joint Instructions") at 12 (instructing the Commission that, in determining fair market value, they may consider, "not only the opinions of the various witnesses who testified as to the market value, but also all other evidence in the case that may aid in determining market value[,]" which the Court interprets as permitting the Court to consider its experience and observation at the site visit).) The old buildings and other indicia of historical mining activity were interesting. The desert landscape and views from the Property were beautiful. And more importantly, the view of

the remote operating base known in popular culture as Area 51 was quite clear. Considering the clarity of the view in conjunction with the Court's knowledge of that view's exclusivity, and its awareness of the Area 51 phenomena in popular culture, the Court found the Property special. It had an inexplicable quality to it, its aura no doubt influenced by the question of whether other life forms exist in the universe. The Court therefore agrees with the Commission the Property would command some sort of premium over the most expensive comparable sale selected by Neville—a nicer, but not as unique, property.

Turning to the amount of the premium, while it is difficult to say exactly why it should be 25%, the Court also cannot say that this premium is arbitrary or unreasonable, or that some other premium is more logical than 25%. Regardless, after reviewing the Report, the parties' briefs, and the evidence before the Commission, the Court has not been able to devise a more rational premium. The Court therefore agrees with the Commission that 25% per acre was an appropriate premium to apply in this case. The Court's agreement with the Commission is informed by both the substantial evidence offered by Landowners of the uniqueness and exclusivity of the Property at the time of the taking, along with general interest in Area 51.

As to Plaintiff's objection, the Court does not disagree that it could have excised the 25% premium because the Court's review is de novo. (ECF No. 659 at 12 (relying on caselaw).) But, for the reasons provided above, the Court chooses not to. Further, Joint Instruction 15 does not compel a different result because "determination of the market value of an estate or interest in land, at a given date, is necessarily based upon assumption rather than fact." (ECF No. 600 at 19; *see also* ECF No. 659 at 11 (arguing this instruction weighs against adopting the Commission's 25% per acre premium).) Neither does Joint Instruction 5, because the "report need not include detailed findings on all contested issues, but it must show the pathway that you took through the maze of conflicting evidence[,]" and the Court finds that paragraph 166 of the Report does this when read in light of the whole Report. (ECF Nos. 600 at 7 (Joint Instruction 5), 656 at 43

1  (including paragraph 166), 659 at 11 (arguing this instruction weighs against adopting the
2  Commission's 25% per acre premium).)

3      In sum, the Court overrules Plaintiff's objection. (ECF No. 659 at 8-12.)

4      **C. Landowners' Objections**

5      Depending on how you count them, Landowners raised approximately 24
6  objections to the Report. (ECF No. 660.) Landowners insist they are entitled to
7  $49,870,000.00 for the Property. (*Id.* at 76.) Landowners' objections may be organized
8  into five groups.[6] The Court addresses each of the five groups of objections, in turn, below.

10      **1.      The Level of Detail in the Commission's Highest and Best Use Analysis (Objection V.(1)(A))**

11      Landowners contend that the Commission did not perform a sufficiently detailed
12  analysis of all four highest and best use prongs (physically possible, legally permissible,
13  financially feasible, and maximally productive), which led to error when they rejected
14  Landowners' proposed tourism use as speculative. (ECF No. 660 at 18-19.) The Court
15  disagrees.

16      To start, Landowners primarily rely on *Desert Citizens Against Pollution v. Bisson*,
17  231 F.3d 1172, 1181 (9th Cir. 2000) to support this objection.[7] (ECF No. 660 at 18-19.)
18  However, *Desert Citizens* was not—like this case—a condemnation case. Indeed, the
19  *Desert Citizens* court specifically distinguished another case because it was a
20  condemnation case. *See* 231 F.3d at 1183. Moreover, to the extent *Desert Citizens* is
21  even applicable, Landowners specifically cite to page 1181 (ECF No. 660 at 18-19), which
22  contains the following qualification: "While uses that are merely speculative or conjectural

25      [6]The Court also refers to Landowners' objections using the section headings
26  Landowners assigned to them. (*See generally* ECF No. 660.)

27      [7]The Court discussed *Desert Citizens* in a prior order after Landowners relied on it,
   and did not raise this issue of its applicability, instead assuming it applied. (ECF No. 497
28  at 5-6, 27-28.)

need not be considered, uses that are "reasonably probable" must be analyzed as a necessary part of the highest and best use determination." *Id.* at 1181.

That qualification renders Landowners' objection unpersuasive because the Commission specifically rejected Landowners' valuation of the Property as too speculative. (ECF No. 556 at 15-39; *see also id.* at 16 ("[T]he issue is not whether any commercial tourism use was reasonably probable at the Date of Value (i.e., physically possible, legally permissible, financially feasible, and maximally productive). The issue is whether Landowners have supported their proposed large-scale tourism use involving bringing 91,250 people to the Groom Mine, paying $450 each, year after year.").) Thus, even considering *Desert Citizens*, the Commission was not required to complete the highest and best use analysis for Landowners' proffered large-scale tourism use because the Commission determined—over the course of many pages of analysis—it was too speculative. (*Id.* at 15-39.) *See also Desert Citizens*, 231 F.3d at 1181.

Moreover, the Commission conducted more highest and best use analysis than Landowners give them credit for. For example, Landowners argue "there is no analysis on the physical possibility element" in the Report. (ECF No. 660 at 19.) But the Commission concluded that even Landowners' speculative, proposed use was physically possible. (ECF No. 556 at 8.) Thus, Landowners' representation in their objection is both inaccurate, and odd, because the Commission concluded that particular prong of the analysis actually favored Landowners' position. Additionally, the Commission provided extensive findings as to why it did not find Landowners' proposed large-scale tourism use legally permissible. (*Id.* at 29-33.) The Commission also did not find Landowners' proposed use financially feasible. (*Id.* at 16-33.) Finally, the Commission found that using the Property as a rural, recreational retreat was its maximally productive use. (*Id.* at 41.) Thus, Landowners' argument that the Commission did not conduct a highest and best use analysis is

1  unpersuasive—because it is unsupported in view of the actual content of the Report.[8] The

2  Court therefore overrules Landowners' objection V.(1)(A). (ECF No. 660 at 18-19.)

3

4  **2.  The Commission's Application of Governing Legal Standards (Objections V.(1)(B), V.(1)(C)(3), V.(1)(C)(6), V.(1)(D), V.(2)(A))**

5  A number of Landowners' objections generally argue the Commission either did not

6  apply the correct legal standard as provided to them in the Joint Instructions (ECF No.

7  600), or incorrectly applied those instructions. And while the Court will discuss some of

8  Landowners' more specific objections below, the Court generally finds Landowners'

9  arguments unsupported in view of the content of the Report, and the very Joint Instructions

10  Landowners rely on to make their arguments.

11  To start, Landowners appear to confuse 'proof' and 'evidence.' Landowners argue

12  the Commission erred in determining that their existing use of the Property—as a rural,

13  recreational retreat—was the highest and best use of the Property. (ECF No. 660 at 20-

14  23.) Landowners rely on both a Joint Instruction and caselaw providing that "the existing

15  use of property at the date of value in an eminent domain action is only presumed to be

16  the highest and best use in the 'absence of proof to the contrary.'" (*Id.* at 20 (citation

17  omitted).) They then go on to argue that the Commission erred because it assigned little

18  weight to the evidence Landowners presented as to their proposed large-scale

19  commercial tourism use as speculative, repeatedly emphasizing the 'absence of proof to

20  the contrary' language. (*Id.* at 20-23.) Landowners even go so far as to state, "[h]ere, it is

21  uncontroverted that there was significant proof of a higher and better use, other than the

22  existing use made of the Property[.]" (*Id.* at 21.) Later on the same page, Landowners

23  characterize their 'proof' as 'evidence.' (*Id.*)

24  _____

25  [8]Indeed, Landowners appear to argue the Commission's analysis in its Report is

26  flawed because the Commission did not adopt Landowners' proposed analysis. (ECF No. 660 at 19 (stating that they "provided the appropriate analysis for each of these individual elements" and criticizing the Commission for not following that analysis).) But declining to

27  rule in Landowners' favor is not necessarily error. The Commission's job was to decide the appropriate valuation for the Property in light of competing proposals from both sides.

28  The Commission was obviously not required to adopt Landowners' positions.

This argument is unpersuasive. It is plainly controverted as to whether there is significant proof of a higher and better use of the Property than a rural, recreational use. That was one of the key issues presented at the bench trial before the Commission, and Plaintiff extensively argued in its proposed findings of fact and conclusions of law that Landowners' evidence as to their proposed large-scale tourism use was too speculative. (ECF No. 653 at 16-72.) Thus, it is not—and cannot be—uncontroverted. Moreover, there is no question Landowners presented evidence at the bench trial. But the Commission spent many pages of its Report explaining why it found Landowners' evidence unpersuasive. (ECF No. 656 at 15-39.) Thus, Landowners' evidence never became proof. And the Court declines to deem it proof in this order because, as explained above, the Court agrees with the Commission that Landowners' evidence as to their proposed large-scale commercial tourism use was too speculative to establish it is the Property's highest and best use.

Further, the Court finds the Commission faithfully applied Joint Instruction 13. (ECF No. 600 at 16 ("However, in absence of proof to the contrary, the current use is presumed to be the best use.").) Because the Commission rejected Landowners' evidence as to their proposed large scale tourism use as too speculative, the Commission did not err in determining that Landowners' use as of the time of the taking was the highest and best use. Relatedly, Landowners also object to the Commission's use of the word 'presumption' (ECF No. 660 at 21-23), but the Court finds the Commission's use of the word presumption is nothing more than an accurate rephrasing of Joint Instruction 13 (ECF No. 556 at 5). The Court therefore overrules Landowners' objection V.(1)(B) (ECF No. 660 at 20-23).

Landowners raise a few other, similar objections. For example, they repeatedly argue the Commission applied an improper "exact and actual" evidentiary standard to evidence presented by Landowners through their expert DiFederico. (ECF No. 660 at 37 (Objection V.(1)(D)), 660 at 53-58 (Objection V.(1)(D)(3)(a)), 67 (Objection V.(1)(D)(4)).) But the Commission does not use this phrase anywhere in the Report. And when the Court

1    carefully reviewed the Report (again) after reviewing these objections, the Court finds the

2    Commission applied the correct evidentiary standard. (*Compare, e.g.*, ECF No. 660 at 37

3    (arguing the Commission applied the 'exact and actual' standard in ECF No. 656 at 15-

4    16) *with* ECF No. 656 at 15-16 (stating that Landowners' expert DiFederico's proposed

5    "tourism operation involving 250 daily customers, coming on the Groom Mine 365 days

6    per year, with each visitor paying an entrance fee of $400 and an additional $50 for

7    knickknacks" was unsupported by any market evidence).)

8          At a high level, Landowners appear to suggest in making their 'exact and actual'

9    argument that the Commission should have found in their favor because the burdens they

10   are subject to (i.e. preponderance of the evidence) are not particularly high. (ECF No. 660

11   at 53-56 (attacking the Commission's finding that DiFederico's proposed $400 admission

12   charge was unreasonable because he talked to 11 booking agents, one of them told him

13   $300 would be reasonable, and he did not say what the other agents told him; and

14   attacking the Commission's finding that the fact 2,000 people annually pay $200 dollars

15   to go on an existing Area 51 photo tour does not establish that 91,250 people annually will

16   pay $400 to go to the Property).) But while it may be true the preponderance of the

17   evidence standard is not particularly high, the Commission found Landowners did not carry

18   that burden—and the Court agrees with the Commission. (ECF No. 656 at 17 ("The

19   Commission finds Landowners have not met their burden of establishing by a

20   preponderance of the evidence that there was market demand or the prospect of market

21   demand for Landowner's proposed large-scale tourist commercial use in the reasonably

22   foreseeable future for the reasons explained below."), 25-28 (finding DiFederico's

23   proposed $400 fee was inadequately supported).) Thus, Landowners' argument is

24   unconvincing, in part because DiFederico's report and testimony lack persuasive force.

25   As explained throughout this order, DiFederico's report and testimony do not establish

26

27

28

much of anything, even under a preponderance standard.[9] The Court therefore overrules Landowners' objections V.(1)(D), V.(1)(D)(3)(a), and V.(1)(D)(4). (ECF No. 660 at 37, 53-58, 67.)

Landowners' final objection in this vein is that the Commission erred in their analysis of DiFederico's proposed comparable sales because the Commission insisted on properties similar to the Property, which created an impossibly high burden for the Landowners to meet because the Property is unique. (ECF No. 660 at 67-68 (objections V.(2), V.(2)(A)).) This objection is unpersuasive both because it mischaracterizes the Commission's pertinent findings, and DiFederico's proposed comparable sales are so remarkably unlike the Property. To start, the Commission did not deviate from the pertinent instructions in stating how comparable the sales had to be. (ECF No. 656 at 33 (relying on Commission Instruction No 14).) Moreover, the Commission merely determined DiFederico's proposed comparable sales were insufficiently similar to the Property. (*Id.* at 656 at 33-39; *see also id.* at 33 ("Mr. DiFederico misapplied the sales comparison approach by selecting sales from a drastically different market, by adjusting those sales inconsistently, and by failing to support those adjustments with any market evidence.").) Thus, Landowners' objection is generally unpersuasive.

///

---

[9]As just one example, DiFederico estimated that every tourist who came on his proposed $400 tour to the Property would spend $50 on food and souvenirs in part because he spends a lot on money on churros when he takes his family to Disneyland. (ECF No. 656 at 28-29.) But how would a tourist spend any money on food and souvenirs considering that Landowners' proposal included no capital improvements? (ECF No. 660 at 7.) The Court assumes some capital improvement would be necessary to build a souvenir stand or cafe on the Property, unless Landowners contemplated selling the tourists souvenirs and offering them food in the vehicle used to transport them to and from the Property—though Landowners never argued this. (ECF No. 654 at 64.) DiFederico also supported this $50 figure by pointing to sales at the Alien Research Center, but those sales only averaged $26.75 once the Alien Research Center's owner excluded everyone who did not buy anything. (ECF No. 656 at 28.) And as the Commission also pointed out, DiFederico's analysis assumed sustained demand (250 people a day spending $50 on knickknacks forever) without providing any evidence for such sustained demand. (*Id.* at 29.) Thus, DiFederico's food and souvenir spending assumption is incredible in the literal sense of the word—impossible to believe. It is also representative of many of DiFederico's other assumptions in his report and testimony.

1    Landowners' argument in these objections also glosses over the dissimilarity

2  between the Property and DiFederico's five selected comparable sales. His five selected

3  comparable sales are all in the Las Vegas metropolitan area—one of the them right off the

4  Las Vegas strip and next to the MGM Grand Hotel. (ECF No. 656 at 34-39.) In contrast,

5  the Property is about 2.5 driving hours from Las Vegas, an hour from the nearest medical

6  facility, and down a long dirt road inside a secret military base. (*Id.* at 5-15.) Moreover, the

7  Property lacks power, water rights, internet, or a sanitation system capable of handling

8  more than a few people at a time. (*Id.*) It presents obviously different development

9  challenges than the sales DiFederico selected as comparable. And as the Commission

10  pointed out, even DiFederico conceded the properties he selected were not really

11  comparable. (*Id.* at 34.) In sum, for the reasons provided by the Commission (*id.* at 34-

12  39), the Court is convinced DiFederico's selected comparable sales are simply not

13  comparable.[10] The Court therefore overrules objections V.(2) and V.(2)(A). (ECF No. 660

14  at 67-73.)

15    More generally, the Court overrules all of Landowners' objections that the

16  Commission either did not apply the correct legal standard as provided to them in the Joint

17  Instructions (ECF No. 600), or incorrectly applied those instructions in its Report.

18  ///

19  ///

20  ///

21

---

22    [10]Two subsidiary points. First, Landowners' argument the Court should consider
other valuation approaches beyond comparable sales is irrelevant at this point in the
23  litigation because the Court considered and rejected basically the same argument when it
excluded Landowners' attempt to rely on the income approach, in part because the
24  Property had not generated any income since mining operations stopped in the 1950s.
(ECF No. 660 at 68 (acknowledging the Court excluded in the income approach at ECF
25  No. 497 at 14:3-4 ).) Second, Landowners' argument they could not do better than the
comparable properties proffered by DiFederico because the Property is unique is
26  unconvincing. (ECF No. 660 at 68-73.) While the Court need not speculate, perhaps a
vacant property within a piece of federal land with views into Bryce Canyon or the Grand
27  Canyon (tourist attractions Landowners proffered as comparable) would have been a
better comparable sale, assuming such a sale existed? Regardless, the comparable sales
28  DiFederico selected are too dissimilar to the Property.

### 3.     Challenges to Particular Factual Findings (Objections V.(1)(D)(3)(b)-(f))

Landowners also object to specific factual findings the Commission included in the Report. (ECF No. 660 at 58-67.) The Court will briefly address—and overrule—those objections.

Landowners first challenge the Commission's conclusion that the Las Vegas Convention and Visitors Authority ("LVCVA") survey data that DiFederico relied on does not establish demand for Landowners' proposed large-scale tourism use of the Property. (ECF No. 660 at 58-61 (Objection V.(1)(D)(3)(b)).) However, the Court agrees with the Commission's finding in the Report. (ECF No. 656 at 22.) Landowners more specifically argue the Commission should have credited the testimony of their experts—who relied on the LVCVA—rather than Plaintiff's experts, whose testimony the Commission relied on to support their findings, because Landowners' experts are more familiar with Southern Nevada. (ECF No. 660 at 58-60.) However, the Commission did not rely on the testimony of Plaintiff's experts for anything specific to Nevada. (ECF No. 656 at 22.) Instead, the Commission relied on that testimony to buttress the Commission's findings that: (1) surveys about an entire metropolitan area do not establish demand for a particular project; (2) nothing in the LVCVA survey attempts to quantify demand for alien-themed tourism; and (3) Landowners' expert DiFederico did not sufficiently consider how price impacts demand. (*Id.*) The Court is unable to see how local knowledge would change these findings. In addition, Landowners challenge the Commission's finding that DiFederico's estimate of annual visitor traffic to the Property is merely *ipse dixit*. (ECF No. 660 at 60-61.) But Landowners rely on the portion of the trial transcript immediately preceding the portion the Commission did to support their argument. (*Compare id.* (relying in part on ECF No. 633 at 24-25) *with* ECF No. 556 at 21-22 (relying in part on ECF No. 633 at 27-42).) The Court agrees with the Commission's view of this testimony, not Landowners'. While of course DiFederico's calculation of demand for Landowners' proposed large-scale tourism use will necessarily be subjective on some level, DiFederico pulled his demand

1  estimate out of thin air. (*See, e.g.*, ECF No. 633 at 38 ("I'm not a huge Laughlin fan

2  maybe.").) The Commission was not required to accept DiFederico's demand estimate.

3  The Court will thus overrule objection V.(1)(D)(3)(b). (ECF No. 660 at 58-61.)

4  Landowners next challenge the Commissions' finding that interest in Area 51

5  peaked in the mid-1990s. (ECF No. 660 at 61-62 (Objection V.(1)(D)(3)(c).) The Court

6  overrules this objection as immaterial to the Commission's Report. In considering the

7  Report as a whole, the Commission did not reject Landowners' proposed large-scale

8  tourism use because interest in Area 51 peaked before the date of the taking, but because

9  it was speculative and unsupported. Moreover, the Commission otherwise found that

10 Landowners carried their burden to show there was substantial interest in Area 51 as of

11 the date of taking. (ECF No. 556 at 11-12 (noting in addition that Plaintiff conceded people

12 are interested in Area 51).) Thus, the Commission's finding that interest in Area 51 peaked

13 in the mid-1990s did not prevent them from finding in Landowners' favor that people are

14 interested in Area 51. The Court will therefore overrule objection V.(1)(D)(3)(c) as

15 immaterial. (ECF No. 660 at 61-62.)

16 Landowners then challenge the Commission's finding that the 'Storm Area 51'

17 event was 'not cancelled' and was a 'financial failure.' (*Id.* at 63-65 (Objection

18 V.(1)(D)(3)(d).) The Court overrules this objection because the Commission rejected the

19 precise argument Landowners raise in their objection (ECF No. 656 at 20 n.6), and the

20 Court agrees with the Commission for the reasons stated in that footnote.

21 Landowners further challenge the Commission's finding that Landowners did not

22 carry their burden to establish year-over-year demand for their proposed large-scale

23 tourism use by arguing that other alien-themed business in the area have been in business

24 for a while, other tourist attractions such as Grand Canyon West and Death Valley have

25 year-over-year demand, and over 3 million people signed up to 'Storm Area 51' on

26 Facebook in the summer of 2019. (ECF No. 660 at 65-66 (Objection V.(1)(D)(3)(e)).)

27 However, the other alien-themed businesses in the area and tourist attractions like Death

28

1    Valley do not owe much of their value to exclusivity. DiFederico's assumption that over

2    90,000 tourists a year will visit the Property forever depends on its exclusive view of Area

3    51—which necessarily becomes less exclusive over time, as more people visit. Thus,

4    those businesses and attractions do not demonstrate the Commission erred. As to

5    Landowners' argument that the 'Storm Area 51' Facebook event evidences sustained

6    demand for their proposed large-scale tourism use, it is obvious that signing up for an

7    event on Facebook does not mean someone will pay $400 for 6.5 hour car ride into the

8    desert and back. Said more simply, the Court is unconvinced by Landowners' arguments

9    and will therefore overrule objection V.(1)(D)(3)(e). (ECF No. 660 at 65-66.)

10       Landowners finally challenge the Commission's finding in paragraph 111 of their

11   report that Landowners' proposed large-scale tourism use might not be financially feasible

12   if it could not attract 91,250 annual visitors, and those visitors paid less than $400 per

13   person. (ECF No. 660 at 66-67 (Objection V.(1)(D)(3)(f)).) The Court overrules this

14   objection as immaterial because the Commission's meaningful conclusion in that

15   paragraph was that "Landowners put on no evidence about the financial feasibility of a

16   tourism operation having less than 91,250 annual visitors." (ECF No. 656 at 27.) That

17   finding supported the Commission's broader conclusion that Landowners had not carried

18   their preponderance of the evidence burden to establish that a large-scale commercial

19   tourism use was reasonably probable. (*Id.* at 15-16.) Moreover, the Commission correctly

20   made clear it was not permitted to "attempt to value some 'smaller scale' tourism scenario

21   (e.g., where tourists come to the property one weekend per month) because Landowners

22   did not put forward any sales to value such a 'small scale' commercial tourism use." (*Id.*

23   at 16.) Thus, the particular sentences of the Report Landowners object to had no real

24   bearing on the Commission's findings as to their just compensation award

25   recommendation. Objection V.(1)(D)(3)(f) is overruled. (ECF No. 660 at 66-67.)

26   ///

27   ///

28

1
2

### 4. The Commission's Alternative Holding that Landowners' Proposed Large-Scale Tourism Use Was Not Necessarily Legally Permissible (Objection V.(1)(C))

3   Landowners object to the Commission's finding that, while some type of tourist use

4   of the Property was legally permissible, Landowners' proposed tourism use was not

5   necessarily permissible. (ECF No. 660 at 23-26 (Objection V.(1)(C)).) Though the Court

6   overrules the entire objection, the Court will specifically address its major components.

7   First, the Court views the Commission's pertinent holding as an alternative holding.

8   The Commission first found Landowners' proposed large-scale tourism use too

9   speculative to constitute the Property's highest and best use. (ECF No. 656 at 15-29.) The

10  Commission went on to also find that Landowners had not established their proffered

11  large-scale tourism use was permissible without a special use permit from Lincoln County,

12  and the Air Force could object to their proposed use. (*Id.* at 29-33.) Thus, even if the Court

13  did not agree with the Commission on these two latter points—though it does—it could

14  still adopt the Commission's rejection of Landowners' proposed large-scale tourism use

15  as too speculative.

16  Moving on to Landowners' objections, Landowners primarily rely on Joint

17  Instruction 12—along with representations Air Force officials made at the time of the 1984

18  withdrawal—to argue the Commission's finding that the Air Force could object to

19  Landowners' proposed large-scale tourism use is erroneous because the parties

20  stipulated the Air Force could not cap the number of business visitors Landowners could

21  invite on the Property. (ECF No. 660 at 25-28.) However, this objection is unpersuasive.

22  From the 1984 withdrawal onwards, the Property was an island within the NTTR. (ECF

23  No. 556 at 6.) Both before and after the taking, the Air Force used the NTTR to conduct

24  classified missions. (*Id.* at 7.) Thus, as a matter of common sense, the Air Force might

25  object if Landowners began bringing 250 people on the Property every day for the

26  foreseeable future. That is very different from the occasional long weekends Landowners

27  used the Property for from the 1950s until the date of the taking. (*Id.* at 10-15.) Member of

28

1    the Lincoln County Planning Commission Lytle also confirmed the Air Force, as an

2    adjacent property owner, could have objected if Landowners began bringing 250 people

3    a day onto the Property. (*Id.* at 32.) Moreover, this view aligns with an important caveat

4    included in Joint Instruction 12 that Landowners' argument ignores: "However, any

5    positive or negative effects of the NTTR (if any) on the Property that were present prior to

6    December 19, 2014, should be considered." (ECF No. 600 at 13-14.) Thus, the

7    Commission was permitted to consider the fact the NTTR encompassed the Property, and

8    the Air Force was therefore able to object if Landowners began bringing 250 people a day

9    to the Property notwithstanding the Air Force's longstanding commitment to allowing

10   Landowners and their guests on to the Property.

11        This dovetails with Landowners' argument the Commission violated the project

12   influence rule in finding the Air Force could object to Landowners' proposed large-scale

13   tourism use. (ECF No. 660 at 28-30.) Landowners rely on caselaw and Joint Instruction 8

14   to make their argument. (*Id.*) As encapsulated in Joint Instruction 8, the project influence

15   rule provides the Commission should not "consider the fact that the United States

16   government has taken, or planned or intended to take, the land" in determining just

17   compensation. (ECF No. 600 at 10.) Landowners argue the Commission violated the

18   project influence rule in finding the Air Force could object to Landowners' proposed large-

19   scale tourism use "as the Government's necessities cannot influence in any way the value

20   of the Property." (ECF No. 660 at 30.)

21        The Court disagrees. Landowners' argument overlooks that the NTTR

22   encompassed the Property before the date of taking. As the operator of the NTTR—and

23   again as supported by Lytle's testimony—the Air Force could have objected if Landowners

24   started bringing 250 people a day onto the Property. The Air Force's ability to object does

25   not come from any contemplation of condemning the Property, but from its existing rights

26   as the adjacent (indeed, surrounding) landowner. The Commission's finding thus did not

27   violate the project influence rule. Said otherwise, the Commission may have violated the

28

1    project influence rule if it valued the Property at $0 because the Air Force was condemning

2    it—but that is not what the Commission did. Instead, the Commission recognized the

3    reality that the NTTR has encompassed the Property since 1984.

4           Landowners' remaining objections to the Commission's legal permissibility findings

5    relate to the Property's zoning. The Court also overrules these objections. The Property

6    was zoned A-5 at the date of taking, which permits agricultural uses as of right. (ECF No.

7    556 at 9.) Landowners more specifically argue the Commission erred because a rural

8    recreational use—the way Landowners had been using the Property for approximately 60

9    years—was not permitted under the A-5 zoning. (ECF No. 660 at 30-32.) However, Lytle

10   testified that Landowners' existing use of the Property would be permitted because it

11   predated current zoning regulations,[11] and was thus permitted under the A-5 zoning. (ECF

12   No. 632 at 17.)

13          Landowners, relying on Lytle's testimony, also argue the Commission erred in

14   determining Landowners would have needed a special-use permit to engage in their

15   proposed large-scale commercial tourism use because a tourism use was permitted as of

16   right. (ECF No. 660 at 32-34.) However, Lytle did not testify Landowners did not need a

17   special-use permit, and other experts on both sides testified that Landowners would need

18   a special use permit. (ECF No. 556 at 29-33.) Moreover, as the Commission pointed out,

19   Lytle also testified that he, as a Lincoln County Planning Commission member, would have

20   entertained any objections from the Air Force if Landowners pursued their large-scale

21   tourism use. (*Id.* at 33.)

22          Landowners finally argue the Commission erred in determining Landowners had

23   not established they could get the special use permit from Lincoln County required for a

24   large-scale tourism use because they got a post-hoc special use permit. (ECF No. 660 at

25

26          [11]"'Providing such protection commonly is known -- in the case law and otherwise -
27   - as 'grandfathering.' We decline to use that term, however, because we acknowledge that
     it has racist origins.'" *Comstock v. Zoning Bd. of Appeals of Gloucester*, Case No. 19-P-
28   1163, 2020 WL 4432295, at *3 n.11 (Mass. App. Ct. Aug. 3, 2020).

1   34-36.) However, as the Commission found, Landowners did not describe the large-scale

2   tourism use they proffered to the Commission to the Lincoln County Planning Commission

3   when they applied for a post-hoc special use permit, the post-hoc special use permit

4   process they went through was not indicative of what would have happened under normal

5   circumstances because it was not noticed as it would have normally been, and the Air

6   Force did not participate in the process, though it would normally be expected to. (ECF

7   No. 556 at 30-33.)

8       In sum, the Court overrules all of Landowners' objections within objection V.(1)(C)

9   to the Commission's legal permissibility findings. (ECF No. 660 at 23-36.)

10

11                 **5.     The Commission Should Have Disqualified Plaintiff's Experts
                            Neville and Weissenborn (Objection V.(2)(B))**

12      Landowners also argue the Court should disqualify Plaintiff's experts Neville and

13  Weissenborn primarily because neither of them has sufficient experience with Southern

14  Nevada. (ECF No. 660 at 73-76; *see also id.* at 73 n.29.) As to both experts, the Court

15  does not find their purported lack of experience with Southern Nevada disqualifying. Both

16  Neville and Weissenborn retained a local appraiser, Chris Matthews, to help them with

17  portions of their reports, in compliance with applicable professional standards, and to fill

18  any gaps in their knowledge stemming from their lack of familiarity with Southern Nevada

19  specifically. (ECF No. 634 at 135-145, 245.) As to Neville, the Commission found his

20  analysis complied with professional standards. (ECF No. 556 at 16-19, 40-41.) Further,

21  the Court already considered and denied a motion Landowners filed to exclude Neville's

22  opinion for similar reasons. (ECF No. 497 at 23-29.) Landowners also overlook that Neville

23  had some particularly relevant appraisal experience: he appraised the Fuchs Nuclear

24  Mine, a patented mining claim within the NTTR, and conducted appraisals of three other

25  mining inholdings within the Lake Mead National Recreation Area. (ECF No. 634 at 163-

26  64.) And even Landowners' expert Harper agreed that Neville's appraisal complied with

27  professional standards. (ECF No. 556 at 40-41.) As to Weissenborn, the Court similarly

28

1    declined to exclude her testimony on particular subjects in a prior order. (ECF No. 497 at

2    14-17, 19-22.) The Court declines to disqualify Plaintiff's experts Neville and Weissenborn.

3         Landowners finally argue the Court should disregard Neville's testimony because

4    he did not conduct a financial feasibility analysis or market demand study for a commercial

5    tourism use in rejecting such a use as the Property's highest and best use, though he

6    concluded such a use was physically possible and legally permissible with conditions.

7    (ECF No. 660 at 74-75.) However, the Commission considered and rejected this same

8    argument in the Report. (ECF No. 556 at 16-29.) The Court agrees with the Commission

9    for the reasons the Commission provided in the Report. (*Id.*) Moreover, Neville correctly

10   testified that he did not need to conduct a financial feasibility analysis because he

11   determined Landowners' proposed tourist commercial use was not reasonably probable.

12   (ECF No. 634 at 213.) In sum, the Court overrules Landowners' objections seeking to

13   exclude the testimony of Plaintiff's experts Neville and Weissenborn. (ECF No. 660 at 73-

14   76 (Objection V.(2)(B).)

15   **IV.    CONCLUSION**

16        The Court notes that the parties made several arguments and cited to several cases

17   not discussed above. The Court has reviewed these arguments and cases and determines

18   that they do not warrant discussion as they do not affect the outcome of the issues before

19   the Court.

20        It is therefore ordered that the Report of the Commission (ECF No. 656) is accepted

21   and adopted in full.

22        It is further ordered that just compensation for the taking of the Property is

23   $1,100,000, plus another $104,000 for the mineral estate (as separately agreed to by the

24   parties), for a total of $1,204,000. The Clerk of Court is directed to issue a check in an

25   amount corresponding to the funds still held by the Clerk of Court in this case to the Law

26   Offices of Kermitt L. Waters (ECF Nos. 10, 85).

27

28

1    It is further ordered that Plaintiff's motion to adopt in part and modify in part the

2    Commission's Report (ECF No. 659) is granted in part, and denied in part, as explained

3    in this order.

4    It is further ordered that Landowners' objections to the Commission's Report (ECF

5    No. 660) are overruled, and their request to modify the Report in part is denied.

6    The Clerk of Court is directed to enter judgment in accordance with this order and

7    close this case.

8    DATED THIS 27th Day of August 2020.

9

10   _____

11   MIRANDA M. DU
     CHIEF UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

**<u>Appendix A</u>**

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

400 ACRES OF LAND, more or less,
situate in Lincoln County, State of Nevada;
and JESSIE J. COX, et al.,

               Defendants.

Case No. 2:15-cv-01743-MMD-NJK

**COMMISSION'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................3

II.   FINDINGS OF FACT ...........................................................................................5

    A.   Joint Pretrial Order .........................................................................................5

    B.   Commissions Finding Of Fact ........................................................................9

III.  CONCLUSIONS OF LAW ..................................................................................15

    A.   Landowners' Proposed Large-Scale Tourism Use was Speculative, Not Reasonably Probable, at the Date of Value .........................................................................16

        1.   Demand Requires Consideration of Price.................................................21

        2.   Mr. DiFederico Otherwise Did Not Support His $400 Entrance Fee .......25

        3.   Mr. DiFederico Failed To Support That Visitors Would Pay $50 Per Person On Knickknacks ....................................................................................28

        4.   Landowners Failed To Establish That Lincoln County Would Have Issued The Special Use Permit Or Zone Change Necessary For Large-Scale Commercial Tourism And Commercial Retail.............................................................32

    B.   Mr. Neville Concluded That The Groom Mine Had A Value Of $254,000 At The Date Of Taking As A Rural Recreational Retreat ............................................39

    C.   Landowners Did Not Present Other Rural Recreation Sales Or Challenge Mr. Neville's Sales-Comparison Analysis ...............................................................40

    D.   Just Compensation ........................................................................................41

IV.   CONCLUSION ....................................................................................................43

## I.     INTRODUCTION

This is a condemnation action filed by the United States for the taking of approximately 400 acres of patented and unpatented mining claims in Lincoln County, Nevada, known as the "Groom Mine."  Commission Instruction No. 1 (ECF No. 600).  Chief Judge Du selected a land commission ("Commission") to determine just compensation for the taking pursuant to Rule 71.1(h) of the Federal Rules of Civil Procedure on September 17, 2019.  Order (ECF No. 515).

The Groom Mine consists of six patented mining claims totaling 87.49 acres and 15 unpatented mining claims totaling approximately 309.9 gross acres.  *Id.*  The Commission has been instructed that the patented mining claims are the equivalent of fee simple ownership, and that the surface of the unpatented mining claims can only be used for mining related activities and to access patented claims.  *Id.*  The only issue the Commission is to decide is how much the United States should pay for the property it has taken.  *Id.*  The Commission was explicitly instructed that it may not decide any questions or issues related to the validity of the taking, or the value or contributory value of any mineral interest to the Groom Mine which is outside the scope of the proceedings before the Commission.  *Id.*

This unanimous report of findings of fact and conclusions of law is issued pursuant to Rule 71.1(h)(2)(D).  The Court has instructed that conclusory findings alone are insufficient. Commission Instruction No 5.  However, the Commission's report "need not include detailed findings on all contested issues."  *Id.*  Rather, the report must show the pathway the Commission took through the maze of conflicting evidence, which at the very least consists of demonstrating the reasoning used in deciding on the award, the standard of valuation the Commission tried to follow, and the lines of testimony the Commission adopted.  *Id.*  The Commission was instructed it need not resolve every contested issue of fact or make subsidiary findings of fact but should make specific findings as to the matters on which valuation was based, show how it applied the principles of law in reaching its ultimate conclusion and state the reasons for arriving at its valuation.  This includes our finding on the highest and best use of the property.  *Id.*  The Commission was instructed that just compensation means the fair market value of the property on the date of taking.  Commission Instruction No. 8.  Although there are generally three

recognized approaches to ascertain market value, the parties agreed one was not an available method, and one approach was excluded in this case. Commission Instruction No. 9. Accordingly, the Commission was instructed it must ascertain the fair market value of the property utilizing the comparable sales approach. *Id.*

At trial both parties offered expert and other evidence concerning the highest and best use of Groom Mine on the stipulated date of value, September 10, 2015. Both sides presented expert MAI opinion testimony on just compensation for the taking based on the price per acre due to the Landowners for the 87.49 acres comprising the patented mining claims.

The United States contended that the highest and best use of the Groom Mine was its existing use at the time of taking as rural residential, and that just compensation for the taking was $254,000. The United States' appraiser opined that comparable substitute sales of rural recreational property in the area of the Groom Mine sold for between $1,668 per acre and $10,000 per acre. He offered testimony on which of his five comparable sales of rural residential property were superior or inferior to the Groom Mine. He testified the Groom Mine would sell for between $2,303/acre and $2,953/acre and concluded the market value on the date of value was $2,900/per acre or $254,000 ($2900 x 87.49 = $253,721 rounded to $254,000).

Landowners contended that the highest and best use of the Groom Mine was tourist commercial—"a use where 250 people a day visit the Property for a fee, with no capital improvements, drawing on the established market interest in, and demand to see Area 51 and drawing on the regional tourism hub of Las Vegas." Landowners' Proposed Findings of Fact and Conclusions of Law ("FFCL") (ECF No. 654), p. 5, ll 13-18, ¶¶ 140, 215. Based on his determination of highest and best use Landowners contended the just compensation owed by the United States was $49,870,000. Landowners' MAI appraiser testified the Groom Mine had the potential for generating $41,062,500 in annual tourist revenue because it is the only private property in the world with a clear and unobstructed view of the Air Force operating base commonly referred to in the popular culture as Area 51. Landowners' appraiser testified that there were no other large acreage properties with tourist commercial highest and best use in Lincoln County or other rural Nevada counties surrounding Lincoln County. He therefore

selected sales of tourist commercial properties in the Las Vegas metropolitan area to find similar sales with a similar highest and best use and potential to draw visitors similar in number as the Subject Property.  Landowners' Proposed FFCL, ¶ 268.  He testified comparable tourist commercial properties in the Las Vegas metropolitan area would sell for between $125,320 per acre and $1,187,931 per acre.  After making adjustments to his selected comparable sales, he concluded the fair market value on date of taking "was $570,000/acre for the patented acres with the unpatented acres contributing to that value."  Landowners' Proposed FFCL, ¶ 301. ($570,000 x 87.49 = $49,870,000).

The Commission was instructed that highest and best use "is not necessarily what the owner was using the property for at the time of taking.  However, in the absence of proof to the contrary, the current use is presumed to be the best use."  Commission Instruction No. 13.  For the reasons explained in this report, the Commission finds that the highest and best or most profitable use on the date of value was its existing rural residential use.  Landowners did not present sufficient evidence to overcome the presumption that the property's existing use on the date of value was its highest and best use.  Although Landowners presented evidence to the contrary, they did not meet their burden of showing by a preponderance of the evidence that there was market demand or the prospect of market demand for their proposed large-scale tourist commercial use in the reasonably foreseeable future.

## II.   FINDINGS OF FACT

### A.   Joint Pretrial Order

The parties stipulated in their Joint Pretrial Order (ECF No. 566) that the following facts are admitted and required no proof at trial.  The Commission therefore accepts these facts as true, and binding on the parties.

1.   This is a case to determine the just compensation for the taking of approximately 400 acres of patented and unpatented mining claims known as the "Groom Mine" in Lincoln County, Nevada (the "Property").  Stipulated Fact No. 1.

2.   The United States exercised its power of eminent domain and took the Property on September 15, 2015.  Stipulated Fact No. 2.

3.     The date of taking in this case is September 15, 2015; however, the parties agree that the date of value is September 10, 2015 ("Date of Value") – the date the United States filed its Complaint in Condemnation.  Stipulated Fact No. 3.

4.     Just compensation is the fair market value of the Property on the Date of Value. Stipulated Fact No. 4.

5.     The United States took the Property for the public purpose of operating the military test and training facility known as the Nevada Test and Training Range ("NTTR"). Stipulated Fact No. 5.

6.     On October 17, 1984, Congress enacted Public Law 98-485 ("1984 Withdrawal"), which authorized the withdrawal of 89,600 acres of federal land in Lincoln County, Nevada, from public use for military purposes ("1984 Withdrawal Area").  However, the 1984 Withdrawal was made "[s]ubject to valid existing rights," such as the patented and unpatented mining claims comprising the Property.  The legislative history from the 1984 Withdrawal also confirms that the Property was not within the scope of the 1984 Withdrawal.  Stipulated Fact No. 6.

7.     Prior to the 1984 Withdrawal, the Federal land surrounding the Property was open to the public and administered by the United States Department of the Interior, Bureau of Land Management.  Stipulated Fact No. 7.

8.     After the 1984 Withdrawal, the Property was a private inholding within the 1984 Withdrawal Area from enactment of Public Law 98-485 until the taking in 2015.  Stipulated Fact No. 8.

9.     For valuation purposes in this case, a buyer of the Property could be granted permission to enter the NTTR to access the Property for themselves, their employees, and business visitors.  The Air Force also would not prohibit the number of persons allowed to access the Groom Mine, nor would the Air Force constrain or interfere with access to the Property beyond those basic restrictions applicable to anyone seeking entry to the NTTR.  Stipulated Fact No. 9.

10.     The Property generally provides an unobstructed and elevated view, from six to

seven miles away, of improvements at a remote operating location on the far side of dry Groom Lake.  While not a term used by the Air Force, these improvements are referred to by the Landowners as Area 51.  Stipulated Fact No. 10.

11.     The Property generally provides an unobstructed view of classified national defense missions occurring within the NTTR and its remote operating locations.  Stipulated Fact No. 11.

12.     The Property is located in Lincoln County, Nevada.  Stipulated Fact No. 12.

13.     The Property is located at the southern end of the Groom Mountain Range at an elevation ranging from approximately 5000 to 5800 feet.  Stipulated Fact No. 13.

14.     The Property is located approximately 150 road miles from downtown Las Vegas. Stipulated Fact No. 14.

15.     The Property is located approximately 39 road miles from the closest town, Rachel, Nevada.  Stipulated Fact No. 15.

16.     The nearest rail connection is in Caliente, Nevada.  Stipulated Fact No. 16.

17.     The Landowners' family has owned the Property since approximately 1885. Stipulated Fact No. 17.

18.     The Property consists of six patented mining claims totaling approximately 87.49 acres and 15 unpatented mining claims totaling approximately 309.9 gross acres.  Stipulated Fact No. 18.

19.     A patented mining claim is one for which the federal government has passed its title to the claimant, making it private land equivalent to fee simple ownership.  Stipulated Fact No. 19.

20.     An unpatented mining claim is Federal land containing a mineral for which a claimant has asserted a right of possession.  This right is limited to the extraction and development of the mineral and title remains with the Federal Government.  Stipulated Fact No. 20.

21.     The surface of unpatented mining claims can only be used for mining related activities and to access patented claims.  Stipulated Fact No. 21.

22.     As of the Date of Value, there was water present on the Property but the Property did not include any adjudicated water rights as the Groom Lake Valley Basin has not been adjudicated.  Stipulated Fact No. 22.

23.     As of the Date of Value, there were nine cabin structures on the Property and several miscellaneous structures.  Stipulated Fact No. 23.

24.     There are inactive mineral processing features on the Property, including historical prospect pits, a main shaft, hoist/headframe remnants, open mine shafts and tunnels, and the remains of a former mill which was destroyed in 1954.  Stipulated Fact No. 24.

25.     As of the Date of Value, the Landowners had not sought to have the improvements on the Property receive any designation as historic structures, such as listing on the National Register for Historic Places.  Stipulated Fact No. 25.

26.     As of the Date of Value, the Property was not serviced by public utilities. Stipulated Fact No. 26.

27.     For calendar years 2007-2014, according to U.S. Air Force records, Defendant Landowners and their guests visited the Property between five to sixteen times each year.  These visits typically were a few days in length (e.g., a long weekend).  The shortest such visit was one day in length, and the longest such visit was nine to ten days in length.  Stipulated Fact No. 27.

28.     As of the Date of Value, the Property was zoned A5-Agricultural.  Stipulated Fact No. 28.

29.     The Property has not been used for any commercial activities nor generated income since 1956.  Stipulated Fact No. 29.

30.     The Landowners never sought to sell any portion of the Property nor did they receive unsolicited written offers to purchase any portion of the Property in the 10 years prior to the Date of Value.  Stipulated Fact No. 30.

31.     The tourist commercial use proposed by Landowners' expert, Tio DiFederico, involving no capital improvements, is physically possible.  Stipulated Fact No. 31.

/ / /

/ / /

**B.**     **Commission's Findings Of Fact**

32.     The topography is steep in parts.  Def. Ex. 51 (Draft EIS) at TDG WF 001924; Vol. IV, Tr. 240:14-17 (DiFederico).  The property has a desert climate, and the vegetation on the property is consistent with the surrounding desert terrain.  *See* Def. Ex. 51 at TDG WF 001945.

33.     Most of the cabins date to the early 1900s and are in poor to average condition. *See* ECF 574 (Joint Proposed Site Visit Instructions) at 5-6 (Stop 1 description); Vol. III, Tr. 22:13-22 (Sheahan); Vol. VI, Tr. 176:23-177:2 (Neville); Pl. Ex. 306 (photos).

34.     The A-5 zoning designation permits agricultural related uses as of right, not commercial tourism.  Pl. Ex. 295(a) at § 13-5L-2.

35.     The Groom Mine did not have a special use permit of any kind at the Date of Value.  Vol. III, Tr. 140:13-23 (Sheahan).

36.     The Groom Mine is located approximately 150 road miles from downtown Las Vegas, and the drive from Las Vegas to the Groom Mine takes about 2.5 hours.  Stip. Fact No. 19; Vol. VI, Tr. 171:8-9 (Neville).  The last 27 miles are off State Highway 375.  Vol. VI, Tr. 171:22-24 (Neville).  To reach the property from State Highway 375, a vehicle must travel: 15 miles on a gravel road; then one mile on a paved road to a NTTR security checkpoint; then eight miles on a paved road inside the NTTR.  The last three miles are on a narrow dirt road.  *Id.*, Tr. 171:12-21.

37.     The nearest town, Rachel, is about 52 miles from the Groom Mine (via the back gate).  Vol. VI, Tr. 182:16-183:2 (Neville).  Rachel has a population of roughly 60.  *Id.*, Tr. 183:3-4 (Neville).  There is no school, gas station, grocery store, or post office in Rachel.  *Id.*, Tr. 183:5-14 (Neville).  The only commercial establishment in Rachel is the Little A'Le'Inn, a small, alien-themed restaurant and gift shop.  Vol. VI, Tr. 183:15-16 (Neville); Vol. IV, Tr. 154:3-6 (Harris).

38.     The nearest medical facility to the Groom Mine is in Caliente, about an hour away.  Vol. V, Tr. 232:6-20 (DiFederico).  Any critically injured or ill person at the Groom Mine would need to be taken to Las Vegas or to St. George, Utah.  Def. Ex. 66 at TDG Rpt 00061;

Vol. V, Tr. 232:21-24 (DiFederico).

39.     Lincoln County, where the property is located, has a total population of about 5,000.  Vol. V, Tr. 187:8-10 (DiFederico); Vol. VI, Tr. 180:25-181:1 (Neville).

40.     Before 1984, the public could enter upon and hike the BLM land surrounding the Groom Mine, including land south of the Groom Mine that is closer to the remote operating location near Groom Lake.  Vol. III, Tr. 176:4-19 (Sheahan).  There was no charge to access this BLM land.  *Id.*, Tr. 176:4-21 (Sheahan).

### Landowners' Use Of The Groom Mine Prior To The Taking

41.     Landowners stopped residing full-time at the Groom Mine in the mid-1950s when mining operations ended.  Vol. III, Tr. 143:4-6 (Sheahan).

42.     For the 60 years preceding the taking, Landowners used the Groom Mine as an occasional recreational retreat.[1]  Vol. III, Tr. 157:21-158:6 (Sheahan).

43.     For calendar years 1979-1986, according to Air Force correspondence, Landowners visited the Groom Mine about four times per year with a duration of between two and 10 days per visit.  Pl. Ex. 18.  Landowners did not dispute this frequency of visits in responsive correspondence back to the Air Force.  Pl. Ex. 20; Vol. III, Tr. 156:12-16 (Sheahan).

44.     Popular culture interest in "Area 51" began in the 1980s and reached its apex in the 1990s.  Vol. III, Tr. 141:25-142:3 (Sheahan); Vol. VI, Tr. 52:12-14 (Moeder).

45.     Landowners never pursued Groom Mine tourism in the 1990s or at any time thereafter.  Landowners never charged anyone to visit the property.  They never developed any business plans for a tourism use.  They never contacted potential tourism operators or investors.  They never attempted to obtain financing for a tourism operation.  They never improved the property for a tourism use.  And, before the taking, they never attempted to change the A-5 agricultural zoning designation or obtain a special use permit necessary for commercial tourism.  Vol. III, Tr. 139:2-20, 140:13-141:12 (Sheahan).

46.     No one approached Landowners about buying the Groom Mine for a potential

---

[1]     Landowners also performed mining assessment work on their occasional visits to the property.  Vol. III, Tr. 157:21-158:6 (Sheahan).  Landowners needed to perform this assessment work in order to maintain their unpatented mining claims.  *Id.*, Tr. 158:7-12 (Sheahan).

tourism use.  *Id.*, Tr. 141:16-20; Stip. Fact No. 39.

47.     It is uncontested that the Subject Property, is the only private and legally accessible property in the world with a clear and unobstructed view of Area 51.

48.     The Commission finds that in this case, exclusion of the Project influence means that the fair market value of the Property is to be determined without consideration of: the Government's need to acquire the Property as a "buffer area for the NTTR" or the fact that "use of the NTTR has increased in complexity and tempo over the last several decades" to a point where the "Air Force can no longer test and train securely while civilians are present at the Property due to its location inside the NTTR and increasing national security demands." However, the Commission may consider that "the Property was a private inholding within the 1984 Withdrawal Area" with access and A-5 zoning until the taking in 2015.  Stipulated Fact No. 10 at ECF No. 566 at 4.

49.     *Area 51* is a secret military base located on Groom Lake that has become a location widely believed in a segment of the popular culture to be where UFOs or aliens have been stored by the Government and where alien technology is tested. Tr. Trans. Vol. 4 at 160:16-20 and Vol. 5 at 9-24:1.  More specifically, it is believed in a segment of the popular culture that in the 1950's a UFO crashed in Roswell, New Mexico and those remains were transported to *Area 51* for testing.  Pltf. Ex. 536 and Def. Ex. 68:380-382.  It is known that the U-2 and Oxcart spy plane programs were run at *Area 51*.  Def. Ex. 22:TDG WF 001428.  The Government conceded that the Landowners proved that people are interested in *Area 51*.  Tr. Trans. Vol. 8 at 46:6.

50.     Evidence produced at trial confirmed *Area 51* has been a national and international cultural phenomenon and place of significant interest for several decades.  Tr. Trans. Vol. 5 at 9-24:1 and Def. Ex. 67. Evidence was admitted showing that outside surveys from 2012 by the National Geographic channel indicated more than one-third of respondents said "they believed aliens have visited Earth, and almost half were not sure.  Only 17 percent said they did not believe so."  Def. Ex. 69a.  And, that people who are interested in UFOs and aliens

are also interested in *Area 51*.  Def. Ex. 68 opening page.[2]  Def. Ex. 69a.

51.     [LO 37]     Evidence was provided that the Google hits for "*Area 51*" range anywhere from 38 million to over 59 million.  Tr. Trans. Vol. 5 at 9:8-19.  Evidence was presented that there are over 1 million YouTube videos relating to *Area 51* and "one video that has 9.9 million views" and approximately 20 other videos that had 3 million views.  Tr. Trans. Vol. 5 at 17:19-18:4.

52.     The evidence produced at trial demonstrated that there have been numerous television shows, documentaries, movies, books, and merchandise which relate to *Area 51*.  Def. Exs. 4, 67, 68 and Tr. Trans. Vol. 5 at 9-13. Notable shows, movies, books and merchandise include, without limitation: "Ancient Aliens;" "the X-Files;" the "Independence Day" movie franchise; the "Indiana Jones" movie franchise; the book "*Area 51* An Uncensored History of America's Top-Secret Military Base" authored by Annie Jacobsen[3] and on the National Best Seller's List; and, Bud Light's production of *Area 51* themed beer cans.  Def. Exs. 4, 67, and 68. Evidence was adduced that prior to moving to Summerlin in 2019, Las Vegas' Triple-A minor league baseball team was named "The Las Vegas 51's" in reference to *Area 51*.  Tr. Trans. Vol. 7 at 144:8-9.

53.     Evidence introduced by the Government confirms that prior to its withdrawal "since 1993, visitation to the White Sides area [an area separate and apart from the 1984 Withdrawal Area] has increased, primarily as a result of media attention and networking among Unidentified Flying Object (UFO) and military viewing groups."  Pl's Ex. 056:LO 00000388 (AS) (internal citations omitted).

54.     Evidence was presented that in July of 2019, 2 - 3.5 million people signed up on Facebook to "Storm *Area 51*."  Tr. Trans. Vol. 4 at 157:11-15 and Vol. 5 at 49:6-8.  This was widely covered by national news outlets.  This evidence was not contravened by the Government.

---

[2] Copies of the book "*Area 51*: An Uncensored History of America's Top Secret Military Base" by Annie Jacobsen were provided for the Commissioners at trial.  Def. Ex. 68.

[3] Ms. Jacobsen is an author and also a producer involved in the popular Jack Ryan series on Amazon among other works.  Tr. Trans. Vol. 5 at 10:24-11:3.

55.     Government witness, Col. Zuhlke confirmed that from the 1984 Withdrawal "there's no limit on how many people the Sheahan Family can bring onto their property" and "after the 1984 withdrawal hearing, there was nothing in the record which limited when the Sheahan Family could come onto the property." Tr. Trans. Vol. 6 at 34:23-35:1 and 37:15-19.

56.     The Commission experienced the "basic restrictions" for the Site Visit and the "basic restrictions" consisted of a background check and security screening at the Air Force gate similar to standard airport screening.

57.     The Commission finds that substantial evidence was submitted to confirm that as of the Date of Value, the Subject Property had full access rights, consistent with Stipulated Fact No. 12.

58.     As part of the 1984 Withdrawal, on June 1 and 5 of 1984, the Air Force issued letters to then Congressman Harry Reid and Congresswoman Barbara Vucanovich concerning the effect of the 1984 Withdrawal on the Property. Def. Exs. 55 and 56. These letters were signed by Colonel Albert L. Barbero from and on behalf of the United States Air Force. *Id.* In these letters the Air Force stated, "[t]he Sheahans will continue to have access to the Groom Mine. Their legal rights to own, operate and sell the mine are not affected by the proposed land withdrawal." *Id.* The Air Force recognized that it "would have no authority to deny access to any employees or business visitors of the Sheahans." *Id.* And, that the "Air Force could only terminate the Sheahans' rights to Groom Mine by initiating condemnation proceedings or purchasing the property. At this time the Air Force has no intention of taking such action." *Id.* The Air Force summarized that "the Sheahans possess legal rights regarding the Groom Mine which the Air Force has no plans to interrupt." *Id.*

59.     Also, as part of the 1984 Withdrawal, on July 6, 1984, the Deputy Assistant Secretary of the Air Force, James F. Boatright, represented directly to the Landowners on behalf of the Air Force "to assure you" that "by its proposed [1984] withdrawal …. [the Air Force] has no intention of encroaching upon your established rights or entitlements." Def. Ex. 57 (emphasis added). "Your legal rights to own, operate and sell your mine are not affected by the proposed land withdrawal." *Id.* The Air Force stated it "would not deny access to your family, any of

13

your employees or business visitors." *Id.* "The Air Force could only terminate your rights through condemnation or purchase of the property.  We have no intention of initiating such actions." *Id.*

60.    As further evidence of the Subject Property's access rights, the Landowners admitted deposition testimony from Terry Ochal (NTTR Liaison Officer), disclosed by the Government as the individual with "[i]nformation pertinent to landowner and guest access… based on personal and organizational knowledge." Def. Ex. 254:2.[4]  Government Witness, Col. Zuhlke, confirmed that for purposes of these proceedings, Mr. Ochal was the individual who would have the most knowledge from the Air Force about what the access conditions were as of the Date of Value.  Tr. Trans. Vol. 6 at 30:6-24.

61.    Mr. Ochal testified that: he had worked with the Sheahans regarding access to the Property from 2007 to 2015 which was carried over from his predecessor (Tr. Trans. Vol. 3 at 225:10-14, 226:4-6, 227:25-228:10); his job was to ensure that their visits in and out went smoothly (Tr. Trans. Vol. 3 at 227:10-24); "the Sheahans had the right of access to their property for themselves, their family, employees and business visitors" (Tr. Trans. Vol. 3 at 232:16-19); the Air Force would not "obstruct" access to the Property (Tr. Trans. Vol. 3 at 232:20-23); the Sheahans could invite any individuals with clear backgrounds to visit the Property (Tr. Trans. Vol. 3 at 247:6-10); prior to the taking, the Sheahans and their invitees were not required to go through any metal detectors and were not searched when accessing the Property (Tr. Trans. Vol. 3 at 245:18-25); the stop at the Air Force security gate was "just a name check" that would only take a "few minutes per vehicle" (Tr. Trans. Vol. 3 at 236:13-22); the Sheahans and their invitees could bring firearms, cameras and cell phones to their Property prior to the taking (Tr. Trans. Vol. 3 at 236:23-237:6); that in some instances 35 people or more invited by the Sheahans would visit the Property at a given time (Tr. Trans. Vol. 3 at 242:15-18); and, people that were not invited by the Sheahans could not gain access beyond the Air Force security fence (Tr. Trans.

---

[4] Def. Ex. 254 is Deposition Ex. 2 to Mr. Ochal's deposition which was provided by Landowners' counsel to the Commission as one of the exhibits referenced in Mr. Ochal's designated deposition segments played on day 3 of trial.  Counsel for the Government had no objection to the admission of Def. Ex. 254.  Tr. Trans. Vol. 3 at 222:3-8.

Vol. 3 at 242:22-243:5).

62.     Mr. Ochal further testified that from approximately 1984 to 2015, the Landowners, as a courtesy, provided the Air Force with a list of visiting individuals and advanced notice of visits, to prevent any delays at the NTTR security gate, as the Air Force was not permitted to deny access to the Landowners, their family, their employees or the Landowners' business visitors.  (Tr. Trans. Vol. 3 at 241:22-242:2).  Mr. Ochal testified consistently with Mr. Sheahan that this courtesy was voluntary.  Tr. Trans. Vol. 3 at 232:24-233:18, 237:7-14 and 248:11-16.

63.     Mr. Sheahan testified that on and before the Date of Value water was available on the Property from natural springs and a well, that the water had been used continuously by the Sheahan Family, and that water was always available.  Tr. Trans. Vol. 3 at 96:2-5 and 99:9-16.

64.     However, Mr. Sheahan testified that for many decades the Property was served by electricity through a generator and battery banks (Def. Ex. 7.4b and Tr. Trans. Vol. 3 at 102:18-22 and 103:13-104:13); that water was always diverted from springs on the Property and used to fill tanks which served the buildings on the Property and provided ample water for uses on the Property (Def. Exs. 7.3a and 7.7G and Tr. Trans. Vol. 3 at 100:19-101:7); and, gas/propane was used on the Property for hot water heaters and stoves (Def. Ex. 7.4c and Tr. Trans. Vol. 3 at 101:18-20).

65.     Both sides' appraisers testified that the existing use of a property is not always its highest and best use.  Mr. Neville understood that "some people just don't use their property to the highest and most profitable use sometimes."  Tr. Trans. Vol. 7 at 30:17-19.  Mr. DiFederico similarly testified that the highest and most profitable use of property is not limited to the use at the time of the taking and that "people sometimes just don't use their properties to their highest and best use."  Tr. Trans. Vol. 4 at 245:24-246:11.

## III.     CONCLUSIONS OF LAW

66.     Landowners contended that the Groom Mine should be valued based on a tourism operation involving 250 daily customers, coming on the Groom Mine 365 days per year, with each visitor paying an entrance fee of $400 and an additional $50 for knickknacks.  Vol. V, Tr.

43:2-6; 47:9-12 (DiFederico).  According to Landowners' expert appraiser, Mr. DiFederico, this tourism operation would have generated annual gross revenue of $41.1 million (91,250 annual paying customers x $450 = $41,062,500).  *Id.*, Tr. 47:9-12 (DiFederico).

67.     Landowners did not put forward any market evidence supporting the financial feasibility of an alternative commercial tourism scenario.  The Commission may not speculate as to whether some alternative tourism scenario may have been probable in the near future.  See Instruction No. 15 ("An opinion of market value must be supported by market evidence. Evidence must not be vague or speculative, nor should you consider any testimony of mere possibilities unsupported by market evidence.").

68.     The Commission also may not attempt to value some "smaller scale" tourism scenario (e.g., where tourists come to the property one weekend per month) because Landowners did not put forward any sales to value such a "small scale" commercial tourism use.  Mr. DiFederico selected his five comparable sales because those properties had the potential of generating revenue of $41.1 million annually.  Landowners' counsel made this clear in closing:

> What the appraiser is required to do is go find properties that have similar earning potential as that property that's being appraised….  And in this case, that's a large tourist commercial property….  Again, if you have a property that you've determined [] has the potential to earn $41 million a year, you have to go find something similar that has the potential to earn a similar income.

Vol. VIII, Tr. 37:25-38:4, 39:13-16.

69.     For all of these reasons, the issue is not whether any commercial tourism use was reasonably probable at the Date of Value (i.e., physically possible, legally permissible, financially feasible, and maximally productive).  The issue is whether Landowners have supported their proposed large-scale tourism use involving bringing 91,250 people to the Groom Mine, paying $450 each, year after year.

### A.     Landowners' Proposed Large-Scale Tourism Use was Speculative, Not Reasonably Probable, at the Date of Value

70.     Landowners retained a Nevada MAI appraiser, Keith Harper, to provide an appraisal review of the appraisal done by the government's appraiser, Warren Neville.  In response to questions by Commissioner Pro, Mr. Harper testified that except for his analysis of

16

highest and best use, Mr. Neville' appraisal complied with standard practices, USPAP, and the Uniform Standards of Federal Land Acquisitions ("Yellow Book).

71.     Mr. Harper opined that Mr. Neville did not perform a sufficient financial feasibility analysis to render a conclusion that a tourist commercial use was speculative.  Tr. Trans. Vol 7 at 152:8-18; Landowner's FFCL, 239.

72.     The Commission has been instructed that "[i]n determining whether a proposed use was needed or likely to be needed in the reasonably near future, you must determine, based on a preponderance of the evidence, that there was market demand or the prospect of market demand for such use in the reasonably near future.  The demand, or market, requirement means that the highest and best use of a property must be financially feasible. A proposed use should be considered only to the extent that the prospect of demand for such use would have affected the price that a willing buyer would have offered for the property as of the taking."  Commission Instruction No. 13, (ECF No. 600 at 16).

73.     The Commission finds Landowners have not met their burden of establishing by a preponderance of the evidence that there was market demand or the prospect of market demand for Landowner's proposed large-scale tourist commercial use in the reasonably foreseeable future for the reasons explained below.

74.     Landowners' speculative proposed tourism use cannot be the basis for determining the Groom Mine's market value.  Vol. VII, Tr. 151:19-21 (Harper) ("Q.  And do you think a tourist commercial use of the subject property, as of September 10, 2015, was speculative?  A.  Well, I don't know that it was -- well, yes.").[5]  However, Mr. Harper also testified that all land use is speculative until the financial feasibility analysis is complete.

75.     Landowners' decision not to pursue any tourism use at the Groom Mine in the decades preceding the taking demonstrates that tourism was not reasonably probable in the reasonably near future as of September 10, 2015.

76.     Landowners had 25-30 years to attempt to profit from the Groom Mine's

---

[5]   Mr. Harper went on to testify that "any use is speculative, even the rural residential." Vol. VII, Tr. 151:21-22 (Harper).  But there is nothing speculative about how Landowners actually used the property for 60 years prior to the taking.

proximity to "Area 51." Popular culture interest in Area 51 began in the 1980s and reached its apex in the 1990s. Vol. III, Tr. 141:25-142:3 (Sheahan) ("Q. And you would agree that Area 51 has been known in popular culture since the 1980s? A. I would say it was a little bit before that, but, you know, it really took off in the mid – early to mid '80s."); Vol. VI, Tr. 52:12-14 (Moeder) ("Q. And do you know when the interest in Area 51 was at its peak? A. That would be the early to mid 1990s.").

77. Landowners never pursued Groom Mine tourism in the 1990s, during peak interest in Area 51, or at any time thereafter. Vol. III, Tr. 141:5-15 (Sheahan). Landowners never charged anyone to visit the property; they did not develop any business plans for a tourism use; they did not contact potential tourism operators or investors; they did not attempt to obtain financing for a tourism operation; they did not improve the property for a tourism use; and they did not attempt to change the zoning or obtain a special use permit necessary for commercial tourism. Vol. III, Tr. 139:2-141:1 (Sheahan).

78. Landowners did not receive any offers for the Groom Mine for a potential tourist use, and no one approached Landowners about buying the property for a potential tourism use. *Id.*, Tr. 141:16-20; Stip. Fact No. 39.

79. Market participants do not leave tens of millions of dollars sitting in the desert for decades. As explained by Mr. Neville, "if [a] property is … ripe for development, market forces will seek it out and try to, at least, propose that type of development." Vol. VII, Tr. 31:10-13; *see also* Vol. VI, Tr. 52:18-23 (Moeder) ("[O]ne of the questions I get from developers that approach a land investment if it hasn't been done is why hasn't it been done. And so the question that would be of interest to a developer is when was the peak interest. When would have been the prime, opportune market time to develop the property."). Keith Harper, Landowners' review appraiser, agreed that, "as we all know, the historical use of a property, yes, is a factor in analyzing the property." Vol. VII, Tr. 136:5-6.

80. Given that there was no demonstrated market interest in developing the Groom Mine for tourism in the 1990s, when there was peak interest in Area 51, it is not reasonable to assume that such development would materialize in 2015, when interest in Area 51 was

18

1    declining.

2        81.    The Commission finds Landowners failed to show market demand for their

3    proposed large-scale tourism use.  Landowners' evidence demonstrates only that (a) there is

4    popular culture interest in Area 51, and (b) 16% of Las Vegas tourists take day-trip excursions.

5    Landowners did not establish by a preponderance of the evidence that 91,250 people would pay

6    $400 each to visit Groom Mine for a view of Area 51 year after year.

7                    **Interest in Area 51 Does Not Establish Demand**

8        82.    The Groom Mine offers a view, from 6-7 miles away, of a remote Air Force

9    operating location near dry Groom Lake that popular culture describes as "Area 51."

10   Landowners put forward evidence that there is popular culture interest in Area 51.  They cited

11   Internet search hits, YouTube videos, television shows, movies, books and articles referencing

12   Area 51.

13       83.    General interest in Area 51 does not establish market demand for 91,250 people to

14   visit the Groom Mine. As explained by the United States' real estate economist and market

15   expert, Nathan Moeder, general interest "doesn't give a developer or investor the ability to …

16   translate that [interest] to specific numbers to quantify demand.  So general interest doesn't

17   translate to a comfort level for developers and investors."  Vol. VI, Tr. 51:18-22.

18       84.    The "Storm Area 51" events in September 2019 demonstrate that interest does not

19   establish demand.  Landowners' witnesses testified that millions of people signed up to "storm"

20   Area 51.  Vol. IV, Tr. 157:11-15 (Harris); *Id.*, Tr. 261:12-14 (DiFederico); *see also* Vol. VIII, Tr.

21   27:10-14 (Leavitt closing) ("And then when there was even the slightest doubt that people could

22   have an opportunity to see Area 51 illegally in the Storm Area 51 event, 3 million people signed

23   up.· Think about that for just a minute, how many people 3 million people is.").  This interest

24   resulted in Connie Travis staging an event in Rachel at the Little A'Le'Inn, called "Alienstock,"

25   and George Harris staging a separate event in Hiko at the Alien Research Center, called "Area 51

26   Basecamp."  Vol. IV, Tr. 181:12-21 (Harris); Vol. VII, Tr. 79-88 (Mathews).  The entertainment

27   at the "Area 51 Basecamp" event included Grammy nominated DJ Paul Oakenfold, "the father of

28   EDM music."  Vol. IV, Tr. 183:22 (Harris).  According to Mr. Harris, Mr. Oakenfold typically

"gets paid $350,000 a show" but agreed to perform at Area 51 Basecamp "for free because he's an alien enthusiast." *Id.*, Tr. 183:15-16.

85.     However, the evidence at trial established that the Area 51 Basecamp event was poorly attended. Mr. Mathews testified that organizers had waived the $51 entrance fee by 9:15 p.m. on the first day of the event, prior to Mr. Oakenfold taking the stage. Vol. VII, Tr. 85:15-86:8. Mr. Mathews personally counted about 100 attendees for Mr. Oakenfold's performance. *Id.*, Tr. 86:9-11, 88:10-12. *See* Pl's Ex. 599.

86.     The Commission finds the Storm Area 51 events were financial failures. Mr. Harris testified that he canceled the second day of the Area 51 Basecamp. Vol. IV, Tr. 187:7-9. He also admitted that he lost "a lot of money" staging the event. *Id.*, Tr. 187:10-12.

87.     The "Alienstock" festival in Rachel, although better attended than Mr. Harris' event, also lost money according to press reports. Vol. V, Tr. 167:11-168:5 (DiFederico). Mr. Mathews testified that most "Alienstock" attendees parked for free across the highway. Vol. VII, Tr. 82:25-83:2. Mr. Mathews counted just 38 cars the evening of Friday, September 20, in the pay lot (and 230 cars parking for free). *Id.*, Tr. 83:3-8.

88.     Landowners suggested that the events failed because they were "canceled."[6] *See*, *e.g.*, Vol. V, Tr. 60:13-14 (DiFederico). But nothing was "canceled." Vol. VII, Tr. 84:4-5, 84:23-85:14, 112:16-113:2 (Mathews). DJ Paul Oakenfold, the "father of EDM music," performed—and about 100 people were there for it.

---

[6]     Landowners' incorrect "cancellation" argument relates to the decision by one of the original promoters of Alienstock, Matty Roberts, to disassociate himself with the Rachel event and to stage a rival event in Las Vegas. Mr. Roberts initially said that Alienstock was canceled; however, Connie West said that she would continue with the Alienstock event at the Little A'Le'Inn in Rachel (and Alienstock did, in fact, go forward). *See* Vol. VII, Tr. 85:2-6 (Mathews) ("So what I read in the newspapers was that the original organizer was planning a separate event here in Las Vegas, but Connie West, who was partnering with the original organizer, she said that she was going to continue with the event [in Rachel]."). Mr. Harris's Area 51 Basecamp event was entirely separate from Alienstock. *Id.*, Tr. 85:9-14 ("And Judge Pro raised a good point. So the cancellation issue or rival events in Las Vegas, that related to the events in Rachel; right? A. Yes. Q. And not the Alien Research Center? A. No."); Vol. IV, Tr. 181:12-21 (Harris).

1

   1. <u>Demand Requires Consideration of Price</u>

2

89.     In addition to relying on general interest in Area 51 to support market demand,

3  Landowners relied on a 2015 survey by the Las Vegas Convention and Visitors Authority

4  ("LVCVA") indicating that 16% of Las Vegas tourists (or 6.9 million people annually) take a

5  day trip as part of their Las Vegas stay.  Def. Ex. 71 (LVCVA Visitor Profile Study); Vol. V, Tr.

6  27:16-28:2 (DiFederico).  Mr. DiFederico testified, without any market evidence or support, that

7  the Groom Mine could capture 4% of these excursions, a number between the draw of Red Rock

8  Canyon and Laughlin.  *Id.* Tr. 38:1-5 ("Q.  And so why did you choose the 4 percent between

9  Laughlin and Red Rock for this property here?  A.  It was just – I'm not a huge Laughlin fan

10  maybe.  And I just thought we could do, you know, the demand would be higher than that.").

11

90.     According to Mr. DiFederico, 4% of the nearly 7 million Las Vegas visitors who

12  take day trips established 277,568 tourists would visit the Groom Mine annually *Id.*, Tr. 38:6-14.

13  Mr. DiFederico then reduced the number of expected Groom Mine tourists by two-thirds, to

14  91,250 expected visitors, to account for logistical obstacles.  *Id.*, Tr. 42:11-19 ("I wanted to use

15  common sense and I said I think you should bring five groups of 50 out here….  You can do an

16  hour each….  Now you're bringing out 250 people a day, which is 91,250, which is a third of the

17  demand.  So, what I've done is made it realistic.").

18

91.     In addition to relying on the LVCVA data, Mr. DiFederico also pointed to several

19  comparable tourist properties as demand.  These attractions included Roswell, New Mexico, and

20  Grand Canyon West, among several others.

21

92.     Mr. DiFederico's demand analysis relies on *ipse dixit*.  No facts or data support

22  Mr. DiFederico's conclusion that Groom Mine would attract fewer visitors than Red Rock

23  Canyon and more visitors than Laughlin.  Mr. DiFederico "just thought" Red Rock Canyon

24  "would do a little better" and Laughlin would do worse because "I'm not a huge Laughlin fan

25  maybe."  Vol. V, Tr. 37:1-8, 38:1-5.  Mr. DiFederico had no factual basis for his demand

26  conclusion; and it therefore deserves no weight.  See Commission Instruction No. 15 ("An

27  opinion of market value must be supported by market evidence."); see also, e.g., Gen. Elec. Co.

28  v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing… requires a district court to admit opinion

21

evidence that is connected to existing data only by the *ipse dixit* of the expert.").

93.   In all events, the LVCVA survey does not provide a basis for determining demand.  As explained by Mr. Moeder, the LVCVA survey "is at a 50,000 foot level."   Vol. VI, Tr. 50:25-51:2 ("I've never seen anybody just use a metropolitan wide survey to quantify demand.").  The survey does not provide any basis for determining demand to come to the Groom Mine.  *Id.*, Tr. 59:7-12 ("Every major metropolitan has a convention and visitors bureau where they publish this type of information…. But you don't translate those into a specific demand for a project.").

94.   Nothing in the LVCVA survey attempts to quantify visitor interest in alien-themed tourism, Area 51, or the Groom Mine.  Def. Ex. 71; Vol. VI, Tr. 59:16-20 (Moeder) (explaining that, because the LVCVA survey does not have any question about alien tourism, there is no way to gauge interest in such tourism).[7]

95.   More problematic, Mr. DiFederico failed to consider how price impacts demand. Vol. VI, Tr. 60:23 (Moeder) ("[Demand is] never in a vacuum for investors and developers."). The more expensive a good (or excursion), the less demand there will be for it.  Mr. Moeder explained this basic economic concept:

> Q.   And so how does price and demand, how does that relationship work with one another?
>
> A.   It's an elastic relationship.  They're tied together.  They go hand in hand. The price of any good is going to be tied to the demand for it.  So the more expensive a product is, the less number of people that are willing to pay for it…. So they're always interlinked.  That's a fundamental question that developers will always ask themselves is how much are we charging and what does that do to our demand.  Is that market there.  Can we push

---

[7]   Landowners elicited testimony from Mr. Harper that he has used LVCVA data to establish demand. But Mr. Harper's testimony underscored that an appraiser's demand analysis requires consideration of price and consideration of facts and data specific to the market being studied.  Mr. Harper testified that he used LVCVA data to establish demand for a motel in Laughlin because the LVCVA survey includes hotel/motel average daily room rates and occupancy rates for the Laughlin market.  Vol. VII, Tr. 130:1-10 ("Q.  And is it your understanding that LVCVA Visitor Profile Study can also be used to determine demand?  A.  Oh absolutely.  I use it all the time for demand.  I just recently appraised an Extended Stay Motel in Laughlin.  And, believe me, there's not many people or groups that track data in Laughlin.  And so the LVCVA actually does provide broken out statistics for the Laughlin market, and I relied heavily on that, the average daily room rate of the hotels and motels in Laughlin, the occupancy rate, the things that the LVCVA provides.").

the price and still get the same number of people.

*Id.*, Tr. 60:8-19.

96.     The entrance fees for the attractions Mr. DiFrederico used to support market demand for visitors to pay $400 each to visit Groom Mine do not support his market demand analysis. The entrance fee for each attraction is a small fraction of Mr. DiFederico's hypothetical $400 entrance fee for the Groom Mine, as shown in the table below:

| Supposedly Comparable Attractions Supporting Demand For Groom Mine Tourism | | |
|---|---|---|
| Attraction | Entrance Fee | Record Cite(s) |
| Roswell Crash Site | **Sold for cattle ranch** | Pl.'s Exs. 556, 556a; Vol. V, Tr. 260:14-262:12 (DiFederico) |
| Roswell UFO Museum | **$5** | Vol. V, Tr. 18:14-23, 161:19-21 (DiFederico) |
| Roswell Festival | **FREE** | Vol. VI, Tr. 55:10-17 (Moeder) |
| Alien Research Center | **FREE** | Vol. V, Tr. 21:11-22:5 (DiFederico); Vol. IV, Tr. 160:1-3 (Harris) |
| Little A'Le'Inn | **FREE** | Vol. V, Tr. 22:6-23, 164:18-24 (DiFederico) |
| Nevada National Security Site Tour | **FREE** | Vol. V, Tr. 38:15-23, 163:25-164:8 (DiFederico) |
| Virginia City | **$8** | Vol. V, Tr. 40:10-41:1, 165:10-14 (DiFederico) |
| Oatman | **FREE** | Vol. V, Tr. 41:10-18, 166:9-12 (DiFederico) |
| Calico | **$8** | Vol. V, Tr. 42:1-2, 165:15-19 (DiFederico) |
| National Atomic Testing Museum (Las Vegas) | **$22** | Vol. V, Tr. 18:5-10, 166:4-8 (DiFederico) |
| Stonehenge | **£20** | Vol. V, Tr. 39:22-40:3 (DiFederico); Vol. VI, Tr. 62:16-63:5 (Moeder) |
| Laughlin | **FREE** | Vol. V, Tr. 36:11-14 (DiFederico)[8] |

---

[8]     The Commission may take judicial notice that Laughlin is a city in Southern Nevada, and there is no cost of admission.  Fed. R. Evid. 201.

23

| Supposedly Comparable Attractions Supporting Demand For Groom Mine Tourism | | |
|---|---|---|
| Attraction | Entrance Fee | Record Cite(s) |
| Red Rock Canyon | **$15** (vehicle) | Vol. V, Tr. 34:22-24[9] |
| Bryce Canyon National Park | **$35** (vehicle) | Vol. V, Tr. 34:1-2 (DiFederico)[10] |
| Zion National Park | **$35** (vehicle) | Vol. V, Tr. 33:7-12 (DiFederico); Vol. VI, Tr. 67:7-8 (Moeder) |
| Death Valley National Park | **$30** (vehicle) | Vol. V, Tr. 30:13-17 (DiFederico)[11] |
| Grand Canyon National Park | **$35** (vehicle) | Vol. V, Tr. 31:3-6 (DiFederico); Vol. VI, Tr. 67:7-8 (Moeder) |
| Grand Canyon West | **$80** | Vol. V, Tr. 31:7-32:9, 163:1-9 (DiFederico); Vol. III, Tr. 191:16-194:6 (Sheahan) |

97.     That 200,000 Las Vegas tourists visit Laughlin <u>for free</u>, or that 347,000 pay $15/vehicle to enter Red Rock Canyon, does not establish that 91,250 Las Vegas tourists would pay $400 to go to the Groom Mine.

98.     Roswell underscores that price and demand are interdependent.  Landowners elicited testimony that Roswell supports demand for Groom Mine tourism because Roswell, like Area 51, interests alien enthusiasts.  Vol. V, Tr. 18:15-24 (DiFederico); *see also* Vol. VIII, Tr. 26:23-27:1 (Leavitt closing) ("On that first issue of demand, [Mr. DiFederico] looked, of course, did 180,000 people go to the UFO museum in Roswell.  That's evidence that it's more probable than not that 180,000 people would come to the Sheahan Family property.").  But the Roswell festival is free, and the Roswell UFO Museum charges an admission fee of just $5.00 ($2 for

---

[9]     Landowners did not offer evidence on the admission fee to Red Rock Canyon.  The Commission may take judicial notice of the official park website setting forth admission fees, https://www.redrockcanyonlv.org/fees/.

[10]     Mr. DiFederico testified that "tours" to Bryce Canyon, apparently where transportation is provided, cost $200.  Vol. V, Tr. 34:16-18.  But the actual admission fee is $35/vehicle, the maximum charge to visit any national park.  *See* https://www.nps.gov/aboutus/entrance-fee-prices.htm (listing national parks where there is an entrance fee and the price of admission).

[11]     Landowners did not offer evidence on the admission fee to Death Valley National Park.  The Commission may take notice of the National Park Service website setting forth the $30/vehicle admission.  https://www.nps.gov/aboutus/entrance-fee-prices.htm

24

children).  Vol. V, Tr. 161:19-21 (DiFederico); Vol. VI, Tr. 55:10-17 (Moeder).

99.    Landowners also suggested in questions to Mr. DiFederico that prior owners of the Roswell crash site charged visitors as much as $250/person for VIP access to the property. Vol. V, Tr. 246:14-18.  But the article mentioning a $250 admission fee makes clear that the tours would be offered only for a few days during the annual Roswell festival, from July 5-9, 2018. Ex. 556a; Vol. V, Tr. 261:9-14 (DiFederico).  Landowners offered no evidence of how many people, if any, paid $250 for the VIP tour during the one time the property was open to the public.

100.    Four months later, in November 2018, the Roswell crash site sold as a cattle ranch, not for any tourism use.  Pl. Ex. 556 (describing sale of property in November 2018 for "ranching operations"); Vol. V, Tr. 162:3-20 (DiFederico).

## 2.   Mr. DiFederico Otherwise Did Not Support His $400 Entrance Fee

101.    Mr. DiFederico testified that his $400 entrance fee could be justified based on discussions that he had with 12 tour booking companies as well as the fact that Adventure Photo Tours charges $200 for its "Area 51 Tour."  Vol. V, Tr. 20:11-20, 45:18-25 (DiFederico); *see also* Vol. I, Tr. 57:5-16 (Leavitt opening) ("[H]e looked at the existing Area 51 tour where people pay 200 bucks to not see Area 51.  And he said, well, I know I can get that.  He then contacted the booking agencies that book for this Area 51 tour, there are about 12 of them…."); Vol. VIII, Tr. 33:1-5 (Leavitt closing) ("He consulted several booking agencies who gave him a number of $300 to $1,000 per person, and he concluded at $400 per person.").

102.    These two data points do not support a $400 admission price at the Groom Mine.

103.    First, Mr. DiFederico's telephonic conversations with 12 booking agents deserve little weight.  Vol. V, Tr. 20:11-20, 45:18-25 (DiFederico).  One booking agent apparently told Mr. DiFederico that a tour operator could charge $1,000 for overnight stays.  *Id.*, Tr. 149:24-150:1.  This hearsay conversation has no relevance because Mr. DiFederico's analysis does not contemplate overnight stays.  *Id.*, Tr. 150:4-6.  A second booking agent apparently told Mr. DiFederico that a tour operator could charge $300 to go to Area 51.  *Id.*, Tr. 149:18-21.  This hearsay conversation lacks probative value because a $300 entrance fee does not support Mr.

DiFederico's $400 entrance fee.  Mr. DiFederico did not testify to what the other ten booking agents told him.

104.    Landowners did not lay an adequate foundation to give Mr. DiFederico's testimony about conversations with Area 51 tour operators much weight.  Mr. DiFederico did not know the names of the two booking agents.  *Id.*, Tr. 148:12-14.  He never met them.  *Id.*, Tr. 148:15-17.  He did not show the unnamed persons any photographs of the Groom Mine.  *Id.*, Tr. 148:18–149:1.  Nor did he testify regarding how long the two unnamed individuals had been booking tours and whether they had any knowledge or expertise regarding how much tours should cost.

105.    With respect to the unnamed, unknown person who told Mr. DiFederico that a $300 entrance fee was possible, Mr. DiFederico did not testify how the person determined the $300 price, including how many people would pay $300.  Only 2,000 people take the current "Area 51 Tour." Vol. V, Tr. 158:8-11 (DiFederico); Vol. VI, Tr. 56:23-57:25 (Moeder).  Most significant of all, Mr. DiFederico did not testify to what he told this unknown, unnamed person.[12]

106.    The Adventure Photo Tours "Area 51 Tour" also does not support Mr. DiFederico's $400 admission fee.  Landowners argued that if people are willing to pay $200 to go to Area 51's back gate, then they must be willing to pay more to see the distant Air Force buildings.  Vol. I, Tr. 57:5-16 (Leavitt Opening) ("[Mr. DiFederico] looked at the existing Area 51 tour where people pay 200 bucks to not see Area 51.  And he said, well, I know I can get that.").

107.    There are at least three major flaws with this conclusion.  First, there is no charge to go the "Area 51 back gate."  Anyone can go for free; Mr. Harris testified that he has gone hundreds of times.  Vol. IV, Tr. 175:13-24 (Harris).

108.    Adventure Photo Tours charges $200 for transportation and entertainment. People pay to: ride in a luxury SUV for an entire day; get picked up and dropped off at their

---

[12]    For example, the record does not indicate whether Mr. DiFederico alerted the booking agent that the Groom Mine experience would last just one hour and that there would be no capital improvements at the Groom Mine, not even bathrooms.

hotel; have an entertaining tour guide; have lunch at the Little A'Le'Inn; view Native American petroglyphs; see a Joshua tree forest; and go to various "Area 51 sites," including the back gate, the black mailbox, the Alien Research Center, and McCarran International Airport (to see Janet Airlines).  Vol. V, Tr. 156:17-158:7 (DiFederico); Vol. IV, Tr. 177:9-178:23 (Harris).  The $200 that people pay for the tour is not tied to any interest in real estate.  Vol. VI, Tr. 106:17-22 (Weissenborn).

109.    Second, about 2,000 people annually take the Adventure Photo Tours "Area 51 Tour."  Vol. V, Tr. 158:8-11 (DiFederico); Vol. VI, Tr. 56:23-57:25 (Moeder).  But Mr. DiFederico assumed that 91,250 would visit the Groom Mine annually.  That 2,000 people pay $200 to go on an "Area 51 Tour" does not establish 91,250 people would pay $400 to visit the Groom Mine.  Vol. VI, Tr. 83:14-20 (Moeder) ("So when you go from what's empirically defensible, existing in the marketplace … that's the 2,000.  When you go to the next level of 91,000 people … there's no evidence of that.  That's where it's speculative and that's where it's unreliable.").

110.    Third, no facts or data support Mr. DiFederico's speculation that a Groom Mine tour operator could double the tour price (from $200 to $400) and increase attendance by a multiple of 46 (from 2,000 to 91,250).

111.    Landowners put on no evidence about the financial feasibility of a tourism operation having less than 91,250 annual visitors.  Vol. V, Tr. 159:16-19 (DiFederico) ("Q.  And as part of your appraisal reports, you did not study how expenses should be adjusted if 8,000 or 12,000 people are going out to the Groom Mine?  A.  No, I did not.").  And Mr. DiFederico admitted in deposition that Groom Mine tourism may not be financially feasible if the tour operator only could get 12,000 annual visitors paying $300 each (i.e. where price is 50% higher than the Adventure Photo Tour's price and attendance is sextupled).  Mr. DiFederico testified:

> Q.    Mr. Leavitt asked you the following [in deposition]:  Question.  "Okay. As you sit here today, can you offer an opinion of whether … the operation would be financially feasible if there were only 12,000 people going to the property at a $300 charge?
>
> "Answer.  No. Because I'd have to redo all these.  But my gut would tell me it wouldn't be feasible."

Did I read that correctly?

A.    Yes.

Q.    Now, if we could go to page 607 of your deposition, beginning at line 17. Mr. Leavitt asked you, "Okay. So I'm going to go back. So if there's a tour operation which currently exists which does not even allow an individual to see Area 51 and only approximately 2,000 people a year are taking that tour and it continues to operate, why would a tour that has 12,000 persons and goes onto the landowners' property and charges $300 a person instead of $200 a head not be financially feasible?

"Answer. Because there's different expenses getting to the property."

Did I read that correctly?

A.    Yes.

Vol. V, Tr. 160:15-161:13 (DiFederico).

### 3.    Mr. DiFederico Failed To Support That Visitors Would Pay $50 Per Person On Knickknacks

112.    Mr. DiFederico also did not support his assertion that Groom Mine visitors would spend $50 on magnets, key chains, t-shirts, and other knickknacks. To justify this additional $4.5 million revenue stream,[13] Mr. DiFederico claimed that his family spends a lot on churros and sundries when they go to Disneyland. Vol. V, Tr. 46:7-14 (DiFederico) ("[W]hen I travel, I joke that I have a Churros Card for Disneyland…because my kids want to get churros all day. So you're spending money on knickknacks, T-shirt, key chain, a magnet, something…."). Mr. DiFederico's personal spending habits over the course of an entire day at Disneyland are an anecdote, not market evidence of what people would spend in one hour at the Groom Mine.

113.    On cross-examination, Mr. DiFederico testified that George Harris, the owner of the Alien Research Center, also supported his assumed $50 per person expenditures for knickknacks. *Id.*, Tr. 144:7-13. Mr. Harris testified otherwise. According to Mr. Harris, the Alien Research Center had 2,192 sales in 2015, and the average sale was $26.75—for total annual revenue of $58,636 (2,192 x $26.75=$58,636). Vol. IV, Tr. 168:20-24 (Harris).[14]

---

[13] 91,250 x $50 = $4,562,500.

[14] Landowners did not offer evidence regarding the percentage of visitors to the Alien Research Center who spend nothing. The average expenditure presumably would be materially less than $26.75 if these

28

114.     In addition, Mr. DiFederico's proposed large-scale tourism use must be rejected as speculative because Landowners failed to put forward credible market evidence of sustainable demand.  As Mr. Moeder explained, establishing sustainable demand is critical: "If the demand is not there permanently or [is not] sustainable and it falls off, the value of that investment plummets.  So a developer and investor wants to know that it is sustainable, number one."  Vol. VI, Tr. 55:3-6 (Moeder).

115.     Landowners failed to carry their burden of proving that demand for large-scale tourism at the Groom Mine could be sustained year after year.  For this additional reason, their proposed highest and best use of large-scale commercial tourism is speculative and not reasonably probable in the reasonably near future.

116.     The Property's A-5 zoning district does not exclude all commercial uses.  In fact, as Mr. Lytle explained, the agricultural district conditionally permits a "broad range" of commercial uses beyond the legal uses by right.  Vol. IV, Tr. 16:1-17:14 (Lytle).  Examples of approvable uses include: bed and breakfast inns, golf courses, mining and milling operations, recreational camps and resorts, and recreational vehicle parks and campgrounds.  Pl. Ex. 295(a) at § 13-5L-3.  Each of these uses, however, requires a special use permit.  *Id.*

117.     The Lincoln County Master Plan further supports the fact that large-scale commercial tourism at the Groom Mine would require, at a minimum, a special use permit. Landowners introduced the following matrix from the Master Plan:

| Zoning Designation / Master Plan Designation | R1 | RM | RR-1 | RR-2 | RR-3 | RR-4 | RR-5 | RR6 | RR7 | RR8 | C-1 | C2 | M1 | M2 | SID | A-1 | A2 | A3 | A4 | A5 | Os | MHP | HD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| LDR | N | N | N | Y | Y | Y | Y | Y | N | M | N | N | N | N | N | N | N | N | N | N | N | M | M |
| MDR | Y | M | Y | Y | Y | Y | N | N | M | M | N | N | N | N | N | N | N | N | N | N | N | M | M |
| HDR | M | Y | M | M | M | M | M | N | N | N | N | M | N | N | N | N | N | N | N | N | N | M | M |
| MHP/RVP | M | Y | M | M | M | M | N | N | N | N | N | M | N | N | N | N | N | N | N | N | N | Y | M |
| COMMERCIAL | M | M | M | M | M | M | M | M | M | M | Y | Y | M | M | N | M | M | M | M | M | N | M | M |
| L. INDUSTRIAL | N | N | N | N | N | N | N | N | N | N | N | M | Y | Y | M | N | N | N | N | N | N | N | N |
| H.INDUSTRIAL | N | N | N | N | N | N | N | N | N | N | N | N | M | Y | Y | M | N | N | N | N | N | N | N |
| AGRICULTURE | N | N | N | N | N | N | N | N | N | N | N | N | N | N | Y | Y | Y | Y | Y | Y | M | N | N |
| PUBLIC | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M | M |
| PARKS/REC. | M | M | M | M | M | M | M | M | M | M | M | M | N | M | M | M | M | M | M | M | M | M | M |
| OPEN SPACE | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | Y | N | N |
| PUD | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | N | Y | N | N |

*M- WITH CONDITIONS   Y- IS CONSISTENT   N- IS NOT CONSISTENT*

---

$0 expenditures also were included in the overall count.

Def. Ex. 37 at CLARION WF 003754.  As Mr. Lytle, Director of Planning for Lincoln County, explained, the County uses this chart to "vet proposed actions or potential uses in the county." Vol. IV, Tr. 12:11-16 (Lytle).  Using the matrix, the intersection of the agricultural and commercial zoning results in an "M," which means a commercial use <u>may</u> be approved in the A-5 zoning district, but with conditions.  *Id.*, Tr. 13:20-22.  In other words, the Master Plan further establishes that commercial uses are inconsistent with an agricultural zoning designation absent a special use permit.  So, while it is true that one goal of the master plan is to increase tourism[15] (Vol. IV, Tr. 11:4-25 (Lytle)), it is also true that the master plan does not allow unrestricted large-scale commercial uses in agricultural zoning districts.  If it did, there would be a "Y" not an "M" in the above matrix.

118.    Additionally, the actions of Mr. DiFederico and Landowners themselves confirm that any reasonable buyer would expect approval from Lincoln County before putting the Groom Mine to a tourist commercial use.  According to Mr. DiFederico, "special use permits are for things that are not specifically identified as an allowable use."  Vol. V, Tr. 175:19-20 (emphasis added).  Mr. DiFederico therefore assumed that a special use permit was required for his proposed tourism use.  *Id.*, Tr. 176:12-22 ("Q.  And in your analysis, you did not treat the Groom Mine property as zoned for tourist commercial use at the date of value; correct?  A.  I -- I assumed that it would get the use permit and it would be able to operate…. I just thought you would probably get [a special use permit] because it would clear up things.  When you come in with something that's not directly identified as a use, you typically would apply for a special use permit.").

119.    Landowners spent thousands of dollars to obtain a post-taking advisory opinion on the possibility of a special use permit and zone change.  Vol. III, Tr. 198:23-199:25

---

[15]   Mr. Lytle described increasing tourism as "one small facet of improved economic stability and sustainability in the county."  Vol. IV, Tr. 11:9-15 (Lytle).  Mr. Lytle further explained that the economic fiber of Lincoln County includes the Air Force, which is not only a major employer, but which pays a significant sum per year to the County in lieu of taxes.  *Id.*, Tr. 62:9-63:2; 66:6-12.  And since unemployment remains high in the area (Def. Ex. 37 at CLARION WF 003740), the goal of increasing tourism cannot be viewed in isolation when other important goals of maintaining existing jobs and revenue streams also exist.

(Sheahan).  This suggests that Landowners came to the same conclusion as Mr. DiFederico and Mr. Neville: commercial tourism of any kind likely required a rezoning or a special use permit.  Vol. VI, Tr. 192:12-14 (Neville) ("Q.  Is commercial tourism a permitted use under the agricultural zoning designation?  A.  No, it isn't."); *Id.*, Tr. 199:23-200:8.

120.    Landowners argued that their post-taking efforts merely involved finding out what the "highest" use Lincoln County would have allowed on the Date of Value, not whether the County would have approved Mr. DiFederico's highest and best use.  Vol. III, Tr. 108:16-25; 199:16-22 (Sheahan); Vol. IV, Tr. 39:21-40:22 (Lytle); Vol. IV, Tr. 255:24-258:3 (DiFederico).  However, a close look at Landowners' applications and public representations prior to trial belie this claim.  First, absent from the May 2016 special use request is any statement to the effect that Landowners had the legal right to bring 250 tourists per day to the property and were only seeking guidance about the "highest" use the County theoretically would have approved.  Def. Ex. 38.  Rather, the application states that Landowners wanted a special use permit, in part, so that the existing mine could be "used as a live museum to educate visitors on the history of the Groom Lake Valley area and the rich family history at the Groom mine site."  *Id.* at TDG WF 000853.

121.    Further, in explaining their proposal to the Lincoln County Commissioners, Landowners represented that the purpose of submitting the applications was to "essentially allow a - - a recreational use with a tourist commercial component . . . ."  Pl. Ex. 293 at 7:22-9:22.  "Individuals would be invited under this special use permit and zone change to come onto the property and enjoy a tour of the oldest owned family [sic] mine in the entire state of Nevada . . ." *Id.*  Landowners made clear at that time that visitors on the tour "would have an opportunity to look across the valley, across Groom Lake Valley and see Area 51."  *Id.* at 10:1-4.  These statements are at odds with Landowners' newfound claim that a special use permit was <u>only</u> necessary if Landowners constructed new improvements.  Vol. VIII, Tr. 22:5-23:1 (Leavitt closing).

122.    Regardless, there is no evidence that a buyer would simply assume that large-scale tourism was legally permissible on the Date of Value.  As Mr. Moeder explained, before

developers or investors will pay a significant sum for a tourist commercial property, they require written assurances that the property can be put to that intended use.  Vol. VI, Tr. 66:8-18 (Moeder).  Here, Lincoln County never made such a guarantee.  Therefore, a buyer looking to purchase the Groom Mine for large-scale tourism on the Date of Value would be left with allowable uses in the A-5 zoning district and would understand that, at a minimum, the buyer would need to apply for a special use permit.  *See* Vol. V, Tr. 175:16-24 (DiFederico) (noting that special use permits are for uses "not specifically identified as an allowable use").

123.   A reasonable buyer also would be aware that if the buyer changed the existing use of the Groom Mine from rural recreation to commercial tourism, the Air Force, as the neighboring property owner, could file an objection with the planning commission to prevent that use—even if the zoning permitted a tourism use as of right.  Vol. IV, Tr. 68:8-12 (Lytle).

124.   For all of these reasons, no reasonably knowledgeable buyer would assume large-scale tourism was legally permissible at the Groom Mine on the Date of Value without permission from Lincoln County.

4.   <u>Landowners Failed To Establish That Lincoln County Would Have Issued The Special Use Permit Or Zone Change Necessary For Large-Scale Commercial Tourism And Commercial Retail</u>

125.   Although  Lincoln County's Master Plan has the goal of encouraging tourism, the Commission finds it would have considered and weighed the Air Force's objections to permitting large scale commercial tourism use of the Property. Mr. Lytle testified that, in his opinion, "not a large population of people" would ever come to the Groom Mine as part of any tourism business.  Vol. IV, Tr. 59:3-5.  Lincoln County would not have put at risk Air Force jobs and the Air Force's annual payment to the County if "not a large population of people" ever were expected to travel to the Groom Mine.  *Id.*, Tr. 62:9-63:2, 66:6-12.

126.   As Mr. Mathews explained, while zoning may be "somewhat flexible" in Lincoln County, "[it] really becomes an issue when there's conflict between neighbors, and that's when zoning really becomes an issue."  Vol. VII, Tr. 108:2-10 (Mathews).  Mr. Neville further testified that although he concluded it was reasonably probable the Groom Mine could be

rezoned for commercial tourism on the Date of Value, that permission would be "subject to conditions, and there are a lot of unknown conditions due to the way the special use permit was processed. So that's a very important part of that statement."  Vol. VII, Tr. 11:7-21 (Neville); Vol. VI, Tr. 212:16-20 (Neville) ("[A]ny buyer of that property who was going to use it for a tourist commercial [use] … would want to know exactly what those conditions were going to be and just exactly how the Air Force would react to their proposal.").

127.    Indeed, Mr. Lytle testified that he "[c]ertainly" would consider any Air Force objections and that those objections could be addressed through conditions such as a limitation on the number of days or hours a tourism business could operate at the Groom Mine.  Vol. IV, Tr. 61:20-62:8 (Lytle).

**Mr.DiFrederico's Sales Are not Comparable to the Groom Mine.**

The Commission has been instructed that "to be truly comparable, a sale should have the same or similar highest and best use as the Subject Property." Commission Instruction No 14.

128.    Landowners otherwise did not carry their burden of proving the fair market value of the Groom Mine, and their valuation must be rejected for this separate reason as well.  As set forth below, Mr. DiFederico misapplied the sales comparison approach by selecting sales from a drastically different market, by adjusting those sales inconsistently, and by failing to support those adjustments with any market evidence.  Mr. DiFederico's opinion of value is therefore unreliable and cannot serve as a basis for awarding just compensation.

129.    Rather than look for sales with the same highest and best use in a similar market area, Mr. DiFederico relied on sales in the Las Vegas metropolitan area.  Vol. V, Tr. 68:7-20 (DiFederico) (testifying that he considered approximately 75 sales, most of which were on the Las Vegas Strip); *see also* Pl. Ex. 482 (Weissenborn map showing location of DiFederico sales relative to the Groom Mine).  Las Vegas and rural Lincoln County do not share comparable populations, Vol. VI, Tr. 108:1-6 (Weissenborn); similar supply and demand characteristics, Vol. IV, Tr. 214:22–215:7 (DiFederico) ("[Lincoln County is] just not an active place.  It's very slow, very quiet."); comparable municipal infrastructure, Vol. V, 93:8-12 (DiFederico); or market competitiveness. Vol VI, Tr. 108:18-24 (Weissenborn).  As Mr. DiFederico himself testified at

trial: "I don't think anybody competes with Las Vegas, hotels, entertainment, shopping.  There's more in a five-mile stretch on the Strip than, I think, more top-notch restaurants than anywhere in the country in that five-mile stretch."  Vol. IV, Tr. 216:4-8 (DiFederico) (emphasis added).  Accordingly, real estate prices are higher in Las Vegas than anywhere else in Nevada.  Vol. VI, Tr. 111:22-25 (Weissenborn) (citing Mr. DiFederico's appraisal report); *see also* Vol. V, Tr. 171:14-16 (DiFederico) ("$50 million is a big number. . . but in Las Vegas, we have large sales, large sale prices, for properties.").  None of Mr. DiFederico's comparable sales are in the same or similar market as the Groom Mine in rural Lincoln County.  *See* Vol. VI, Tr. 107:24-108:24 (Weissenborn).

130.    Mr. DiFederico was unable to explain how any of the sales he used in his comparable sales analysis were a substitute for the Groom Mine other than being tourist commercial properties.  Mr. DiFederico admitted that none of his sales "were truly the best comparable."  Vol. V, Tr. 69:7 (DiFederico).

131.    Despite Landowners' claims that the Groom Mine is a unique, one-of-a kind property, Mr. DiFederico used Las Vegas sales that are not themselves unique or one-of-a-kind.  *See* Vol. V, Tr. 185:19-22 (DiFederico) ("And that one, to me, is funny because [Sale 1] has been vacant for 15 years.  So if it's such a unique development opportunity, why – nobody has put a stick out there."); *Id.*, Tr. 90:12-14 ("I mean, I've done a lot of work over there [where Sale 2 is located]."); *Id.*, Tr. 97:6-14 ("I mean, I've used [Sale 3] multiple times. . . ."); *Id.*, Tr. 98:5-12 ("[Sale 3 is] not unique . . . ."); *Id.*, Tr. 105:12-25 (testifying that he appraised the property across the street from Sale 4); *Id.*, Tr. 111:19-22 (testifying that Sale 5 "was from [his] database").

132.    Nor do any of Mr. DiFederico's sales have value based on a view.  *Id.*, Tr. 202:11-13 ("Q.  And none of your comparable properties was purchased with the intent of selling the view from those properties; right?  A.  Thinking of my properties, no."); *see also* Vol. VI, Tr. 93:10-16 (Moeder) ("You're talking about paying $400 to see something versus comps that are hotels or other land uses or racetracks.  That is a completely different market…. It's not comparable.").

34

133.     Individually, and collectively, Mr. DiFederico's Las Vegas sales fail to inform the fair market value of the Groom Mine.

### DiFederico Sale 1

134.     Mr. DiFederico's Sale 1 on Tropicana Avenue is not probative of the fair market value of the Groom Mine because the properties are not remotely comparable.  Vol. VI, Tr. 111:4-13 (Weissenborn).  Mr. DiFederico's Sale 1 is located just east of the Las Vegas Strip and adjacent to McCarran Airport. Vol. V, Tr. 73:23-74:3 (DiFederico); Pl. Ex. 474 (aerial view).  It is behind the MGM Grand Hotel, the largest hotel in the United States, in the resort corridor of the Las Vegas Strip.  Vol. V, Tr. 187:2-5 (DiFederico); Pl. Ex. 470 (marketing material).  The MGM has enough rooms to accommodate every single resident of Lincoln County.  Vol. V, Tr. 187:6-10 (DiFederico).  Mr. DiFederico's Sale 1 was even considered as a possible site for the new NFL stadium.  Vol. V, Tr. 188:11-13 (DiFederico).  The University of Nevada Las Vegas ultimately purchased Mr. DiFederico's Sale 1 for $50 million, Vol. V, Tr. 74:8-9 (DiFederico), the same value that Mr. DiFederico ascribes to the Groom Mine.

135.     Commercial properties with the greatest exposure tend to sell for higher unit prices.  Vol. V, Tr. 210:21-211:2 (DiFederico); *see also* Vol. VI, Tr. 110:17-111:3 (Weissenborn) ("Well, for a commercial property, traffic count is desirable.  It provides a marketing window for a business.  And if you have 100,000 people per day traveling past a commercial property, that's that much less marketing money you have to spend on a property.").  Mr. DiFederico's Sale 1 fronts Tropicana Avenue, one of Las Vegas's "major thoroughfares" with close to 100,000 vehicles per day.  Vol. V, Tr. 85:12-17, 186:22-23 (DiFederico).  By comparison, no vehicles drive within miles of the Groom Mine.  *See* Vol. VI, Tr. 171:12-24 (Neville) (Groom Mine is 11 miles beyond the NTTR security checkpoint).

136.     No buyer would view Mr. DiFederico's Sale 1 as comparable to the Groom Mine because of these locational differences. Vol. VI, Tr. 111:4-13 (Weissenborn) ("Q. Would a potential buyer view sale 1 as comparable to the Groom Mine? A. Sale 1 is located on Tropicana Boulevard.  It is an eight-lane highway a half a mile from the Las Vegas Strip just north of McCarran Airport. . . . And Mr. DiFederico is comparing that property to an inholding . . . within

the Air Force field 29 miles from a major highway.  They are not remotely comparable in location.") (emphasis added).  Nor would a buyer with $50 million to spend view the Groom Mine as a substitute for Mr. DiFederico's Sale 1. Vol. VI, Tr. 112:1-5 (Weissenborn).  Even Mr. DiFederico himself testified that his Sale 1 is "substantially better" than the Groom Mine.  Vol. V, Tr. 85:2-11 (DiFederico); *Id.*, Tr. 81:25-82:4 ("Well, first, I think it was obvious it was a better location.").

### DiFederico Sale 2

137.    Mr. DiFederico's Sale 2 is also not comparable to the Groom Mine. Vol. VI, Tr. 113:23-114:1 (Weissenborn).  Like his Sale 1, Mr. DiFederico's Sale 2 has a superior location in the Las Vegas metropolitan area.  *Id.*  His Sale 2 has frontage on Boulder Highway with access to I-515 within a half mile.  Vol. V, Tr. 189:20-190:1 (DiFederico).  The property is within a gaming overlay that has hotel casinos.  *Id.*, Tr. 90:25-91:9.

138.    Sale 2 was developed into a school and apartments.  Vol. V, Tr. 87:1-9 (DiFederico); Pl. Ex. 464 (photos).  Prior to the sale, the buyer of Sale 2 intended construction of 600 apartment units.  Vol. V, Tr. 189:10-12 (DiFederico).  It thus does not share the same highest and best use as Mr. DiFederico's proposed highest and best use of the Groom Mine, and he admitted as much at trial.  *Id.*, Tr. 95:14-25 ("Because if - - if this was a hot area, then this location had a gaming overlay . . . . So it had that potential, but because of that location on Boulder Highway, it doesn't have that demand. . . .").  A potential buyer would not develop a 600-unit apartment complex on the Groom Mine.  Vol VI, Tr. 113:8-14 (Weissenborn).  No buyer would view the Groom Mine as a substitute for Mr. DiFederico's Sale 2.  *Id.*, Tr. 114:6-8.

139.    Mr. DiFederico testified that smaller properties tend to sell for higher per acre values.  Vol. V, Tr. 92:13-18.  His Sale 2 is a quarter the size of the Groom Mine, *Id.*, and it sold for $4,195,000.  *Id.*, Tr. 88:12-14.  On its face, Mr. DiFederico's Sale 2 does not support a $50 million valuation of the Groom Mine.  In response to this critique, Mr. DiFederico testified that that was "ridiculous" because "[y]ou're comparing apples and oranges. . . . They're not the same size.  There's [sic] so many differences. . . ."  Vol. V, Tr. 89:9-22.  Mr. DiFederico is right— there are so many differences between his Sale 2 and the Groom Mine that the price paid for

Sale 2 is not indicative of the fair market value of the Groom Mine.

### DiFederico Sale 3

140.    As with his other sales, Mr. DiFederico's Sale 3 is not comparable to the Groom Mine because of its location in the Las Vegas Metro, a 15-minute drive to the Strip.  *See* Vol. VI, Tr. 114:21-115:1 (Weissenborn); Vol. V, Tr. 192:16-19 (DiFederico).  Mr. DiFederico's Sale 3 has excellent visibility from I-15, the "lifeblood" of Las Vegas.  Vol. V, Tr. 192:2-11 (DiFederico).  I-15 is the "primary artery connecting Los Angeles and Las Vegas," and this traffic passes by Mr. DiFederico's Sale 3.  Vol. VI, Tr. 114:21-24 (Weissenborn); Vol. V, Tr. 192:2-11 (DiFederico).  A buyer would not view the Groom Mine as a substitute for Mr. DiFederico's Sale 3 because of "the location that is influenced by Las Vegas, the municipal utilities that are available, the freeway interchange, and the visibility to about 50,000 vehicles per day."  Vol. VI, Tr. 115:15-22 (Weissenborn).  DiFederico's Sale 3 was developed into Speed Vegas, where visitors can pay several hundred dollars to drive a Lamborghini or Ferrari around a racetrack.  Vol. V, Tr. 191:11-15 (DiFederico).  The property was zoned H-2 at its sale date; the H-2 zoning permits a variety of residential, office, and commercial uses.  *Id.*, Tr. 193:1-5.

141.    Mr. DiFederico's Sale 3 is not comparable to the Groom Mine and cannot be used to support Mr. DiFederico's $50 million valuation.

### DiFederico Sale 4

142.    Similarly, Mr. DiFederico's Sale 4 is not comparable to the Groom Mine because of location.  Vol. VI, Tr. 116:23-117:4 (Weissenborn) ("Again, Sale 4 is located in metropolitan Las Vegas with all municipal infrastructure and it's ready for development.").  His Sale 4 is located in the rapidly growing Galleria area, just west of Boulder Highway and less than a half mile to the on/off ramps to US 95/I-515.  Vol. V, Tr. 101:18-22, 193:24-194:4 (DiFederico); Vol. VI, Tr. 116:13-22 (Weissenborn).  Near the Galleria at Sunset Mall, the area around Mr. DiFederico's Sale 4 has numerous retail stores and restaurants, with probably "the most retail in the whole city of Las Vegas."  Vol. V, Tr. 194:8-11 (DiFederico).  There is also a hospital nearby and a subdivision development to the south.  Vol. VI, Tr. 116:16-20 (Weissenborn).  Mr. DiFederico's Sale 4 was developed into Cowabunga Water Park.  Vol. V, Tr. 102:1-5

(DiFederico); Pl. Ex. 466 (photos).

143.    At 22.68 acres, his Sale 4 is roughly a quarter the size of the Groom Mine patented acres, Vol. V, Tr. 193:9-17 (DiFederico), and it sold for approximately $4.6 million. *Id.*, Tr. 193:18-19.  Mr. DiFederico's Sale 4 does not support his opinion of value of the Groom Mine.

**DiFederico Sale 5**

144.    Finally, Mr. DiFederico's Sale 5 is not comparable to the Groom Mine, and no buyer would view it as a substitute.  Vol. VI, Tr. 118:17-119:3 (Weissenborn) ("Again, its location.  It is just west of the Petro Truck Stop.  There's some other retail users there.  There's a large restaurant.  And what doesn't really show in this photograph, but the area has since been developed with a number of large distribution facilities, large industrial buildings, in addition to the [Las Vegas Speedway].");  Pl. Ex. 467 (photos).  It is located near the Las Vegas Motor Speedway, which hosts NASCAR races and seats more than 100,000 people.  Vol. V, Tr. 109:24-110:9 (DiFederico).  It sold for approximately $7.5 million in July 2007, at the "top of the market."  Vol. V, Tr. 110:14-18, 111:10-11 (DiFederico).  The buyer owned adjacent land and intended to construct a casino on the site.  *Id.*, Tr. 197:1-3.

145.    Because of the significant market differences between rural Lincoln County and metropolitan Las Vegas, not one of Mr. DiFederico's sales would be viewed as a substitute for the Groom Mine by a potential buyer.  Vol. VI, Tr. 119:17-20 (Weissenborn).  Since none of Mr. DiFederico's sales are comparable, no number or magnitude of adjustments will provide a reliable indication of the market value of the Groom Mine.  Vol. VI, Tr. 111:14-21 (Weissenborn) ("I don't think whatever adjustment you apply to [Sale 1], it doesn't result in a reliable indication of value."); *see also* Vol. VI, Tr. 114:2-5, 116:23-117:4 (Weissenborn).

146.    Landowners' failure to establish that large-scale tourism was the highest and best use of the Groom Mine, as well as Mr. DiFederico's failure to support his valuation with comparable sales and supported adjustments, mean that the Groom Mine must be valued based on its actual, existing use at the Date of Value: as a rural recreational retreat.  *See* Commission Instruction No. 13 ("The highest and best use is not necessarily what the owner was using the

property for at the time of the taking.  However, in absence of proof to the contrary, the current use is presumed to be the best use.").  The United States' expert appraiser, Warren Neville, so valued the Groom Mine.

### B.    Mr. Neville Concluded That The Groom Mine Had A Value Of $254,000 At The Date Of Taking As A Rural Recreational Retreat

147.    Mr. Neville identified five comparable rural recreation properties in Lincoln and White Pine counties.  These sales all were arms-length transactions.  *Id.*, Tr. 216:17-21, 218:18-19.  They ranged from 25 to 195 acres in size, comparable to the Groom Mine's 87.49 patented acres.  Pl. Exs. 325, 326 (summarizing sales).

148.    Market participants buy and sell rural recreational properties on a price per acre basis.  Vol. VI, Tr. 216:4-13 (Neville).  Mr. Neville's five comparable sales ranged from $1,668 to $10,000/acre, as shown in Plaintiff Exhibit 324, imaged below:

| Sale No. | Price / Acre | Overall Comparison |
|----------|--------------|--------------------|
| S-1 | $10,000 | Very superior |
| S-4 | 3,237 | Superior |
| S-2 | 2,953 | Superior |
| Subject | - | - |
| S-3 | 2,303 | Inferior |
| S-5 | 1,668 | Inferior |

149.    Mr. Neville concluded that the Groom Mine should sell for less than the Sale 1 (S-1), Sale 2 (S-2), and Sale 4 (S-4) properties.  He concluded these properties had superior attributes to the Groom Mine when they sold including: superior improvements (Sales 1 and 4)[16]; pinyon pines and junipers (Sales 1 and 4); less acreage (Sales 1 and 2)[17]; better location (Sale 2);

---

[16]    Sale 1 had a "very good quality" modular home, solar electric system, 3-car garage, and fencing.  Vol. VI, Tr. 220:20-221:3 and 221:16-21 (Neville).  Sale 4 had a remodeled home and superior solar electric system.  *Id.*, Tr. 229:7-230:24.

[17]    The appraisers on both sides agree that smaller-acreage properties will fetch a higher unit price than comparable larger properties.  Vol. VI, Tr. 222:7-9 (Neville) ("So, typically, smaller properties tend to sell for a higher unit value.  So I considered that to be a superior feature."); Vol. V, Tr. 82:5-12 (DiFederico) (explaining why smaller properties sell at a higher unit value) ("So our parcel is twice as large as this.  This one is smaller.  It has more buyers that can afford it, more competition, pushes the price up.  So that one you adjust down for size because it's smaller.").

proximity to public recreation and hunting land (Sales 1 and 4); and superior water rights (Sale 4).  Vol. VI, Tr. 219:5-222:15 (Sale 1), 222:16-224:21 (Sale 2), 227:17-230:24 (Sale 4).  Mr. Neville separately determined that the Groom Mine should sell for more than the Sale 3 (S-3) and Sale 5 (S-5) properties.  *Id.*, Tr. 235:14-20.

150.    Mr. Neville opined that the Groom Mine would sell for between $2,303/acre and $2,953/acre.  *Id.*, Tr. 235:5-20.  His final value conclusion was $2,900/acre.  *Id.*, Tr. 235:21-23.

151.    Mr. Neville applied his $2,900 price/acre to the patented 87.49 acres only.  He did not multiply this price by the acreage of the Groom Mine's unpatented claims because the unpatented claims could be used for mining-related purposes only; they therefore did not contribute to the overall value of the property as a recreational retreat.[18]  Vol. VI, Tr. 166:23-167:13 (Neville).[19]

152.    This resulted in a total market value of the Groom Mine, excluding the mineral interest, of $254,000 at the Date of Value ($2,900/acre multiplied by 87.49 patented acres).

### C.    Landowners Did Not Present Other Rural Recreation Sales Or Challenge Mr. Neville's Sales-Comparison Analysis

153.    Landowners disputed Mr. Neville's highest and best use conclusion but otherwise did not seriously challenge his valuation.[20]  For example, Landowners did not present any alternative sales of properties having a highest and best use of rural recreation.

154.    Landowners retained Keith Harper to review Mr. Neville's appraisal.  Mr. Harper testified that Mr. Neville was qualified to review desert land like the Groom Mine and that Mr.

---

[18]   Mr. Neville did not testify to the value of the mineral estate because the value of the mineral estate is outside the scope of this proceeding.  Commission Instruction No. 20.

[19]   Mr. DiFederico similarly multiplied his per-acre price by the patented 87.49 acres only.  Vol. V, Tr. 122:24-123:3 (DiFederico).  Mr. DiFederico also testified that he searched for properties similar in size to the patented claims (87.49 acres), not properties similar in size to the Groom Mine's total acreage including the unpatented claims (371.79 acres).  *Id.*, Tr. 182:6-18 (explaining search for properties between 10-150 acres).

[20]   On cross-examination, counsel suggested that two of Mr. Neville's comparable properties may have sold under duress.  Vol. VII, Tr. 49:5-51:6.  Mr. Neville explained that he personally verified the circumstances of each sale and confirmed that the sales were market, arm's length transactions.  *Id.*, Tr. 60:21-61:16.

Neville's appraisal satisfied professional standards (except with respect to the determination of highest and best use).  Vol. VII, Tr. 146:5-8; 142:4-10 (Harper) ("Q. [Commissioner Pro]:  Just assuming – assuming he was correct, that it was … rural recreational residential, was the approach to the comparable analysis taken by Mr. Neville within the normal standards of certified appraisers?  A.  Yes.  I believe that his analysis meets the standards of USPAP and the Yellow Book outside of the highest and best use.").

155.    Mr. Harper offered no criticism of Mr. Neville's selection of rural-recreation sales or of Mr. Neville's sales-comparison analysis generally.  In response to questioning from Commissioner Pro, Mr. Harper testified only that he did not agree with "some" of Mr. Neville's rankings of his sales.  *Id.*, Tr. 142:22-143:9.

156.    But Mr. Harper did not state which sales he would have ranked differently or how a different ranking would have impacted value.  Mr. Harper also admitted that he did not visit all of Mr. Neville's comparable sales.  *Id.*, Tr. 148:8-12.

157.    The Commission has been instructed that "in situations where there are few instances of comparable sales in recent time, the expert is only expected to make a reasonable estimate of the market value of the subject property after examining all relevant facts."  Commission Instruction No 14.

### D.    Just Compensation

158.    The Commission finds Mr. Neville correctly concluded that the Property's highest and best use on the date of value was rural recreational.  The Commission also finds that Mr. Neville's appraisal complied with applicable industry standards, and that he is qualified to render an expert opinion on the fair market value of the Property.  However, the Commission finds that Mr. Neville failed to give sufficient consideration to the unique one-of-a-kind nature of the Groom Mine.

159.    The Commission concludes just compensation for the taking is $12,500 per acre or $1.100,000 (87.49 x $12,500 = $1,093,625, rounded to $1,100,000) for the following reasons:

In enacting Public Law 98-485 ("1984 Withdrawal") Congress authorized the withdrawal of 89,600 acres of federal land in Lincoln County, Nevada from public use for military purposes.

41

Stipulated Fact No 8. The withdrawal was explicitly made "[s]ubject to valid existing rights," including the patented and unpatented claims comprising Groom Mine. *Id.* The legislative history confirms the Groom Mine was not within the scope of the 1984 Withdrawal. *Id.*

160.    Prior to the 1984 Withdrawal, the Federal land surrounding the Property was open to the public. Stipulated Fact No 9. After the 1984 Withdrawal, the Property was a private inholding until the taking in 2015. *Id.*

161.    After the taking, the government restricted public access, but the Landowners had access rights which the Air Force agreed allowed Landowners, their employees and business visitors to access the Groom Mine. Stipulated Fact No. 12. In 1984, the Air Force gave written assurances to Landowners and Congressman Harry Reid and Congresswoman Barbara Vucanovich that "[t]he Sheahan's will continue to have access to Groom Mine. Their legal rights to own, operate and sell the mine are not affected by the proposed land withdrawal" and that the Air Force "would have no authority to deny access to any employees or business visitors of the Sheahans." The Air Force also provided written assurances that it "would have no authority to deny access to any employees or business visitors of the Sheahans", and "could only terminate the Sheahans' rights to Groom Mine by initiating condemnation proceedings or purchasing the property. At this time the Air Force has no intention of taking such action."

162.    For valuation purposes in this case the parties stipulated that a buyer of the property could be granted permission to enter NTTR to access the Property for themselves, their employees and business visitors, and that the Air Force would not prohibit constrain or interfere with access to the Property beyond those basic restrictions applicable to anyone seeking entry to NTTR. Stipulated Fact No. 12.

163.    Terry Ochal was the NTTR Liaison Officer responsible for facilitating the Landowners access to Groom Mine, and was disclosed as the individual with knowledge of Landowners and their guests access. Col. Zuhlke testified at trial that Mr. Ochal was the individual who would have the most knowledge about access to Groom Mine on the date of value. Mr. Ochal testified he had worked with the Sheahans from 2007 to 2015; his job was to facilitate smooth access; the Sheahans had the right of access to their property for themselves,

their employees and business visitors; as a courtesy the Landowners provided the Air Force with a list of visiting individuals and advanced notice of visits, but the Air Force was not permitted to deny access to the Landowners, their family, their employees or business visitors.  Mr. Ochal testified this courtesy was voluntary.

164.   As a result of the 1984 Withdrawal, which restricted public access but was subject to all Landowners existing legal rights to the Property, including access to the Groom Mine, Landowners owned the only privately held property with a clear and unobstructed view of Area 51.

165.   The Landowners legal rights to their fee simple interest in the 87.49 acres comprising the patented claims were fully intact on the date of taking.

166.   The Property is unique and one-of-a-kind because of its view of Area 51 and its historic use as a family owned mining operation.  The Commission finds the uniqueness of the Property establishes it would command a premium in the real estate market above Mr. Neville' Sale No. 1 of $10,000 per acre.  Just compensation for the taking is $1,100,000 (87.49 x $12,500 = $1,093,625, rounded to $1,100,000).

## IV.   CONCLUSION

For the reasons explained in this report, it is the Commission's deliberate judgment that just compensation for the taking is $1,100,000.

Dated this 29th day of May, 2020

LAND COMMISSION

/s/_____
Hon. Michael L. Douglas (Ret.), Commissioner

/s/_____
Hon. Peggy A. Leen (Ret.), Chair

/s/_____
Hon. Philip M. Pro, Commissioner